**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In Re:

DAREN C. DALY,                                    Case No: 22-15694-SMG

      Debtor.                                  Chapter 11 (Sub V)

_____

PATRICK DALY, ELIZABETH DALY,
ALL PAVING & SEALCOATING, LLC, and
PATRICK DALY AND ELIZABETH DALY
AS THE MAJORITY SHAREHOLDERS
OF ALL PAVING, INC.,
                                                  ADV. No: 22-01391-SMG

      Plaintiffs

vs.

DAREN C. DALY,

      Defendant.

_____/

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT DEBTOR'S MOTION
IN LIMINE TO EXCLUDE TESTIMONY OF FRANK HARLEY NORWITCH, JEFF
WILE, JOEY FRIEDMAN, AND LOUIS T.M. CONTI (ECF NO. 38)**

      Plaintiffs PATRICK DALY ("PATRICK"), ELIZABETH DALY ("ELIZABETH"), ALL

PAVING & SEALCOATING, LLC ("ALL PAVING LLC"), and PATRICK  and ELIZABETH as

the Majority Shareholders of ALL PAVING, INC. (collectively, "Plaintiffs") respectfully submit

their Response in Opposition to Debtor's Motion in Limine to Exclude Testimony of Frank Harley

Norwitch, Jeff Wile, Joey Friedman, and Louis T.M. Conti filed on January 6, 2023 as ECF No. 38

(the "Motion"), stating as follows:

      **I.**      **Background and Facts:**

      1.      PATRICK and ELIZABETH were married in 1986 in their home country of Ireland.

In 1988, they moved their family to Florida and have become United States Citizens.  PATRICK and

ELIZABETH have resided in the same home in Coral Springs since 1999, and have three adult children, including Debtor Defendant DAREN C. DALY ("DAREN").

2.      PATRICK's experience in the paving business dates back to 1988.  During 1993 - 2011, PATRICK worked at Atlantic Southern Paving in Broward County and left that business in 2012 to start his own paving business, ALL PAVING LLC.  At the time ALL PAVING LLC began operations, DAREN was in law school and was not involved in the paving business.  DAREN had been a place kicker in college, and his plan in 2012 was to start a sports agency with his law school friend, Joseph D. Fahrendorf, Esq.  ("Fahrendorf").   Becoming a member of The Florida Bar was a necessary step for DAREN to open a sports agency with Fahrendorf.

3.      As of August 2013, ELIZABETH held a 51% ownership interest in ALL PAVING LLC, and PATRICK held a 34% ownership interest in ALL PAVING LLC.  The remaining 15% was owned by Robert Holland who focused on marketing.  In January 2019, Robert Holland sold his 15% ownership in ALL PAVING LLC, and at present ELIZABETH owns 51% of ALL PAVING LLC, and PATRICK owns 49% of ALL PAVING LLC.  Ownership of ALL PAVING LLC is not an issue in this case — DAREN does not claim he ever had an ownership interest in ALL PAVING LLC.

4.      During the summer of 2013, DAREN held a part time position at ALL PAVING LLC, assisting his parents in marketing the paving business.  At that time, DAREN's law school friend Fahrendorf was also employed by ALL PAVING LLC on a part time basis, and worked with DAREN on marketing for ALL PAVING LLC.  Fahrendorf graduated Magna Cum Laude from Nova Southeastern University - Shepard Broad Law Center, and has been a licensed attorney in Florida since 2012.  While Fahrendorf was employed by ALL PAVING LLC, he did some legal work for the Daly family and their entities.

5.      On September 19, 2013, Fahrendorf filed Articles of Incorporation for ALL PAVING INC.  Fahrendorf testified in the State Court Case that his understanding was that "Pat and Lily" (i.e.

PATRICK and ELIZABETH) were the owners of ALL PAVING INC.  (Testimony of Joseph Fahrendorf before the Honorable Mily Rodriguez-Powell, October 12, 2017, page 70, lines 18-22 of transcript.)  Fahrendorf testified as follows on page 70, line 18-22, and page 71, lines 4-18 of said transcript:

> Q. Did you have an understanding as to the ownership of All Paving, Inc.?
> A. Yes.
> Q. What is that understanding?
> A. My understanding was Pat and Lily.
> ...
> Q. Did you have any discussions with the Daly family regarding who owned the company, the paving company?
> A. Yes.
> Q. What discussions did you have?
> A. I had discussions with Daren and his parents and pretty much it was my understanding that Pat and Lily owned it. It was that Daren was assisting us and helping start our sports agency and law firm and that he was pretty much assisting me and helping me along with it.
>   My understanding was that Pat and Lily were the owners of it and Daren had an option at some point, but at that point, I knew that it was Pat and Lily's company.

6.      At the time ALL PAVING INC.'s Articles of Incorporation were filed on September 19, 2013, DAREN and Fahrendorf did not intend to remain involved with ALL PAVING or in the paving business.  Instead, they intended to start a sports agency / law firm after DAREN was admitted to The Florida Bar.  On September 23, 2013, the Florida Board of Bar Examiners released the results of the July 2013 Florida Bar Examination.  DAREN did not pass.

7.      Thereafter, at the end of September 2013, DAREN found full time employment as an assistant coach with the Miami Dolphins.  After his employment ended with the Miami Dolphins in early 2014, DAREN attempted to get hired by another National Football League team and submitted his resume to NFL teams including the Denver Broncos.  DAREN was not hired by another NFL team, and after performing more part time marketing work for ALL PAVING LLC in

early 2014, he became a full time W-2 employee for his parents' company, ALL PAVING LLC, as of April 2014. DAREN remained on the ALL PAVING LLC payroll until he was moved over to ALL PAVING INC.'s payroll in February 2016.

8.      While DAREN was a part time and later a full time employee of ALL PAVING LLC, his focus was on marketing. DAREN recommended the purchase of the AllPaving.com Domain Name to shorten the website and email addresses from AllPavingAndSealcoating.com to AllPaving.com. DAREN and his older brother Keith Daly (who is a Captain - paramedic / firefighter with the Ft. Lauderdale Fire Department and assists his parents with their paving business) advanced a total of $4,600.00 to purchase the AllPaving.com Domain Name in 2014 from a company called Promosample, pursuant to a written Domain Name Purchase Agreement. (Keith testified in his deposition that he laid out $3,000.00 toward the AllPaving.com purchase.) ALL PAVING LLC's 2014 accounting records including cancelled checks payable to DAREN reflect that DAREN was fully reimbursed by ALL PAVING LLC for amounts paid for the purchase of the AllPaving.com Domain Name. Said cancelled checks include ALL PAVING LLC Check No. 1504 dated March 5, 2014 payable to DAREN in the amount of $2,200. The signature on said check is not PATRICK's, and DAREN admitted in his Answers to Interrogatories dated January 11, 2019 in the State Court Case that said check $2,200 check to DAREN was "signed by Patrick or **Daren on behalf of Patrick**". (Check No. 1504 purports to be signed by PATRICK, and **<u>DAREN forged his father's signature</u>**). In said Answers to Interrogatories, DAREN admitted that all other handwriting on Check No. 1504 is his (including his name as payee, the amount, the date, and the memo which says "website"). Said check and several other checks drawn on ALL PAVING LLC's bank account reflect that <u>DAREN was completely reimbursed by ALL PAVING LLC for the purchase of the AllPaving.com Domain Name</u>. The fact that none of these reimbursement checks paid to DAREN in 2014 were reported by DAREN as income on his 2014 tax return, further shows these checks

reimbursed DAREN for funds laid out for the purchase of the AllPaving.com Domain Name — otherwise they would have been reported as income. Keith Daly does not claim any ownership of the AllPaving.com Domain Name even though he also laid out funds toward the purchase of the Domain Name and testified in his deposition that the Domain Name was purchased for their parents' company, ALL PAVING LLC.

9.     The AllPaving.com Domain Name was purchased using a written Domain Name Purchase Agreement. The Domain Name Purchase Agreement as it existed in February 2014 states that the Purchaser Company is "All Paving & Sealcoating" which refers to ALL PAVING LLC (**as admitted by DAREN**).  After 3 years of ALL PAVING LLC using the AllPaving.com Domain Name for its advertising, website and email, DAREN contacted GoDaddy in March 2017 and fraudulently asserted ownership by sending said Registrar an altered version of the Domain Name Purchase Agreement: DAREN used his computer to change the name of the Purchaser Company, as originally stated in said Agreement in 2014 when the Domain Name was purchased, from "All Paving & Sealcoating" (which refers to ALL PAVING LLC) to "All Paving Inc.," and DAREN sent the fraudulently altered Domain Name Purchase Agreement to GoDaddy, which prompted GoDaddy to transfer the AllPaving.com Domain Name to an account DAREN now exclusively controls.

10.     Although ALL PAVING INC. was incorporated in 2013, it had not begun operations as of late summer 2015.  PATRICK and ELIZABETH then had discussions regarding the utilization of ALL PAVING INC. to expand the paving business with DAREN being given a 15% interest in ALL PAVING INC., and with PATRICK and ELIZABETH having a combined 85% ownership of ALL PAVING INC., with the understanding that ALL PAVING INC. and ALL PAVING LLC will have equal rights to, and ownership of, the "ALL PAVING" name and the AllPaving.com Domain Name and website.  This arrangement would allow Robert Holland to continue to be the marketer for ALL PAVING LLC (Mr. Holland had a 15% ownership interest in ALL PAVING LLC), and

DAREN was to be the marketer for ALL PAVING INC. (in exchange for a 15% interest in ALL PAVING INC. to be given to him), with PATRICK and ELIZABETH owning a majority of both ALL PAVING entities.  On September 18, 2015, ALL PAVING INC. opened a bank account at BankUnited.  DAREN drove ELIZABETH to BankUnited that day, and the two of them arrived together, left together, and were together at BankUnited the entire time.  In connection with ALL PAVING INC.'s opening of its bank account at BankUnited, ELIZABETH, DAREN and PATRICK, as directors and officers of ALL PAVING INC. (with ELIZABETH as President, and DAREN and PATRICK as Vice Presidents) executed a Corporate Resolution of ALL PAVING INC. dated September 18, 2015. Additionally, a Beneficial Ownership Certification was executed at the same time and delivered to the bank under penalties of perjury stating that ELIZABETH is the 75% owner of ALL PAVING INC., PATRICK is the 12.5% owner of ALL PAVING INC., and DAREN is the 12.5% owner of ALL PAVING INC.  ELIZABETH signed the Beneficial Ownership Certification as President of ALL PAVING INC. in the presence of and with the agreement of DAREN.  DAREN had made the arrangements with BankUnited to open the ALL PAVING INC. account on September 18, 2015, and provided the Bank with the aforementioned ownership percentages that were typed into the Beneficial Ownership Certification.

11.      Two days later, on September 20, 2015, **DAREN in his handwriting** filled out all information on a credit application which was submitted to CAT Financial, which included the representation that ELIZABETH is the 75% owner of ALL PAVING INC. and PATRICK is the 12.5% owner of ALL PAVING INC.  These ownership percentages exactly match the ownership percentages stated in the Beneficial Ownership Certification jointly submitted to BankUnited. ELIZABETH and PATRICK signed said credit application filled out by DAREN below language setting forth their representation that the information is true, correct and complete.  Similarly, several additional credit applications **submitted by DAREN** to vendors during the period of September

2015 through October 2016 state that ELIZABETH is the "owner" of ALL PAVING INC., **including several of such credit applications which bear DAREN's forgeries of ELIZABETH's and PATRICK's signatures.**

12.    For example, on October 29, 2015, DAREN transmitted finance documents including a Komatsu Financial Security Agreement with an effective date of November 3, 2015 signed by ALL PAVING INC. by "ELIZABETH DALY Owner" and "PATRICK DALY President".   However, ELIZABETH and PATRICK did not sign the Komatsu Financial Security Agreement nor did they handwrite the words "owner" and "president" — <u>DAREN did</u>, and DAREN's forgery of his mother's signature with the designation she is the owner of ALL PAVING INC. is DAREN's admission of same.  In fact, during DAREN's September 15, 2020 testimony in the State Court Case, DAREN admitted to signing ELIZABETH's name and printing the title "Owner" next to his forgery of her signature, and DAREN also admitted to forging PATRICK's name and printing the title "President" on the same agreement with said finance company.

13.    DAREN's admitted forgeries of his parents' signatures in 2015, and his admission that he handwrote the title "Owner" next to his forgery of ELIZABETH's signature, constitutes DAREN's admission that ELIZABETH is the Owner of ALL PAVING INC., and proves the falsity of Defendants' assertion in this case that ELIZABETH was never an owner of ALL PAVING INC. **Said forgeries by DAREN constitute DAREN's further admissions regarding ownership of ALL PAVING INC.  Said bank documents and credit applications, as well as the several other documents to be introduced at trial, establish that PATRICK and ELIZABETH are the majority owners of ALL PAVING INC., and DAREN is estopped from asserting otherwise.**

14.    On February 14, 2017, **<u>DAREN forged PATRICK's signature on a February 14, 2017 Credit Application submitted to Wells Fargo which falsely states that DAREN owns 50% of ALL PAVING INC. and PATRICK owns 50% of ALL PAVING, INC.</u>**  DAREN has never

owned more than a minority interest in ALL PAVING INC., and DAREN is estopped, by his signature on said February 14, 2017 Credit Application which he submitted to Wells Fargo, from asserting he owns a majority interest in ALL PAVING INC.

15.    On June 29, 2017, Plaintiffs PATRICK and ELIZABETH signed corporate actions as shareholders holding a majority interest in ALL PAVING INC. and as directors, which removed and terminated DAREN as an officer, director, employee, agent, independent contractor, or other representative of ALL PAVING INC., but DAREN has not abided by same.  All parties to this litigation also attended a Shareholders' Meeting on July 11, 2017 and thereafter a pre-suit mediation attended by Defendants' first attorney to represent them in this corporate dispute (Mitchell Adler, Esq.) but a resolution was not reached.  Thereafter, Plaintiffs filed an Amendment with the Florida Department of State on Sunbiz reflecting PATRICK and ELIZABETH as sole officers and directors of ALL PAVING INC. in accordance with the June 29, 2017 Corporate Actions.  However, DAREN thereafter filed documents on Sunbiz.org (the Florida Department of State website) purporting to restore himself as sole officer and director. Plaintiffs filed the State Court lawsuit on August 4, 2017.

16.    Twenty-three (23) months after the State Court Case lawsuit was filed, DAREN and his fiancé Jamie Schindler fabricated and backdated ALL PAVING INC. stock certificates and a stock transfer ledger after testifying in 2018 in the State Court Case that ALL PAVING INC. never issued stock certificates. DAREN's issuance of phony stock certificates and filing false and fraudulent corporate reports with the Florida Department of State are part and parcel of his fraudulent conveyance scheme and actual fraud in purporting to establish a 100% ownership of ALL PAVING INC., when in truth he is only a 12.5% owner.

17.    In this bankruptcy case and the adversary proceeding, Plaintiffs have made a claim against the Debtor Defendant based on Plaintiffs' loss of their combined 87.5% interest in ALL PAVING INC., and seek to establish that one or more exceptions to discharge apply.

18.     In support of Plaintiffs' claim and the Amended Adversary Complaint in the adversary proceeding, Plaintiffs have hired four (4) expert witness, all of which Defendant seeks to exclude from testifying in his Motion.  As discussed below, all four (4) expert witnesses hired by Plaintiffs are qualified to testify, have used and applied reliable methodology, and their testimony will be helpful to the trier of fact.  Federal Rule of Evidence 702.  Therefore, Defendant's Motion should be denied in its entirety.

**II.    Expert witness Frank Harley Norwitch, Forensic Document Examiner:**

19.     As discussed above, there are several signatures of PATRICK and ELIZABETH which DAREN forged.  These signatures operate as DAREN's admissions that his mother ELIZABETH owns 75% of ALL PAVING INC. and that his father PATRICK owns 12.5% of ALL PAVING INC., since they were actually signed by DAREN and not his parents.  Many of these forgeries have already been admitted to by DAREN, and estop him from asserting that his parents are not the majority owners of ALL PAVING INC.

20.     The expert Report of Frank Harley Norwitch ("Norwitch") is the first attachment to the Motion (hereinafter, the "Norwitch Report").  Norwitch is a well known forensic document examiner and has testified as an expert witness in numerous court proceedings.  Norwitch's Curriculum Vitae is attached to the Norwitch Report as Appendix A-1.

21.     The Norwitch Report states:

Norwitch Document Laboratory conducts forensic document examinations and comparisons using widely accepted protocols and instrumentation employed at federal, state, and local government forensic document examination facilities of the United States. F. Harley Norwitch has trained at these facilities, to include The Federal Bureau of Investigation , the United States Secret Service, the United States Postal Service, the Florida Department of Law Enforcement and the Miami-Dade County Crime Laboratory.
...
Handwriting and signatures examination and comparison procedures consist of examination of standard (known) material for consistency and normal variation, and then a side by side comparison of individual writing movements and inherent

characteristics found in the questioned material with comparable writing movements found in the standard material, such as, but not limited to: form, height ratios, slant, proportions, skill level, movement, speed, pressure, and line quality, where possible and/or necessary.

Examination, comparisons, and archival procedures may employ, but are not limited to, stereo microscopy, video-spectral comparison and electro-static instrumentation, transparency comparison, computer scanning, and photo microscopy (photomicrographs).

22.     The foregoing reflects that Norwitch is qualified in the field of forensic document examination, uses methodology that is sufficiently reliable, and his testimony will be helpful to the trier of fact in view of the above-discussed forgeries of the Debtor Defendant. Debtor's Motion does not argue that Norwitch is not qualified to render expert opinion testimony as a questioned document examiner and a handwriting analyst. Furthermore, the 11th Circuit Court of Appeals has recognized handwriting analysis and forensic document examination as an area of expert opinion testimony admissible under *Daubert.  United States v. Paul,* 175 F.3d 906, 909-10 (11th Cir. 1999) (forensic document examiner opinion testimony properly admitted to match handwriting on extortion note to the defendant).

23.     Debtor only argues that Norwitch's testimony will not be helpful for the trier of fact. Debtor is incorrect.  Norwitch's testimony and the Norwitch Report will assist the trier of fact on deciding the disputed issue of ownership of ALL PAVING, INC., in view of Debtor Defendant's forgeries of his parents signatures on documents reflecting their ownership of ALL PAVING, INC. Norwitch's tesimony and the Norwitch Report will also assist the Court on deciding the issue of the disputed ownership of the AllPaving.com domain name, in view of Debtor Defendant's forgeries of his father (PATRICK's) signatures on checks drawn on ALL PAVING LLC's bank account which reimbursed Debtor Defendant on the purchase of the AllPaving.com domain name, which further shows that Debtor is not the owner of, and has no valid claim to, the AllPaving.com domain name.

24.     Norwitch, in the Norwitch Report, offers the following opinions (conclusions) which

will be helpful for the trier of fact in this case:

> In view of the above findings, it is the opinion of this examiner that the questioned "Elizabeth Daly" signatures on the documents in Items A through E are not genuine. Further, it is the opinion of this examiner that it is very probably that these signatures were written by Daren Daly.
> ...
>
> In view of the above findings, it is the opinion of this examiner that the questioned "Patrick Daly" signatures on the documents in Items F, G, and I were very probably written by Daren Daly. Further, it is probable that Daren Daley also authored the questioned signatures on the checks in Item J(l-4) as well.

25.     As discussed above, many (but not all) of the signatures addressed in the Norwitch Report have already been admitted by Debtor Defendant as being forged by him. Nevertheless, Norwitch should not be stricken as an expert witness and Plaintiffs reserve the right to call him at trial. Therefore, the Motion should be denied as to Norwitch. Federal Rule of Evidence 702.

**III.     Expert witness Jeff Wile, Digital Marketing:**

26.     The second expert witness which Debtor Defendant seeks to exclude is digital marketer, Jeff Wile ("Wile"). The Expert Report of Jeff Wile ("Wile Report") attached to the Motion, states:

> I have many years of experience in digital marketing on the internet, including web development and hosting, and am familiar with the procedures involved in changing the Registrant (owner) of a domain name at GoDaddy. My Curriculum Vitae is attached hereto as Exhibit A. I have not previously testified as an expert witness. I am charging $275.00 per hour for my time.
>
> I have experience and knowledge regarding the procedures for effecting a change of Registrant of a domain name held in a GoDaddy account. In order for a change of Registrant to be approved, one or more emails are sent by GoDaddy to the then current Registrant Email Address for the domain name, and a link within each such email must be clicked to authorize and effect the change of the Registrant (owner) of a domain name.
>
> I have reviewed the materials attached hereto as Exhibit B, marked Tabs 1-8. Based on my review of said materials, it is evident, and my opinion that, the links contained in the two emails from GoDaddy received into PATRICK DALY's email account on March 24, 2017, attached as Tabs 5 and 6, were clicked in order to approve and trigger the transfer of the AllPaving.com Domain Name from Patrick Daly as Registrant, to Daren Daly as Registrant. Anyone with knowledge of the password for PATRICK DALY's email account on March 24, 2017 could have

clicked those links.

The emails from GoDaddy attached as Tabs 7 and 8 reflect that the change of Registrant was completed on March 24, 2017, and that Daren Daly became the Registrant of the AllPaving.com Domain Name on that date as a result of the clicking of the links in the emails received from GoDaddy into PATRICK DALY's email account on March 24, 2017 earlier that day.

27.    Rule 702 states that "[a] witness who is qualified as an expert **by knowledge, skill, experience** training or education **may testify in the form of an opinion** ...." (Emphasis added.) The Wile Report states "I have experience and knowledge regarding the procedures for effecting a change of Registrant of a domain name held in a GoDaddy account. In order for a change of Registrant to be approved, one or more emails are sent by GoDaddy to the then current Registrant Email Address for the domain name, and a link within each such email must be clicked to authorize and effect the change of the Registrant (owner) of a domain name." This reflects that Wile has the requisite "knowledge, skill, experience" in order to testify as an expert. His specialized knowledge of domain name transfer procedures at GoDaddy in connection with his digital marketing business qualifies him as an expert witness. His testimony will be based on sufficient facts and data reflected in Exhibit B of the Wile Report, including the Domain Report for AllPaving.com attached as Tab 1 of Exhibit B, the GoDaddy Domain Information Report for Shopper ID 49951435 attached as Tab 2 of Exhibit B, and the remaining Tabs of Exhibit B including the three emails dated March 24, 2017 attached as Tabs 6, 7 and 8 of Exhibit B.

28.    Tab 1 of Exhibit B of the Wile Report, the DomainTools Domain Report for AllPaving.com, is appropriately entered into evidence as part of the Wile Report, because:

It is common practice for courts to take judicial notice of factual information found on the internet. *O'Tooele v. Northrop Grumman Corp.,* 499 F.3d 1218, 1225 (10th Cir. 2007). Thus, cours have taken judicial notice of facts regarding the registration of a domain, including WHOIS records like those in the Domain Report.

*Instructure, Inc. v. Canvas Technologies, Inc.,* 2022 WL 43829 (D.Utah 2022) (Domain Report issued by DomainTools — such as Tab 1 of Exhibit B of the Wile Report — properly considered

by the Court).  *See also, C.D.S., Inc. v. Zetler,* 298 F. Supp. 3d 727, 747-48 (S.D.N.Y. 2018)

(Domain Report admitted into evidence, and defendant's transfer of domain names supported claims

for conversion and breach of fiduciary against him for which the Court found him liable).

Furthermore, internet marketing expert opinions are appropriately admitted when issues regarding

domain names are involved in a case. *American Cruise Lines, Inc. v. HMS American Queen*

*Steamboat Company LLC,* 2017 WL 3528606 (D.Del. 2017) (report of online advertising expert

witness Peter Kent admitted into evidence despite *Daubert* challenge, because the Court found that

Kent's report, which "provides background on how the Internet and websites operate, on how

companies select and use domain names ... are complicated and not within the bailiwick of a

layperson."); *see also, Novak v. Tucows, Inc.,* 2007 WL 922306 (E.D. N.Y. 2007) (declaration which

"describes Tucows' domain name transfer process, and ... authenticate[d] the exhibits demonstrating

that process" properly admitted into evidence).  Wile's review and analysis of the documents within

Exhibit B attached to the Wile Report led to his opinion, as follows:

> **Based on my review of said materials, it is evident, and my opinion that, the links contained in the two emails from GoDaddy received into PATRICK DALY's email account on March 24, 2017, attached as Tabs 5 and 6, were clicked in order to approve and trigger the transfer of the AllPaving.com Domain Name from Patrick Daly as Registrant, to Daren Daly as Registrant.** Anyone with knowledge of the password for PATRICK DALY's email account on March 24, 2017 could have clicked those links.
> **The emails from GoDaddy attached as Tabs 7 and 8 reflect that the change of Registrant was completed on March 24, 2017, and that Daren Daly became the Registrant of the AllPaving.com Domain Name on that date as a result of the clicking of the links in the emails received from GoDaddy into PATRICK DALY's email account on March 24, 2017 earlier that day.** (Emphasis added.)

29.     Debtor Defendant does not argue this testimony is irrelevant.  Of course it is relevant

since it shows that Debtor Defendant fraudulently obtained registrant (ownership) status of the

AllPaving.com domain name, because PATRICK's email account

(patrick@allpavingandsealcoating.com) was wrongfully accessed and the links sent by GoDaddy to

PATRICK via PATRICK's email account were clicked to effectuate a transfer of ownership of the AllPaving.com domain name from PATRICK to the Debtor Defendant on March 24, 2017 which PATRICK did not authorize.  Debtor Defendant's wrongful acquisition of registrant status with respect to the AllPaving.com domain name is relevant to several issues in this case, and is evidence of the actual fraud of Debtor Defendant in effectuating a fraudulent conveyance of the AllPaving.com domain name and the ALL PAVING, INC. paving business at issue in this case. Based on the foregoing, the Motion should be denied as to Wile.

### IV.    Expert witness Joey N. Friedman, CPA, Business Valuation and Additional Analysis:

30.    Plaintiffs have filed a Proof of Claim in the main bankruptcy case (Claim No. 13-1), to which Debtor filed an Objection (ECF No. 69 in the main case), and Plaintiffs filed a Response to said Objection (ECF No. 89 in the main case).  Said related contested matter is scheduled to be tried in a consolidated evidentiary hearing and trial.  See the Court's Orders entered on November 8, 2022 in the main case (ECF No. 80) and on December 21, 2022 in the adversary proceeding (ECF No. 18).

31.    The Proof of Claim filed by Plaintiffs states that the amount of their claim is $4,051,277.41, and attached to said Claim is a copy of the Second Amended Complaint filed in the State Court Case filed on February 17, 2021 which contains several tort claims against Debtor Defendant, including, without limitation, Plaintiffs PATRICK and ELIZABETH's claims for damages arising from Debtor Defendant's conversion of Plaintiffs' 87.5% business interests in ALL PAVING, INC., and Debtor Defendant's breaches of fiduciary duty.  In addition to Plaintiffs' claim for damages based on an 87.5% valuation of ALL PAVING, INC. as of 2017, Plaintiffs have claimed disgorgement damages against Debtor Defendant for the exorbitant sums he has been wrongfully removing from the ALL PAVING INC. business over the years including, without limitation,

through various wire transfers, ATM, and over the counter teller withdrawals.

32.     The Motion filed by Debtor seeks to exclude the expert testimony of Joey N. Friedman, CPA ("Friedman"), and attaches as an Exhibit the report prepared by Joey N. Friedman, CPA entitled "ALL PAVING INC. Business Valuation Summary Report & Additional Analysis; Appendix D includes the 2017 Business Valuation Calculation Report; Appendix E includes the Disgorgement Calculations, Opinion, and Suspicious Activity Notes; Prepared by: Joey Friedman, CPA PA."

33.     The Friedman Report relies upon the information **provided by Defendant**, including the tax returns and financial statements of ALL PAVING INC. which Debtor produced to Plaintiffs. Debtor Defendant is estopped from arguing that the information **he provided** is unreliable and cannot form the bases for Friedman's business valuation and disgorgement damages he calculated.

34.     Friedman is well qualified as an expert witness.  His Report and attached CV reveals that he is a practicing Certified Public Accountant, Forensic Accountant and Business Valuation Professional.  He also holds the esteemed Accredited in Business Valuation ("ABV") designation which is certified through the American Institute of Certified Public Accountants.  He has been a business owner/operator and accountant for over 20 years.  As an expert witness, he specializes in business valuations, forensic accounting, and fraud examination.  He has provided services for both plaintiffs and defendants in both civil and domestic proceedings in a variety of scenarios including in-court hearings, depositions, arbitrations, and business litigation jury trials.  His Report states: "Examples of matters that Mr. Friedman has worked on include, but are not limited to: divorce, shareholder disputes, family trust disputes, embezzlement, check kiting schemes, and other business valuation and fraud matters."

35.     Page 8 of the Friedman Report states that the "principal sources of information" used by Friedman were the following documents **provided by the Debtor Defendant**, as follows:

• Federal and State corporation income tax returns for the years ended December 31, 2016 through December 31, 2020.

• Internally generated Financial Statements as of December 31, 2021

• Information provided by All Paving, Inc, during various email conversations and file transfers before and during the performance of this valuation.

36.     Page 3 of the Friedman Report states: "Our analysis included, but was not limited to, the above mentioned factors. We considered all valuation approaches and various methods and applied the most appropriate methods from the income, asset and market approaches to derive an opinion of value of the subject equity interest. Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation."

37.     The Friedman Report reflects his opinions of value of ALL PAVING INC., including as of the relevant year (2017) — see Appendix D, and a calculation of amounts that should be disgorged from Debtor Defendant — see Appendix E.

38.     On January 13, 2023, Joey N. Friedman, CPA was deposed.  A copy of his deposition including exhibits thereto are attached to this Response as Exhibit A.  His testimony includes a discussion of the methods by which the exact amount stated in Plaintiffs' Proof of Claim was calculated, which includes 87.5% of the ALL PAVING, INC. business valuation as of 2017 (the year that Debtor Defendant misappropriated the assets and wrongfully asserted full ownership of ALL PAVING, INC.) plus 87.5% of the amount that should be disgorged from Debtor Defendant for misappropriation of ALL PAVING, INC. funds (see Appendix E of the Friedman Report).  The Friedman Report is based on sufficient facts and data, is the product of reliable principles and methods of calculation as discussed therein, and will be helpful for the trier of fact in determining the amount of damages to be awarded in favor of Plaintiffs and against Defendant.

39.     Of course, the Friedman Report and Friedman's deposition speak for themselves and nothing herein is intended to limit same.

40.    Debtor's argument in the Motion, that Friedman has relied upon tax returns for only a handful of years and limited financial statement information, is specious.  To the contrary, Friedman has relied upon all ALL PAVING INC. information provided by Debtor Defendant including all years of the ALL PAVING INC. tax returns which were provided by Defendant, all financial statements that were provided by Defendant, and all bank statements and credit card information produced by Defendant, as described in the Friedman Report.  Debtor is estopped from arguing that the information *he provided* is unreliable. Debtor is further estopped to make his unreliability argument because he failed to produce the ALL PAVING INC. QuickBooks data files in violation of Court orders entered in the State Court Case, and Debtor also served an objection and failed to produce QuickBooks data in this case, notwithstanding Plaintiffs' request for the production thereof.

41.    Case law supports the introduction of Friedman's expert testimony and the Friedman Report.  Plaintiffs' damages are measured by their 87.5% interest in ALL PAVING INC. based on Defendant's conversion of same in 2017, plus disgorgement of 87.5% of Defendant's ill-gotten gains, both of which are calculated in the Friedman Report and discussed in his deposition.  *Bailey v. St. Louis,* 268 So. 3d 197 (Fla. 2d DCA 2018); *S.E.C. v. Monterosso,* 756 F.3d 1326, 1338 (11th Cir. 2014) (disgorgement is appropriate to remedy ill-gotten gains based on unjust enrichment and "exactitude is not a requirement"); *Vital Pharmaceuticals v. PhD Marketing, Inc.,* 2022 WL 2952495 (C.D. Cal. 2022) (**plaintiff's damages expert properly relied on income statements <u>provided by Defendant</u>** — Court award plaintiff $10.5 million in disgorged profits); *In re Corbin's Estate,* 391 So. 2d 731 (Fla. 3d DCA 1980) (damages for conversion of business interest is measured by the value of the business as of the time and place of conversion).

42.    In *Tech Pharmacy Services, LLC v. Alixa Rx LLC,* 2017 WL 3394139 (E.D. Tex. 2017), the Court denied the defendant's *Daubert* motion with respect to plaintiff's disgorgement

damage expert engaged to testify regarding the amount by which defendant was unjustly enriched

by its wrongful actions.  The Court stated that plaintiff's expert:

> determined that Defendants' $100 million investment is subject to disgorgement because the investment was a financial benefit traceable to Defendants' alleged wrongful conduct (i.e., misappropriation of trade secrets) ... Defendants disagree with Dr. Ugone's opinion. ...
>
> The Court finds that Dr. Ugone may testify on disgorgement damages based on the standard set forth in Federal Rule of Evidence 702 and *Daubert.* Dr. Ugone meets each of the requirements to testify as an expert witness: (1) he is qualified to testify competently regarding disgorgement damages for Tech Pharmacy's trade secret misappropriation claim; (2) the methodology used to reach his conclusions is reliable under Daubert; and (3) his testimony assists the jury to understand the evidence or to determine a fact in issue.
>
> Defendants' disagreements with Dr. Ugone's conclusion go to the weight of his testimony and not its admissibility. The Court considers vigorous cross-examination and the presentation of contrary evidence as appropriate vehicles to challenge Dr. Ugone's testimony.  *Id.*

43.    Additionally, a *Daubert* motion was denied with respect to plaintiff's damages expert

in *Maiden Biosciences, Inc. v. Document Security Systems, Inc.,* 2022 WL 16964752 (N.D. Tex.

2022) where the expert relied upon data provided by the defendant.  The Court stated:

> Compton's expert opinions on valuation are sufficiently relevant and helpful to be admissible at trial. In his expert report, Compton uses an adjusted balance sheet to estimate the fair market value of the RBC Assets. Taking RBC Sciences' October 2019 balance sheet as a starting point, Compton explains for each asset category whether an adjustment is necessary and, if so, which financial figures—some of which he pulled from DSS's internal documents—he relied on in making the adjustment and why. ... The report provides instead Compton's opinions—based on his specialized knowledge and expertise in the area of business valuation—concerning the adjustments to the October 2019 balance sheet that are necessary to determine the fair market value of the RBC Assets. This evidence is relevant and helpful because it will "assist the trier of fact to understand or determine a fact in issue"—namely, the fair market value of the RBC Assets. ... Accordingly, Compton's expert opinions on value are sufficiently relevant and helpful to be admissible at trial. ... As the court has already recognized above, "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." ... "[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786.

> "[O]ther than taking issue with the sources of information relied on by [Compton, the defendants have] not articulated any reason why [they believe Compton's] methodology is unreliable." ... Defendants' contentions as to the bases and sources underlying Compton's valuation opinions go to the weight these opinions should receive, not to their admissibility. Defendants may advance these contentions through cross-examination. Accordingly, the court rejects defendants' challenge to Compton's valuation opinions on the ground that they are based on unreliable sources.

In the instant case, Friedman relied upon financial data including tax returns <u>provided by Defendant</u>.

*Maiden Biosciences* case shows that it would not be appropriate to prevent Friedman from offering his opinion testimony derived from Defendant's financial reporting.

44.     Based on the foregoing, the Motion should be denied as to the expert testimony of Joey N. Friedman, CPA and the Friedman Report, and Friedman should be permitted to testify. Furthermore, if the trial of this matter is scheduled on a date when Friedman is more than 100 miles from the courthouse, his video and written deposition transcript including exhibits should be admitted into evidence.  Fed. R. Civ. P. 32(a)(4)(B).  (Friedman testified regarding his planned trip to Antarctica during February 2023 when he will be more than 100 miles from the Courthouse.)

## V.     Expert Witness Louis T.M. Conti, Corporate Governance:

45.     Finally, Debtor seeks to exclude the testimony and report of Plaintiffs' corporate governance expert, Louis T. M. Conti, Esq. ("Conti").

46.     Debtor does not argue that Conti is not qualified to testify as a corporate governance expert witness.  The Expert Report of Louis T. M. Conti, Esq. attached to the Motion ("Conti Report") including, Conti's Curriculum Vitae, reflects that Conti is a partner in the prestigious Holland & Knight LLP law firm, and in prior cases was engaged as an expert witness in matters involving Florida business entity practice and procedures, including two that were pending in the Bankruptcy Courts for the Southern and Middle Districts of Florida.  Conti was an Adjunct Professor of Law at the University of Florida from 2006 - 2019 and taught a course titled "Business Transactions and Document Drafting" to third year students which focused on business entity

selection, drafting of LLC, partnership and stockholder agreements, among other topics. Conti's CV reflects he has years of involvement in drafting of state business entity laws including by representing the State of Florida at the Uniform Law Commission during 2011 - 2016, and is a "Member of The Florida Bar Drafting Committee which drafted Amendments to the Florida Business Corporation Act (Chapter 607) from 2012 to Present," the same Florida Statutes Chapter at issue in this case. Furthermore, Conti's CV reflects that he is a "Member of The Florida Bar Drafting Committees which revised the Florida Business Corporation Act, in 1998-1999, and again in 2005-2006, and 2012-present."

47.    Defendant has argued that as the incorporator of ALL PAVING INC. he had authority to determine ownership (shareholders) and directors of that entity pursuant to Florida Statutes Section 607.0205. In fact, Defendant in his Motion cites to that Section of Florida Statutes. One of the opinions being offered by Conti at page 8 of the Conti Report pertains to the operation of Section 607.0205, as follows:

> It appears that no directors were named in the Original Articles when filed, and under those circumstances, the Act requires an incorporator to hold an organizational meeting to elect directors and complete the organization of the corporation pursuant to s. 607.0205(1)(b), which provides: "If initial directors are not named in the articles of incorporation, the incorporators shall hold an organizational meeting… (Emphasis added)." However, I was unable to find any written record or minutes of an organizational meeting having been called by the incorporator of AP Inc. (excluding anything in the contrived "Corporate Book of All Paving Inc." filed by John P. Kelly, counsel to Daren, in the Broward County Case on November 27, 2019 (more than six years after AP Inc. was incorporated and with retroactive effect for certain of the matters therein).

> If the incorporator fails to call that initial organizational meeting, the shareholders by a majority in interest vote may call a meeting to name the directors (or establish a board of directors), to adopt bylaws, approve opening bank accounts, and other matters customary for a newly formed corporation.

> Once directors of a corporation are named or identified, the incorporator does not retain independent authority to amend the Original Articles, nor to appoint directors or officers of the corporation. Once the directors have been named or identified, the directors may then designate or change officers, subject to the bylaws or any

shareholders agreement that may have been adopted.

**Consequently, in my opinion, Daren lost any and all authority to unilaterally take corporate actions as the "incorporator" without shareholder or director approval, particularly in any filings to amend the Articles of Incorporation, or to file Articles of Correction, or to remove and replace any director or officer of AP Inc. from and after the appointment of one or more directors of AP Inc. As I describe further below in section IV, it is my conclusion that initial directors were named by the shareholders of AP Inc., and that those initial directors were Elizabeth, Patrick and Daren, whom I have also concluded were the three initial shareholders of AP Inc. from and after September 19, 2013.** (Emphasis added.)

48.     At pages 14 and 15 of the Conti Report, Conti offers the following opinions:

<u>Presumptions Regarding Ownership</u>

The following section describes the controlling law for determining ownership of corporate stock, including subsequent transfers of corporate stock, whether in certificated or uncertificated form.  This analysis is provided notwithstanding that it is my opinion that the purported issuance or transfers of stock to Schindler, and from Schindler to Daren, as described in Daren's contrived "Corporate Book", should be disregarded as not valid nor trustworthy in any analysis of the ownership of AP Inc. stock.

In determining ownership of corporate stock, the "corporate records" provide prima facie evidence as to ownership of the corporation's stock. If a party's name appears as a shareholder in the official corporate records, then the burden falls on the party challenging the corporate records to prove that the named party  is not a shareholder.

The BankUnited Corporate Resolutions and BankUnited Beneficial Ownership Certification to open the AP Inc. bank accounts by Elizabeth, Patrick, and Daren constitute an official corporate record of AP Inc., and as such, establishes that as of September 18, 2015, there were three shareholders holding all of the 100 shares of stock in AP Inc. as follows:  75 shares held by Elizabeth,  12.5  shares held by Patrick and 12.5 shares held by Daren.  Consequently, the burden of proof in Florida falls on Daren to prove that Elizabeth and Patrick were not shareholders of AP Inc.

49.     The Conti Report provides the following summary of opinions:

(1) The evidence is clearly established by the BankUnited Corporate Resolutions and the BankUnited Beneficial Ownership Certification of AP Inc. provided to BankUnited to open the first bank accounts of AP Inc., that the shareholders of AP Inc. as of that date were Elizabeth Daly holding 75% of the shares, Patrick Daly holding 12.5% of the shares, and Daren Daly holding 12.5% of the shares.   The BankUnited Corporate Resolutions and BankUnited Beneficial Ownership Certification provide clear evidence in a corporate record that there was

a Board of Directors of AP Inc. as of September 18, 2015.

(2) As a consequence of the BankUnited Corporate Resolutions and BankUnited Beneficial Ownership Certification, Daren lost any and all authority as the "incorporator" of AP Inc. to file any Amendments to the Original Articles of Incorporation after September 18, 2015, without the vote or approval of the shareholders or directors, since any amendments filed by Daren after that date would indicate (falsely) that no shareholder or director approval was required. In my opinion, any such Amendments or other filings made by Daren after September 18, 2015 as the "incorporated" were void and should not be given legal effect.

(3) There is no any evidence of a valid or effective issuance or transfer of AP Inc. shares to Schindler. The burden of proof is on Schindler to prove that she acquired shares from Elizabeth and Patrick.

(4) Daren has failed to provide independent clear and convincing evidence to support a conclusion that the purported gift of the AP Inc. shares to him from Schindler was completed and effective. The purported gift of shares of AP Inc. from Schindler to Daren should not be deemed to be a completed gift because (i) there was no independent clear and convincing evidence that Schindler even acquired or owned the shares, or signed indorsement or transfer instructions on the share assignments, (ii) Schindler never took any contemporaneous independent actions as a shareholder of AP Inc., (iii) Schindler never exercised any rights as a shareholder of AP Inc. and (iv) Schindler never documented any share ownership or transfer on the books and records of AP Inc. in any independent contemporaneous corporate record.

(5) Under Florida law, the burden is on Schindler and Daren to overcome any alleged shortcomings in the AP Inc. shareholder record keeping to disprove the ownership of shares by Elizabeth and Patrick, and in my opinion, neither has not carried this burden, and there is no basis to conclude that Schindler ever become a shareholder of AP Inc., nor that Daren ever became the majority or sole shareholder of AP Inc.

50.    The foregoing is a sample of the opinions offered by Conti and in the Conti Report regarding the several corporate statutes and other Florida laws at issue, which will be helpful to this Court in considering the issues and rendering its decisions. Defendant has no valid argument to exclude Conti's testimony regarding same. Furthermore, Conti's opinion regarding ownership, quoted above, may be considered by the Court sitting in a non-jury trial, since Federal Rule of Evidence 704 provides: "An opinion is not objectionable just because it embraces an ultimate issue."

51.    It is appropriate for the Court to admit expert opinion testimony from a qualified expert witness on corporate governance issues. In *Kapila v. Warburg Pincus, LLC,* 2022 WL 4448604 (M.D. Fla. 2022), the Court denied the motion to exclude Professor Stuart Cohn from

testifying as a corporate governance expert witness on several relevant issues.  The defendant in that case argued that Professor Cohn lacked experience and "and that his opinions regarding corporate obligations amount to impermissible legal conclusions and statements of law."  In denying the defendant's motion, the Court stated as follows: "Plaintiff responds that Professor Cohn has reviewed, in the context of his experience with corporate governance standards, practices and obligations at issue in this case, the pertinent documents, testimony, and principles relevant to the actions of Warburg's appointed directors to the Universal board and the obligations of control shareholders if it is determined that Warburg was a control shareholder. Additionally, he has analyzed the issues impacting conflicts of interest and agency relationship. Professor Cohn explains how his experience leads to the conclusions reached, why that experience is a sufficient basis for his opinions, and how that experience is applied to the facts. Professor Cohn sufficiently explains his methodology, and thus, the second prong is satisfied." *Id.*

52.    Similarly, in *Atlanta Gas Light Co. v. UGI Utilities, Inc.,* 2004 WL 5488226 (M.D. Fla. 2004), the Court denied a motion to exclude the testimony of a corporate governance expert witness, stating:

> Centerpoint launches similar attacks on the testimony of Plaintiff's Expert Charles Phillips. According to the same three-part test discussed above, Mr. Phillips is permitted to testify under *Daubert* and Rule 702.
>
> Mr. Phillips satisfies the first prong of the analysis as he is qualified to testify regarding corporate governance and management. With a Master's Degree, a long career as a Certified Public Accountant and Certified Fraud Examiner, extensive experience consulting for and managing corporations, and a substantial track record as an expert witness testifying on similar areas of corporate management, control and direction, Mr. Phillips is clearly competent in the relevant areas. Centerpoint does not challenge this.
>
> Under the second-prong of the *Daubert* analysis, as was the case with Dr. Shifrin, it is the reliability of Mr. Phillips proposed testimony that forms the basis for this challenge. Centerpoint argues that Mr. Phillips' testimony is unreliable because he does not have conclusive facts establishing that a management contract existed between American Gas (Centerpoint's predecessor) or that American Gas received

financial benefit from such a contract. Conclusive facts, however, are not a requirement of Daubert or Rule 702.

Centerpoint's attack is flawed for several reasons. First, Centerpoint suggests that an expert witness must definitively prove the ultimate issues of the case in order to be reliable. This argument was rejected by the Eleventh Circuit in *City of Tuscaloosa v. Harcros Chem., Inc.,* 158 F.3d 548 (11th Cir.1998). In that case, the District Court rejected an expert witness for failing to conclusively prove the existence of a conspiracy. *Id.* at 564. The Eleventh Circuit reversed holding that the proffered testimony need not prove one or more of the ultimate issues of the case, but rather "the testimony need only assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue" *Id.* at 564–65 (emphasis in original). In the present case as well, Mr. Phillips' testimony does not have to absolutely prove the existence or nature of a management contract, but rather "must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury." *Id.* at 565.

Second, Mr. Phillips has relied on adequate facts in making his conclusions. He considered all of the documents and records that appear to have been available including corporate minutes, sample contracts, corporate reports, and the sworn testimony of corporate officers before government agencies. Other Courts have likewise deemed reliable expert testimony based on review of similar sources. *See Bauman v. Centex Corp.,* 611 F.2d 1115 (5th Cir.1980) (expert testimony reliable when based on review of corporation's files and financial statements and expert testified that he had read all available documentation on corporation). Although a court should not accept as reliable opinion evidence connected to existing data only by the ipse dixit of the expert, *see Lord v. Fairway Elec. Corp.,* 223 F.Supp.2d 1270, 1279 (M.D.Fla.2002), absolute factual certainty is not required. *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir.1988). This Court concludes that Mr. Phillips' testimony is factually supported and is sufficiently reliable under *Daubert* and Rule 702. Any weaknesses in the underpinnings of his testimony must go to its weight rather than to its admissibility. *Jones v. Otis Elevator Co.,* 861 F.2d 655, 663 (11th Cir.1988). Moreover, Centerpoint is free to impeach the testimony and Mr. Phillips' credibility through appropriate methods during trial. *Daubert,* 509 U.S. at 596.

Finally, his testimony is helpful to the trier of fact. As all three parts of the Daubert test are satisfied, Mr. Phillips' is permitted to testify as an expert witness and Centerpoint's Motion to Exclude his testimony (Doc. No. 78, filed November 1, 2004) is DENIED.

53.     The reasoning in *Kapila* and *Atlanta Gas Light Co.* apply to this case. Conti is a well

qualified expert witness on corporate governance issues, and he meets all three prongs of *Daubert.*

Accordingly, the Motion should be denied as to Conti and he should be permitted to testify.

WHEREFORE, Plaintiffs PATRICK DALY, ELIZABETH DALY, ALL PAVING & SEALCOATING, LLC, and PATRICK DALY and ELIZABETH DALY as the Majority Shareholders of ALL PAVING, INC.  respectfully request that the Debtor's Motion in Limine to Exclude Testimony of Frank Harley Norwitch, Jeff Wile, Joey Friedman, and Louis T.M. Conti filed on January 6, 2023 as ECF No. 38 be denied in its entirety, and that the Court enter such other and further relief as it deems just and proper.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on February 2, 2023, we served this Response in Opposition to Debtor's Motion in Limine to Monique D. Hayes, Esq., monique@dgimlaw.com, and Isaac M. Marcushamer, Esq. isaac@dgimlaw.com both with DGIM LAW, PLLC.

We hereby certify that we are admitted to the Bar of the United States District Court for the Southern District of Florida and are in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

Respectfully submitted,

BRUCE A. GOODMAN, P.A.
Co-Counsel for Plaintiffs Creditors Patrick Daly,
Elizabeth Daly, All Paving & Sealcoating LLC,
5531 N. University Drive, Suite 101
Coral Springs, Florida 33067
Tel: (954) 919-6000; Fax: (754) 222-5122
Email: bruce@bgoodmanlaw.com

By: **/s/ Bruce A. Goodman, Esq.**
    Florida Bar No. 602302

C. DAVID TANGORA, P.A.
Counsel for Plaintiffs Creditors, Patrick Daly,
Elizabeth Daly, All Paving & Sealcoating, LLC
200 S.E. 18th Court
Ft. Lauderdale, FL 33316
(954) 779-1005-Phone
(954) 764-4502-Facsimile
tangoralaw@bellsouth.net

By: **/s/ C. David Tangora, Esq.**
    C. David Tangora, Esquire
    Florida Bar No: 522104