**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

In Re:

DAREN C. DALY,                                         Case No: 22-15694-SMG

     Debtor.                                         Chapter 11 (Sub V)

_____

PATRICK DALY, ELIZABETH DALY,
ALL PAVING & SEALCOATING, LLC, and
PATRICK DALY AND ELIZABETH DALY
AS THE MAJORITY SHAREHOLDERS
OF ALL PAVING, INC.,
                                                      ADV. No: 22-01391-SMG

     Plaintiffs


vs.

DAREN C. DALY,

     Defendant.

_____/

**PLAINTIFFS' NOTICE OF FILING PROPOSED FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW FOLLOWING CONSOLIDATED EVIDENTIARY HEARING**
**AND TRIAL ON OBJECTION TO CLAIM NO. 13-1 AND**
**RELATED ADVERSARY PROCEEDING**

Plaintiffs PATRICK DALY, ELIZABETH DALY, ALL PAVING & SEALCOATING, LLC,

and PATRICK DALY and ELIZABETH DALY as the Majority Shareholders of ALL PAVING

INC., hereby submit their proposed Findings of Fact and Conclusions of Law for the Court to

consider entering, attached hereto, following the consolidated evidentiary hearing and trial on

Debtor/Defendant's Objection to Claim No. 13-1 and related Adversary Proceeding filed by

Plaintiffs, in compliance with the Court's Order Setting Deadlines for Parties to Submit and File

Proposed Findings of Fact and Conclusions of Law entered on June 29, 2023 (ECF No. 153).

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that on September 8, 2023, we served this Notice to: Monique D. Hayes, Esq. (monique@dgimlaw.com), and Isaac M. Marcushamer, Esq. (isaac@dgimlaw.com), both with DGIM LAW, PLLC.

We hereby certify that we are admitted to the Bar of the United States District Court for the Southern District of Florida and are in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).

Respectfully submitted,

BRUCE A. GOODMAN, P.A.
Co-Counsel for Plaintiffs Creditors Patrick Daly,
Elizabeth Daly, All Paving & Sealcoating LLC,
5531 N. University Drive, Suite 101
Coral Springs, Florida 33067
Tel: (954) 919-6000; Fax: (754) 222-5122
Email: bruce@bgoodmanlaw.com

By: **/s/ Bruce A. Goodman, Esq.**
    Florida Bar No. 602302

C. DAVID TANGORA, P.A.
Counsel for Plaintiffs Creditors,
Patrick Daly, Elizabeth Daly,
All Paving & Sealcoating, LLC
200 S.E. 18th Court
Ft. Lauderdale, FL 33316
(954) 779-1005-Phone
(954) 764-4502-Facsimile
tangoralaw@bellsouth.net

By:  **/s/ C. David Tangora, Esq.**
    C. David Tangora, Esquire
    Florida Bar No: 522104

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 22-15694-SMG |
| DAREN C. DALY, | Chapter 11 (Sub V) |
| Debtor. | |
| _____/ | |
| PATRICK DALY, ELIZABETH DALY, | |
| ALL PAVING AND SEALCOATING, LLC, | |
| AND PATRICK DALY AND ELIZABETH | |
| DALY AS THE MAJORITY SHAREHOLDERS | Adv. No. 22-01391-SMG |
| OF ALL PAVING INC., | |
|     Plaintiffs, | |
| v. | |
| DAREN C. DALY, | |
|     Defendant. | |
| _____/ | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING CONSOLIDATED**
**EVIDENTIARY HEARING AND TRIAL ON OBJECTION TO CLAIM NO. 13-1 AND**
**RELATED ADVERSARY PROCEEDING**

1

**THIS MATTER** was tried before the Court on April 10-11, 2023, May 15-18, 2023, June 6-7, 2023 and June 23, 2023 (a total of nine days) on the contested matter arising from Debtor's Objection to Plaintiffs' Claim No. 13-1 filed in the Main Case No. 22-15694-SMG, and related Adversary Proceeding No. 22-01391-AP-SMG.[1] Pursuant to Bankruptcy Rule 7052 and Fed.R.Civ.P. 52, the Court hereby enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The Court, having considered all the testimony and evidence that was presented, and being advised in the premises, makes the following findings of fact:

### A.  *Litigation Background.*

1.      On July 26, 2022, Debtor Defendant DAREN C. DALY ("DAREN") filed a Voluntary Petition for Individuals Filing for Bankruptcy under Subchapter V of Chapter 11 of the Bankruptcy Code, with an attached Form 101 listing All Paving, Inc. and Resurface Industries, LLC as alleged sole proprietorships of DAREN.  ECF No. 1 Main Case.

2.      In paragraph 3 of his Chapter 11 Case Management Summary filed on July 29, 2022, DAREN asserted that "Debtor is the 100% owner of All Paving, Inc. and Resurface Industries, LLC," and in paragraph 5 thereof DAREN asserted: "Reasons for filing chapter 11: The Debtor is faced with mounting debts principally associated with his business operations and pending Litigation in Broward County and Fourth District Court of Appeal with the Debtor's father including All Paving, Inc. v. Daren C. Daly, et al.; Case No. CACE 17-014794(09), All Paving, Inc. v. All Paving & Sealcoating, LLC, et al.; Case No. CACE 18-21093(08) and All Paving &

---

[1]      References to ECF Nos. shall correspond to filings in Adversary Proceeding No. 22-01391-SMG, unless it is followed by the words "Main Case" which will then refer to filings in the Main Case No. 22-15694-SMG.  The Trial Transcript for each of the 9 days of trial were filed at ECF Nos. 137, 138, 158, 159, 160, 161, 162, 163 and 164. References to the Trial Transcript shall be abbreviated "T-" followed by the applicable page and line numbers (for example, a reference to page 2, line 2 through page 3, line 20 of the Trial Transcript shall be: "T-2:3-3:20"). References to Plaintiffs' Exhibit Numbers shall be abbreviated: "PE #__"; and references to Defendant's Exhibit Numbers shall be abbreviated: "DE#__".

Sealcoating, LLC v. Daren C. Daly, et al; Appellate Case No. 4D22-1825. The debtor intends to reorganize his debts and resolve litigation claims in this chapter 11 case." ECF No. 17 Main Case.

3.       The first case mentioned by DAREN in paragraph 5 of his Chapter 11 Case Management Summary, Case No. CACE 17-014797(09) pending in the Circuit Court of Broward County, Florida, was filed against DAREN on August 4, 2017 by the same Plaintiffs in this Adversary Proceeding: PATRICK DALY ("PATRICK"), ELIZABETH DALY ("ELIZABETH"), ALL PAVING & SEALCOATING LLC ("ALL PAVING LLC") and ALL PAVING INC. ("ALL PAVING INC."), by and through PATRICK and ELIZABETH as the (alleged) majority owners of ALL PAVING INC. (hereinafter, the "State Court Case").

4.       PATRICK and ELIZABETH are husband and wife, and the parents of DAREN. PATRICK and ELIZABETH have two other adult children, including Keith Daly, the older brother of DAREN, who testified in this proceeding.

5.       The State Court Case was heavily litigated since its filing in 2017 until the date DAREN filed the instant Bankruptcy Case on July 26, 2022 and the automatic stay went into effect.

6.       On September 30, 2022, Plaintiffs filed Claim No. 13-1 in the amount of $4,051,277.41 which attaches as its basis the Second Amended Complaint filed in the State Court Case.

7.       On December 27, 2022, Plaintiffs filed their Amended Adversary Complaint for Exception to Discharge based on 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) in the Adversary Proceeding (ECF No. 24).

8.       This Court is being called upon to determine (1) who owns ALL PAVING INC.; (2) how much (if anything) DAREN owes Plaintiffs; and (3) whether Plaintiffs' claims are dischargeable.   Plaintiffs' burden of proof is by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279 (1991), 111 S. Ct. 654 (1991), 112 L.Ed.2d 755 (1991).

**B.   *Factual Findings.***

9.     PATRICK, ELIZABETH, and their family emigrated from Ireland to the United States in 1986.  T-65:24-66:4 (testimony of PATRICK).  DAREN, the son of PATRICK and ELIZABETH, was born that same year, in 1986.  T-68:13-14.

10.     Since 1988, PATRICK has continuously worked in the paving business in the State of Florida.  T-68:10-12 (testimony of PATRICK).

11.     In 2012, PATRICK decided to leave Atlantic Southern Paving where he had been employed for almost 21 years, and PATRICK and ELIZABETH started their own paving business, ALL PAVING LLC, which was formed as a Florida limited liability company in January 2012. T-68:3-22.

12.     In his trial testimony, DAREN testified that he "wasn't an owner in the company [ALL PAVING LLC] or anything like that."  T-1270:2-7 (testimony of DAREN).

13.     DAREN was in law school when ALL PAVING LLC was formed, and his goal at that time (in 2012) was to become a coach for an NFL or college football team.  A coaching position did not materialize, and in 2013 DAREN's new goal was to start up a sports agency / law firm with Joseph D. Fahrendorf, Esq. ("Fahrendorf") who attended law school with DAREN.  T-69:20-72:4 (testimony of PATRICK).

14.     During the summer of 2013, while DAREN awaited the results of The Florida Bar Examination, he held a part time position with ALL PAVING LLC, and focused on marketing his parents' paving business.  At the same time, Fahrendorf also held a part time position with ALL PAVING LLC, and also focused on marketing the paving business.  T-75:2-76:21 (testimony of PATRICK).

15.     Fahrendorf was the first witness to testify at trial on April 10, 2023. T:15:22-63:22. Fahrendorf testified that he graduated magna cum laude from Nova Southeastern Law School in

4

2012 and is a member of the Florida, California and Nevada State Bars.  T-16:23-17:8.  Fahrendorf

testified that in the summer of 2013, "he worked for Pat [PATRICK] and Lily [ELIZABETH]

some time in that summer, with their All Paving & Sealcoating company, with the intent of

eventually starting a new business with Daren and I, where it would only be legal and other type

of law – legal services."  Fahrendorf further testified  that "I was doing pretty much some of their

legal work, some of their marketing, some of their website stuff, like, typing, it was pretty much a

jack of all trades at the time."  T-18:8-18 (testimony of Fahrendorf).

16.     Fahrendorf testified that he and DAREN were friendly in law school and tried to

start a joint enterprise called "Daly Fahrendorf" that was going to be a law firm and engage in

other legal projects including potentially representing college coaches, but the law firm did not go

forward because "Mr. Daly did not pass, first, the multistate professional responsibility exam, so

the MPRE, and then eventually he failed the actual Florida Bar."  T-17:9-19:4 (testimony of

Fahrendorf).

17.     On September 19, 2013, Electronic Articles of Incorporation were filed for ALL

PAVING INC. PE #20 (ECF No. 77-20, pages 1 and 2).  In the State Court Case, Fahrendorf

testified that he sat at the computer and typed in the information transmitted to file the Electronic

Articles of Incorporation of ALL PAVING INC. (while employed by ALL PAVING LLC).  PE

#57, ECF No. 78-14:15 (lines 4-22 of page 69 of the October 12, 2017 hearing transcript in the

State Court Case).

18.     DAREN was shown the same Electronic Articles of Incorporation for ALL

PAVING INC. (DE #56) at trial in this proceeding, and his attorney asked him about its preparation

and the "computer electronic entries." DAREN testified that he "was doing the instruction, and

doing part of the work myself as I was standing there."  T-1278:2-23 (testimony of DAREN).

DAREN's testimony therefore corroborates Fahrendorf's testimony that Fahrendorf sat at the

computer and typed in the information transmitted to file the Electronic Articles of Incorporation for ALL PAVING INC.

19.    Fahrendorf testified in the State Court Case that he is not aware of any valid basis for DAREN to assert he is the majority owner of ALL PAVING INC.  PE #57, ECF No. 78-14:29 (lines 10-24 of page 83 of the October 12, 2017 hearing transcript in the State Court Case).

20.    After being shown the Electronic Articles of Incorporation for ALL PAVING INC. (PE #20) during the trial in this proceeding, Fahrendorf again testified that it was his understanding that the owners of ALL PAVING INC. were "Pat and Lily [PATRICK and ELIZABETH].  There was no doubt in my mind, I took directions from Pat and Lily." T-27:2-5 (testimony of Fahrendorf).

21.    Fahrendorf further testified at the trial in this proceeding that "there is no doubt in my mind that Patrick and Lily were the owners of All Paving. Whether it's All Paving, Inc. or All Paving & Sealcoating, that was a side project that we could just potentially help his parents out, because they were starting a business as well, or I think they had already been established for a few years at that point, and so, I mean, I went to law school, my job wasn't to call housing places and see how we could potentially seal their asphalt. That's part of the gigs that we did during separate times. We had no intention of going into paving."   T-29:22-30:7 (testimony of Fahrendorf).

22.    ALL PAVING LLC paid the filing fee to incorporate ALL PAVING INC in 2013, and also paid the filing fees for ALL PAVING INC.'s corporate Annual Reports in 2014, 2015, and 2016.  PE #21 (ECF No. 77-21, pages 17-20); T-102:17-106:3 (testimony of PATRICK).

23.    DAREN testified that he "worked for my dad's corporation, All Paving & Sealcoating, in parts of 2013, parts of 2014 …." T-1269:1-3 (testimony of DAREN).  DAREN also testified that he was a full-time employee of ALL PAVING LLC for all of 2015.  T-1514:16-23 (testimony of DAREN).

24.     ALL PAVING INC. did not file a tax return for 2013 and 2014, and ALL PAVING INC. did not have a bank account during the years 2013 and 2014. T-1514:4-15 (testimony of DAREN).

25.     In 2014, after his employment with the Miami Dolphins NFL football team had terminated, DAREN came back to work for ALL PAVING LLC as a full-time employee.  DAREN continued to focus on marketing for ALL PAVING LLC, while simultaneously reaching out to different coaches and teams in search of employment in the NFL.  T-80:1-81:17 (testimony of PATRICK).  DAREN was a salesman for ALL PAVING LLC during 2014. T-138:3-11 (testimony of PATRICK).

26.     In early 2014, while DAREN worked full time for ALL PAVING LLC focusing on marketing, DAREN suggested to his parents that the AllPavingAndSealcoating.com domain name used by ALL PAVING LLC be shortened to AllPaving.com, and that ALL PAVING LLC market itself simply as "ALL PAVING".  T-82:3-83:14 (testimony of PATRICK).

27.     In late February 2014 / early March 2014, the AllPaving.com Domain Name was purchased by ALL PAVING LLC with funds initially advanced by PATRICK and ELIZABETH's sons, Keith Daly and DAREN.  T-82:3-88:24 (testimony of PATRICK); PE #29.  The original, legitimate All Paving-Domain Name Purchase Agreement used for the purchase of the AllPaving.com Domain Name (the "Domain Name Purchase Agreement") in 2014 is included within PE #48 (ECF No. 78-5, pages 22-26), and states that the Purchaser Company is "All Paving and Sealcoating" which refers to ALL PAVING LLC and not ALL PAVING INC., since "and Sealcoating" is only in ALL PAVING LLC's name and not also in ALL PAVING INC.'s name. T-90:11-93:23 (testimony of PATRICK).

28.     DAREN was completely reimbursed by ALL PAVING LLC for all funds he advanced for the purchase of the AllPaving.com Domain Name, including through ALL PAVING

LLC's check number 1504 dated March 5, 2014 in the amount of $2,200, which bears only DAREN's handwriting including the maker's signature which is DAREN's admitted forgery of PATRICK's signature.  PE #29 (ECF No. 77-29); PE #46 (ECF No. 78-3).  DAREN admitted that all handwriting on check number 1504 dated March 5, 2014 in the amount of $2,200 is his, and that he signed PATRICK's name on said check, in his videotaped deposition played during the trial in this case.  T-1036:15-1037:2 (testimony of DAREN).  DAREN's income tax return for 2014, PE #30, as transmitted by DAREN to SunTrust Mortgage in 2015 for his mortgage loan application, did not include as income any of the amounts paid to him by ALL PAVING LLC reflected on the reimbursement schedule and documents included in PE #29.  T-1646:1-1647:13; 1651:10-1652:9 (testimony of DAREN).  This corroborates that DAREN was fully reimbursed by ALL PAVING LLC for his out-of-pocket expenses in 2014, as reflected by PE #29.

29.     In addition to the fact that ALL PAVING LLC was named as the Purchaser Company in the Domain Name Purchase Agreement, the Court finds that ALL PAVING LLC reimbursed DAREN for the entire purchase price of the AllPaving.com Domain Name, which is further proof that ALL PAVING LLC is the owner of the AllPaving.com Domain Name, not DAREN.

30.     Although ALL PAVING INC. was incorporated in 2013, it existed in name only until it began operations in 2015.  T-93:17-94:14 (testimony of PATRICK).  During 2013 and 2014, ALL PAVING INC. was a dormant corporation with ALL PAVING LLC having paid all fees for the incorporation of ALL PAVING INC. and its annual reports.  T-104:20-105:8 (testimony of PATRICK).  In 2015, PATRICK and ELIZABETH decided to commence operations of ALL PAVING INC. to work side-by-side with ALL PAVING LLC in the paving business, with DAREN being allocated a 15% ownership interest in ALL PAVING INC., and with PATRICK and ELIZABETH being allocated a combined 85% ownership interest in ALL PAVING INC.,

with the understanding that ALL PAVING INC. and ALL PAVING LLC will have equal rights to, and ownership of, the "ALL PAVING" name, logo, and the AllPaving.com Domain Name and website.  This arrangement was an attempt to resolve conflicts that had arisen between DAREN and ALL PAVING LLC salesman Robert Holland within ALL PAVING LLC, and would allow Robert Holland and DAREN to separately track and be rewarded for their sales generated for ALL PAVING LLC and ALL PAVING, INC. respectively, with Robert Holland generating sales for ALL PAVING LLC in exchange for his 15% ownership interest in ALL PAVING LLC, and with DAREN generating sales for ALL PAVING INC. in exchange for a 15% ownership interest in ALL PAVING INC.  T-107:14-21; 110:5-113:5 (testimony of PATRICK).

31.    On September 18, 2015, ALL PAVING INC. opened its first bank account in connection with the commencement of its operations.  DAREN selected BankUnited and made prior arrangements with BankUnited so ALL PAVING INC.'s bank account may be opened that day, and picked up his mother ELIZABETH from the house in Coral Springs, Florida where DAREN grew up and ELIZABETH still resided, and they drove together to BankUnited that day. T-115:13-117:21 (testimony of PATRICK).

32.    DAREN testified that he selected BankUnited to be ALL PAVING INC.'s bank. T-1319:14-17.  DAREN also testified that he "reached out to BankUnited" prior to ALL PAVING INC.'s bank account being opened on September 18, 2015.  T-1321:6-1322:3 (testimony of DAREN).

33.    PATRICK testified that neither he nor ELIZABETH were "in touch with the bank. Daren made all the previous arrangements to go to the bank.  When we got there, all these documents were already prefilled in, and we were just there to sign them, and make sure everything just moved right along.  So, Daren Daly gave the bank people this information that is on this document right there."  T:506:18-25 (testimony of PATRICK – discussing the ALL PAVING INC.

9

ownership percentages reflected on DE #92 (also marked PE #2) (i.e., the Beneficial Ownership Certification for ALL PAVING INC. submitted to BankUnited on September 18, 2015 which reflects ELIZABETH as 75% owner, PATRICK as 12.5% owner, and DAREN as 12.5% owner of ALL PAVING INC.).  PATRICK further testified that he discussed the fact ELIZABETH is the majority owner of ALL PAVING INC. with DAREN at BankUnited on September 18, 2015, joking they better be nice to Mom, and reaffirmed that DAREN was the one who "set it up" and "this is how we had agreed to move forward."  T-986:6-25 (testimony of PATRICK).

34.     On September 18, 2015, PATRICK, ELIZABETH and DAREN signed a Corporate Resolution for ALL PAVING INC. (PE #1). T-118:8-119:7 (testimony of PATRICK).  DAREN testified that he was the first to sign the ALL PAVING INC. Corporate Resolution on September 18, 2015.  PE #1; T-1027:8-25 (testimony of DAREN – via his videotaped deposition played during the trial).  DAREN testified that the typed-in information was on the Corporate Resolution when he signed his name as Vice President below a signature line for ELIZABETH DALY as President, and above the signature line for PATRICK DALY as Vice President.    T-1028:1-17 (testimony of DAREN – via his videotaped deposition in this case played during the trial).

35.     The September 18, 2015 Corporate Resolution memorializes the existence and action of the Board of Directors ALL PAVING INC., and states that ALL PAVING INC. is a "corporation organized and existing under the laws of the State of FLORIDA, with its principal place of business located at [PATRICK and ELIZABETH's home address in Coral Springs, Florida]."  PE #1 (ECF No. 77-1).

36.     The September 18, 2015 Corporate Resolution states that at a meeting of the Board of Directors at which a quorum was present, the Board of Directors adopted resolutions, including the designation of BankUnited as a depository of ALL PAVING INC.  PE #1.

10

37.    The language of the September 18, 2015 Corporate Resolution immediately below the signatures of ELIZABETH as President, DAREN as Vice President, and PATRICK as Vice President states: "I further certify that the Board of Directors of the Corporation has, and at the time of adoption of this Resolution had, full power and authority to adopt the foregoing Resolutions ...."  PE #1.

38.    A Beneficial Ownership Certification, PE #2, was also executed by ALL PAVING INC. when the BankUnited bank account was opened on September 18, 2015 through the prior arrangements made by DAREN with BankUnited, stating and establishing that ELIZABETH is the 75% owner of ALL PAVING INC., PATRICK is the 12.5% owner of ALL PAVING INC., and DAREN is the 12.5% owner of ALL PAVING INC.  PE #2 (ECF No. 77-2).

39.    The Beneficial Ownership Certification states that DAREN owns 12.5% in ALL PAVING INC. instead of 15% as previously discussed, but DAREN is the one who advised BankUnited to indicate that DAREN owns 12.5% of ALL PAVING INC.  T-121:1-123:25 (testimony of PATRICK).  PATRICK was asked about that discrepancy and testified that: "Daren was buying a house, I was very well aware of that. He was doing a lot of house searching at the time, had applications sent out there. One of the questions on the applications are, if you own 15 percent or more of a business, you need to disclose it on your application, and that's why I think he put down twelve and a half percent …."  T:121:6-16 (testimony of PATRICK in response to the Court's inquiry).

40.    ELIZABETH also testified regarding the opening of the BankUnited bank account on September 18, 2015.  She testified that DAREN made prior arrangements to open the account with Henry Mendez, a bank officer at BankUnited, and drove her to and from the bank that day, and she and DAREN were together at the bank during their entire visit.  PATRICK arrived separately after DAREN and ELIZABETH had arrived.  ELIZABETH testified that during their

visit at the bank on September 18, 2015, PATRICK, ELIZABETH and DAREN signed a Corporate Resolution on behalf of ALL PAVING INC. (PE #1) and ELIZABETH signed a Beneficial Ownership Certification for ALL PAVING INC. (PE #2) in the presence of PATRICK and DAREN.  The Beneficial Ownership Certification stated that ELIZABETH owns 75%, PATRICK owns 12.5%, and DAREN owns 12.5% of ALL PAVING INC. based on the prior arrangements DAREN made with BankUnited.  T-1061:24-1066:23 (testimony of ELIZABETH); T-980:4-981:8; T-985:5-988:14 (testimony of PATRICK); PE #1 and PE #2.

41.     Jamie Schindler is not named as an officer, director, or owner of ALL PAVING INC. in the documents signed by PATRICK, ELIZABETH and DAREN on September 18, 2015, PE #1 and PE #2.

42.     Four months after the ALL PAVING INC. BankUnited account was opened on September 18, 2015, DAREN filed an annual report for ALL PAVING INC. on January 15, 2016, indicating the identical officer positions that were stated in the Corporate Resolution jointly submitted to BankUnited, with ELIZABETH as President, PATRICK as Vice President, and DAREN as Vice President.  T-984:3-985:4 (testimony of PATRICK); PE #20.

43.     Original ownership of ALL PAVING INC. is reflected on the Beneficial Ownership Certification (PE #2).  T-1066:19-23 (testimony of ELIZAZBETH).

44.     PATRICK and ELIZABETH's eldest child, Keith Daly ("Keith"), testified at trial on May 17, 2023.  Keith testified that in 2015, "Daren specifically told me that he was going to get the same deal that Bob [Holland] had, which was the 85/15 for LLC and, Inc. So Daren would get -- his 15 percent would go towards, Inc., Bob's 15 percent would go towards LLC."  T-908:1-909:2 (testimony of Keith Daly).

45.     On cross-examination, ELIZABETH was asked: "who gave you your ownership interest in All Paving, Inc.?"  ELIZABETH answered: "Nobody gave me my ownership. The

ownership was established at the bank when it came into -- when Inc. came off the shelf, ownership was established, and actually Daren got 15 percent, but he put himself down at the bank at twelve and a half percent." T-1109:3-9 (testimony of ELIZABETH). The Court finds this testimony to be credible, and finds that original ownership of ALL PAVING INC. was established by the corporate records of ALL PAVING INC. jointly submitted by DAREN, PATRICK and ELIZABETH to BankUnited on September 18, 2015, with ELIZABETH owning 75%, DAREN owning 12.5% and PATRICK owning 12.5% of ALL PAVING INC.

46.     DAREN subsequently ratified these ownership percentages of ALL PAVING INC. Two days after the bank account at BankUnited was opened, DAREN in his handwriting filled out all information on a credit application dated September 20, 2015 which he submitted to CAT Financial, which included the representation that ELIZABETH is the 75% owner of ALL PAVING INC. and PATRICK is the 12.5% owner of ALL PAVING INC., which is consistent with the percentages reflected on the Beneficial Ownership Certification jointly submitted to BankUnited two days earlier. A copy of said CAT Financial Credit Application was admitted into evidence as PE #4. ELIZABETH and PATRICK signed said credit application filled out by DAREN below their representation that the information is true, correct and complete. T-124:22-126:20 (testimony of PATRICK).

47.     DAREN also testified regarding ALL PAVING INC.'s September 20, 2015 CAT Financial credit application during his videotaped deposition played for this Court during trial, and admitted that he handwrote the name "Elizabeth Daly" next to her ownership percentage of 75% (consistent with the Beneficial Ownership Certification submitted to BankUnited two days earlier). T-1032:4-1034:23 (testimony of DAREN via videotaped deposition played during trial).

48.     DAREN again ratified ELIZABETH's majority ownership of ALL PAVING INC. on October 29, 2015, when he transmitted finance documents to Komatsu Financial including a

Komatsu Financial Security Agreement with an effective date of November 3, 2015 signed by ALL PAVING INC. by "ELIZABETH DALY Owner" and "PATRICK DALY President". (PE #5.) However, ELIZABETH and PATRICK did not actually sign the Komatsu Financial Security Agreement nor did they handwrite the words "owner" and "president" — DAREN did. T-1037:16-1038:17 (testimony of DAREN via videotaped deposition played during trial). Also, during his September 15, 2020 testimony in the State Court Case, DAREN again admitted to signing ELIZABETH's name and printing the title "Owner" on said Komatsu Financial Security Agreement, and DAREN also admitted to signing PATRICK's name and printing the title "President" on the same document. PE #46 (ECF No. 78-3, pages 21, 22, 30).

49.     On November 4, 2015, ELIZABETH registered the fictitious name "ALL PAVING" with the Florida Department of State, and listed two owners of that fictitious name: ALL PAVING INC. and ALL PAVING LLC. PE #7.

50.     During the last quarter of 2015 following the opening of the ALL PAVING INC. BankUnited account on September 18, 2015, ALL PAVING INC. recorded income totaling approximately $190,000 which ELIZABETH referred to as ALL PAVING INC.'s "seed money," reflected on the Transaction Reports admitted into evidence as PE #8. The revenue reflected in PE #8 was generated through DAREN's sales efforts while full-time employed by ALL PAVING LLC, and the receipts therefrom were deposited into ALL PAVING INC.'s BankUnited account. The proposals and contracts included in PE #8, which underly these initial deposits into the ALL PAVING INC. BankUnited account, were all in the name of ALL PAVING LLC (not ALL PAVING INC.). T-137:7-138:11 (testimony of PATRICK); 1072:4-1073:6 (testimony of ELIZABETH). ELIZABETH was asked why this revenue was deposited into ALL PAVING INC.'s BankUnited bank account even though ALL PAVING LLC was the entity named on the

underlying proposals and contracts.  Her answer was: "we were just putting money to get Inc. up and running, into it, that's what we chose to do."  T-1072:25-1073:2 (testimony of ELIZABETH).

51.     Additional "seed money" for ALL PAVING INC. was provided by ALL PAVING LLC through its purchase of equipment put into the name of ALL PAVING INC.  T-292:7-292:24 (testimony of PATRICK).  PATRICK explained why ALL PAVING LLC paid for vehicles purchased in the name of ALL PAVING INC.: "those vehicles were purchased by All Paving & Sealcoating, titled in All Paving, Inc., that was my wife's 85 percent share. We took the money out of the company and purchased them with the money, any down payments that went, any payments that went in place was all paid by LLC. They were titled to All Paving, Inc. because we owned it, the same shares, the same majority shares in All Paving, Inc. as we did in LLC. So, whether I took the money out and put it in a safe deposit box, or I took the money out and invested it into more equipment to grow the company, we didn't feel it was a -- that was the way we wanted to move forward."  T-293:9-21 (testimony of PATRICK).

52.     PATRICK further testified as follows regarding the seed money ALL PAVING LLC put into ALL PAVING INC.: "The fact of the matter is, all of these vehicles that you see in front were financed and provided by LLC as a part of the seed money for, Inc. because my wife and I owned the majority share of the business, that's why we titled it -- if I felt that we didn't own the business, why would[n't] I have Daren Daly or Jamie Schindler sign the guarantees? Why would I sign them and my wife? So I'm going to have two entities, working in the same office, using the same license number, using the same insurance, and then turn around and say, hey, Daren Daly, you own that business a hundred percent?  That's crazy. I didn't need to set up another business.  The only reason we set up a second business was to squish the issues that Daren Daly and Bob Holland had, and also move forward with the All Paving name, to shorten the name, which was Daren's idea. I was agreeing with the idea. He talked me into it. He gave me some good

rationale as to why it took place, and that's how it all came to be. It was like a thread in a shirt, once you start pulling, you just keep on going, and that's how it was, one thing led to another, but there is no distinction here because the seed money, the payments were all made by LLC on all of the equipment that you see in front of us, and the guarantors were the exact same, it was Patrick and Elizabeth Daly, the same as it was in the other entity. Daren Daly did not have his name on anything here." T-294:23-295:24 (testimony of PATRICK). The Court finds this testimony to be credible.

53.    ALL PAVING INC. also received revenue from the Bay Colony Project which was generated by ALL PAVING LLC. ALL PAVING LLC pulled the permit. T-110:5-116:4 (testimony of PATRICK). ALL PAVING LLC signed the contract and bond for the Bay Colony Project. DE #206 (ECF No. 96-2, pages 134-139 - testimony of ELIZABETH by deposition). In discussing the Bay Colony project, which began in 2015, PATRICK testified: "Daren was one of the salespeople for All Paving & Sealcoating. We landed a big project, which was, if I remember right, just under 900,000. It ended up being over a million dollars with change orders, and add-ons, and stuff that they did, which they requested." T-110:15-19 (testimony of PATRICK). PATRICK further testified: "we started putting the revenue into the All Paving [Inc.] account, because we were trying to make a definitive break in Bob's shares and Daren's shares, so Bob didn't feel like he was getting screwed, and Daren didn't feel like he was getting screwed. So, we thought it was the easiest way to do it, and Elizabeth and I were both the majority shareholders of both entities. It was like a right-hand pocket and a left-hand pocket, it didn't matter which one, it was the same amount, it wasn't a change in it. Everybody agreed to it. We all shook hands. There was no hard feelings. Everything was fine, and we moved forward like that. Daren generated his sales, it went into the Inc. column. Bob generated sales that went into the LLC column. The work was performed by the same people, which was the LLC employees, all of the W-2 employees, all the

16

subcontractors, all our vendors, and we operated like that for two and a half, three years." T-112:17-113:11 (testimony of PATRICK).  The Court finds this testimony to be credible.

54.    On December 22, 2015, DAREN and Jamie Schindler submitted a Uniform Residential Loan Application to SunTrust Mortgage, PE #9, which required a listing of their "Stocks & Bonds (Company name/number & description)."  Said Loan Application also required a listing of the "Net worth of business(es) owned (attach financial statement)".  Both DAREN and Jamie Schindler did not report any ownership interests in ALL PAVING INC on their Loan Application to SunTrust Mortgage (PE #9).  In addition, the SunTrust Mortgage Loan Application dated December 22, 2015 included a letter on "All Paving" letterhead, which states: "To Whom It May Concern, Please note that Mr. Daren Daly has zero (0) ownership interest in All Paving and Sealcoating, LLC.  Mr. Daly has been employed here for over a year and is a valued member of the All Paving team, however he is not an owner in any part of the business."

55.    When DAREN was asked at trial about the omission of any reporting of ownership of stocks and bonds in the Loan Application submitted to SunTrust on December 22, 2015, he answered "Yeah, that's – that's false." T-1523:4-13 (testimony of DAREN).  When asked about the omission of any reporting of businesses owned and the omission of any business financial statement attached to the Loan Application, DAREN admitted that he made no mention of ownership of ALL PAVING INC. and that no financial statements were attached, and that "0.0" was his response to business ownership in that section of the Loan Application.  T-1524:5-1529:7 (testimony of DAREN).  During this line of questioning, the Court asked: "Okay. We've established you've signed the document. You've said you didn't fill it out. What he is asking you is, this document, whether or not it discloses an ownership interest in All Paving, Inc.? It's a yes or no question."  DAREN responded: "This document doesn't have All Paving, Inc. on it."  T-1528:24-1529:5 (testimony of DAREN).  DAREN also testified that "SunTrust sent me an email

in which they told me to state any ownership I had in an entity that was above 25 percent." T-1527:15-17 (testimony of DAREN). The fact that the SunTrust Mortgage Loan Applications submitted by DAREN and Jamie Schindler on December 22, 2015, make no mention of their alleged ownership interests in ALL PAVING INC., contradicts their assertions of majority ownership of ALL PAVING INC.

56.    In February 2016, DAREN was shifted from the ALL PAVING LLC payroll onto the ALL PAVING INC. payroll. T-268:1-5 (testimony of PATRICK).

57.    On May 20, 2016, DAREN informed an employee of Plaintiffs in a text message that "My dad doesn't own All Paving. My mom does." PE #11; T-145:2-146:19 (testimony of PATRICK). The project at issue being discussed in PE #11 was Willow Grove, and DAREN admitted that ALL PAVING INC. was involved in it. T-1669:12-1671:10 (testimony of DAREN).

58.    On June 22, 2016, DAREN transmitted an Application for Business Credit and Agreement to Titan America signed by ALL PAVING INC. by "ELIZABETH DALY Owner." PE #46 (ECF No. 78-3, page 43). On September 15, 2020, DAREN admitted in the State Court Case during his testimony, that he signed ELIZABETH's name and printed the title "Owner" next to her name on said credit application. PE #46 (ECF No. 78-3, pages 24-25). DAREN's admitted signing of his mother signature and his admission that he handwrote the title "Owner" next to his signing of ELIZABETH's name, constitutes DAREN's admission and ratification that ELIZABETH is the (majority) Owner of ALL PAVING INC., and proof of the falsity of DAREN's assertion that ELIZABETH was never an owner of ALL PAVING INC.

59.    On November 18, 2016, DAREN emailed BankUnited demanding a freeze of all ALL PAVING INC. funds, asserting that ELIZABETH and PATRICK are no longer authorized users on the account. DAREN testified that BankUnited did not abide by the freeze request but did state in response "that all authorized signers have the full ability to withdraw money, deposit

money, wire money, and that's the capabilities that each authorized signer has." T-1501:1-12 (testimony of DAREN).  DAREN was then asked "Q. What I asked was, you used that authority, knowing -- knowing that the bank told you that each signer had authority to withdraw funds, all the funds, up to all the funds, you used that authority to withdraw $500,000 and wire it to your personal account one month later; right? A. I did." T-1501:23-1502:4 (testimony of DAREN).

60.    The $500,000 removed by DAREN from the ALL PAVING INC. BankUnited bank account in December 2016 was deposited by DAREN into his own personal account.  T-1513:2-5 (testimony of DAREN).  DAREN's removal of the $500,000 in December 2016 from ALL PAVING INC.'s bank account caused "everything to bounce."  T:1081:9-1082:9 (testimony of ELIZABETH).

61.    In the transcript included in Plaintiff's Exhibit 52 in evidence, DAREN testified in the State Court Case that ELIZABETH obtained a Women's Business Enterprise certification for ALL PAVING LLC, and that certification was used by both ALL PAVING INC. and ALL PAVING LLC in their marketing.  DAREN testified in the State Court Case that "Once All Paving & sealcoating got the certification, they titled it All Paving, the certification. So both -- like everything else, both companies used it to its advantage to generate work." PE #52, ECF No. 78-9, pages 13-14.  DAREN testified in his State Court Deposition, PE #52, that in order to obtain a WBENC certification, the business must be owned 51% by a female.  PE #52, ECF No. 78-9, page 19.  DAREN testified that "Elizabeth Daly got the WBE certification."  PE #52, ECF No. 78-9, page 15.  DAREN also testified in the State Court Case that he transmitted emails stating: "We are a Women owned Business that is certified and we just went through the DBE process." PE #52, ECF No. 78-9, page 22.  DAREN testified that Jamie Schindler has never been certified by WBENC as a woman owner.  PE #52, ECF No. 78-9, page 26.  DAREN testified that the emails marked as Exhibit S11 (i.e., pages 42-54 of ECF No. 78-9 (within PE #52)) include several emails

transmitted by DAREN to potential customers stating that "we are a WBENC certified contractor." DAREN testified in the State Court Case that his use of the term "All Paving" in these emails refers to both ALL PAVING INC. and ALL PAVING LLC.  PE #52, ECF No. 78-9, page 25-26. These emails are a further ratification by DAREN of ELIZABETH's majority ownership of ALL PAVING INC.

62.     In January 2017, PATRICK and DAREN had a meeting wherein PATRICK offered to increase DAREN's ownership percentage in ALL PAVING INC. to 35%.  It was PATRICK's understanding that DAREN verbally agreed to the 35% interest.  T-156:1-157:23 (testimony of PATRICK). At trial, Keith Daly testified regarding the January 2017 meeting which he stated was attended by PATRICK, DAREN and Keith Daly, stating: "So, we had the conversation in the office, myself, Patrick, Daren, and basically what it was, if you want to have more stake in All Paving, Inc., that you have to put a little skin in the game, refinancing equipment, put some stuff -- at that time all the trucks and equipment were in my parents' name, Patrick and Elizabeth Daly, so they had the burden on them to obviously pay the equipment and/or vehicles. He said if you want that, we can talk, it will be 65/35, but that would be based on him, you know, getting some of the equipment and vehicles out of their names, and into his own name so that he would be held personally responsible, and be the personal guarantor on those assets."  T-926:21-927:10 (testimony of Keith Daly).  Keith Daly further testified that under this arrangement: "Daren would have 35 percent stake in All Paving, Inc., and Patrick and Elizabeth would have the remaining 65." Keith Daly further testified that "he – they agreed right there in the office that was going to be the deal." T-927:11-927:19 (testimony of Keith Daly).

63.     Consistent with the foregoing testimony of PATRICK and Keith Daly regarding the January 2017 meeting, DAREN signed a Bond Application dated January 6, 2017, PE #17 (ECF No. 77-17, pages 2-6), reflecting a 35% ownership interest for himself in ALL PAVING

INC., and a combined 65% ownership for PATRICK and ELIZABETH (32.5% each) in ALL PAVING INC. Plaintiffs' employee Linda Thorsen testified at trial regarding the January 6, 2017 Bond Application (PE #17), and stated that DAREN is the person who provided the ownership percentages to indicate on the Bond Application. T-1805:1-1809:21 (testimony of Linda Thorsen). The Bond Application dated January 6, 2017 (PE #17) includes DAREN's, PATRICK's and ELIZABETH's signatures and states that PATRICK and ELIZABETH own 65% of ALL PAVING INC. (32.5% each), and DAREN owns 35% of ALL PAVING INC.

64.    In February 2017 DAREN submitted a Wells Fargo Credit Application dated February 14, 2017 (PE #46, ECF No. 78-3, page 46), purporting to state that DAREN owns 50% of ALL PAVING INC. and that PATRICK owns 50% of ALL PAVING INC.  DAREN signed his name to this Application.  During his September 15, 2020 testimony in the State Court Case, DAREN admitted that he also signed PATRICK's name to this Application T-1042:11-1043:15 (testimony of DAREN); PE #46, ECF No. 78-3, page 27.  The Court finds that the February 14, 2017 Wells Fargo Credit Application is fraudulent, because PATRICK's signature was forged by DAREN, and it inaccurately states that DAREN owns 50% of ALL PAVING INC. when in fact at no time has DAREN held more than a minority interest.

65.    On March 13, 2017, DAREN sent a text to PATRICK stating that he told Jenna (the tax accountant), to "calculate 65 percent of the profits" of ALL PAVING INC. on PATRICK's taxes.  PE #22; T-1661:8-23 (testimony of DAREN).  DAREN's March 13, 2017 text message to his father PATRICK goes on to state: "I made an agreement with you and right or wrong I know I can look myself in the mirror and say that I always did the right thing."  PE #22.  A 65/35 split is consistent with the percentages described by PATRICK and Keith Daly in their trial testimony as being the new arrangement discussed with DAREN in January 2017 at the office of ALL PAVING

INC., and is also consistent with the percentages DAREN gave Linda Thorsen to include in the Bond Application dated January 6, 2017 (PE #17).

66.    However, in March 2017, at a meeting at PATRICK and ELIZABETH's home in Coral Springs, Florida, attended by PATRICK, ELIZABETH, DAREN, Keith Daly and Jamie Schindler, DAREN denied he agreed to a 65/35 split of ownership interests in ALL PAVING INC., and instead DAREN argued that his January 2017 agreement was a 65/35 split of ALL PAVING INC. profits, not ownership.   T-175:16-177:16 (testimony of PATRICK); T-1738:25-1739:21 (testimony of Jamie Schindler).   Regarding said March 2017 meeting, Keith Daly testified: "Daren's then argument, or new term was that I [DAREN] didn't agree to that, it was a 65/35 split as far as profits, Patrick would get 65 percent of the profits, not about ownership, which that obviously wasn't the case, or that's not what was said when we met in the office."  T-928:17-22 (testimony of Keith Daly).

67.    Therefore, since DAREN does not acknowledge or seek to enforce the January 2017 agreement which would have increased his ownership percentage to 35%, the Court finds that the original ownership percentages established on September 18, 2015 in accordance with the documents executed at BankUnited, i.e., the Beneficial Ownership Certification and the Corporate Resolution (PE #2 and PE #1), continue to govern through the current date, with ELIZABETH owning 75%, PATRICK owning 12.5%, and DAREN owning 12.5% of ALL PAVING INC.

68.    DAREN testified that he alone decided ownership of ALL PAVING INC. "at inception" and created a "corporate ledger" reflecting same, i.e. an Excel Spreadsheet (DE #57). T-1282:4-1285:5 (testimony of DAREN).  DAREN was asked by his counsel: "who decided who the shareholders would be" and he answered: "I did."  T-1282:21-24.  However, an incorporator of a corporation does not have authority to decide who the shareholders of a corporation are, and the so-called "corporate ledger" is an unsigned Excel Spreadsheet which the alleged majority

owner at inception, DAREN's fiancé Jamie Schindler, first saw more than 3 years after ALL PAVING INC. was formed. T-1730:7-15 (testimony of Jamie Schindler). The Court finds that the Excel Spreadsheet, DE #57, is not a corporate record of ALL PAVING INC. and did not establish ownership of ALL PAVING INC.

69.     DAREN admitted in his trial testimony that the Electronic Articles of Incorporation for ALL PAVING INC. which listed three officers, did not establish ownership, when testifying regarding his November 18, 2016 email to BankUnited: "Q. Daren, do you have a recollection of the incorrect information on file in regards to ownership to which you referred in your November 18, 2016 e-mail? A. I -- as I stated earlier, I do not recall receiving a copy or seeing a copy of the beneficial ownership certificate. Q. So as we sit here today, do you have any idea what you were referring to in this e-mail when you were referencing incorrect information regarding ownership? A. The second part of that sentence, "please find the correct incorporation documents." I could have meant you have the incorrect corporation documents, but I said, "please find the correct incorporation documents." Q. You use the word "ownership" in this e-mail; right? A. Correct. Q. And you know the articles of incorporation do not indicate ownership; correct? A. Correct." T-1499:21-1500:15 (testimony of DAREN).

70.     While DAREN never explained what "incorrect information on file in regards to ownership" he was referencing in his November 18, 2016 email to BankUnited, it is evident that from his testimony quoted above that he understood the Electronic Articles of Incorporation does not reflect ownership of ALL PAVING INC., so he must have been referencing some other document on file with BankUnited. The only document on file with BankUnited stating the ownership of ALL PAVING INC. is the Beneficial Ownership Certification, PE #2, submitted on September 18, 2015 when the account was opened, which states that ELIZABETH owns 75%, PATRICK owns 12.5%, and DAREN owns 12.5% of ALL PAVING INC.

71.     Jamie Schindler testified that she has been a member of The Florida Bar since 2014, and that she began employment as an associate area counsel with the IRS Office of Chief Counsel in 2014 where she is still employed.  T-1725:17-25 (testimony of Jamie Schindler).  Jamie Shindler testified that her name was taken off the ALL PAVING INC. corporate Sunbiz filings as of 2014, and that she has never been a signatory on any ALL PAVING INC. bank account, that she has never been an employee of ALL PAVING INC., that she has never been a guarantor for ALL PAVING INC., and that she never made inquiry with her employer regarding what approvals she may need to allow her to acquire an ownership interest in ALL PAVING INC. (her employer is the IRS Office of Chief Counsel).  T-1734:15-1738:24. At a July 11, 2017 meeting attended by PATRICK, ELIZABETH, DAREN, Jamie Schindler, and counsel for PATRICK and ELIZABETH, and counsel for DAREN (transcribed by a court reporter), Jamie stated that: "If I'm an owner, I would have to go to my employment and figure out what I need to do."  T-1738:1-6 (testimony of Jamie Schindler).  Jamie Shindler testified at the trial in this proceeding that in her text message dated March 16, 2017, she advised PATRICK and ELIZABETH that the Excel Spreadsheet (DE #57) was filed with the State of Florida, and during her testimony in this Court she admitted that her statement in that regard was not correct and in actuality nothing was filed with the State indicating ownership of ALL PAVING INC.  T-1801:23-1803:16 (testimony of Jamie Schindler).  The fact that Jamie Schindler stated that "*if*" she was an owner she "would have to go to my employment and figure out what I need to do," and her admission that she never made such inquiry with her employer regarding her alleged 80% ownership of ALL PAVING INC., contradicts the assertion that Jamie Schindler was ever an owner of ALL PAVING INC.

72.     Furthermore, the unsigned Excel Spreadsheet relied upon DAREN, DE #57, does not describe the business of ALL PAVING INC., in that it states the type of business is: "Construction Contractual Referrals" and states that "All Paving is a service company focused on

connecting businesses with third-party contractors to ease the bidding and subcontracting process." However, the evidence has shown that ALL PAVING INC., like ALL PAVING LLC, is a paving business. At trial, DAREN was asked: "It says, type of business, construction contractual referrals. That's not what All Paving, Inc. does or ever did, correct?" DAREN's answer was "No, All Paving, Inc. does construction." T-1559:1-4 (testimony of DAREN).

73.    The Court rejects the assertion that Jamie Schindler was the 80% owner of ALL PAVING INC. at inception. DAREN, as the incorporator of ALL PAVING INC. had no authority to unilaterally determine corporate ownership, and the unsigned Excel Spreadsheet (DE #57) relied upon by DAREN, first seen by Jamie Schindler, PATRICK and ELIZABETH more than three years after the formation of ALL PAVING INC., is not a valid corporate record does not establish ownership.

74.    The Court finds that prior to the filing of the State Court Case in August 2017, ALL PAVING INC. had not issued stock certificates. T-202:10-23 (testimony of PATRICK); T-1730:16-25 (testimony of Jamie Schindler). This finding is supported by DAREN's testimony in response to the Court's question, as follows: "This is a very important question. He's asking about a certificate not a book. Was there a stock certificate as of January 15, 2016?" In response, DAREN testified: Just the corporate ledger, there was no other certificate." T-1584:23-1585:4 (testimony of DAREN). Additionally, in response to another question asked by the Court, DAREN testified that the first time physical stock certificates existed for ALL PAVING INC. was in 2019. T-1596:17-1597:1 (testimony of DAREN). DAREN later reiterated that: "I am telling you the actual physical stock certificates were done in 2019 …." T-1600:2-4 (testimony of DAREN). Jamie Schindler also testified that there were no physical stock certificates until the summer of 2019 (two years after the State Court Case was filed by Plaintiffs), and DAREN testified that he agreed with Jamie Schindler's deposition testimony on September 10, 2019 taken in the State

25

Court Case wherein she testified that paper stock was issued during the summer of 2019. T-1597:3-1598:1 (testimony of DAREN discussing DE #110, ECF No. 74-5, page 7).

75.     The Court rejects the validity of the paper stock certificates unilaterally created by DAREN and Jamie Schindler in 2019, two years after the State Court Case was filed.  The fact that Jamie Schindler was listed on the original Electronic Articles of Incorporation does not indicate she was ever an owner of ALL PAVING INC.  The Court reiterates its finding that original ownership of ALL PAVING INC. was established on September 18, 2015 pursuant to the documents executed at BankUnited (i.e., the Corporate Resolution and the Beneficial Ownership Certification – PE #1 and PE #2) with ELIZABETH owning 75%, PATRICK owning 12.5%, and DAREN owning 12.5% owner of ALL PAVING INC.

76.     Additionally, for the reasons discussed below, the Court finds that DAREN has engaged in actual fraud in falsely asserting majority ownership and seizing control of ALL PAVING INC. and its assets, and that DAREN has engaged in embezzlement, and has acted willfully and maliciously in injuring the majority ownership interests of ELIZABETH and PATRICK in ALL PAVING INC.

77.     On March 16, 2017, DAREN fraudulently opened new ALL PAVING INC. bank accounts at BankUnited falsely claiming to be the majority owner of ALL PAVING INC., and moved funds from the original ALL PAVING INC. BankUnited accounts, for which PATRICK, ELIZABETH and DAREN were all signatories, to new accounts at BankUnited which DAREN unilaterally opened with himself as sole signatory, and absconded with ALL PAVING INC.'s funds.

78.     Plaintiffs were notified by an employee of ALL PAVING that DAREN was traveling to BankUnited to open the unauthorized accounts on March 16, 2017, and ELIZABETH and Keith Daly responded by also traveling to the Coral Springs branch of BankUnited in an effort

to stop DAREN's unauthorized and fraudulent actions.  Because of the dispute which played out in front of BankUnited, the Bank then froze the ALL PAVING INC. funds (approximately $800,000) which was needed to operate both ALL PAVING INC. and ALL PAVING LLC) and the funds remained frozen for weeks.  In the parking lot of BankUnited on that day, DAREN threatened his mother ELIZABETH with physical violence and called her an unspeakable name. Keith Daly stepped in between his brother DAREN and his mother ELIZABETH to prevent DAREN from carrying out his threat to ELIZABETH.  T-181:17-184:6; 190:15-192:17 (testimony of PATRICK); T-928:23-930:21 (testimony of Keith Daly); T-1088:20-1091:3 (testimony of ELIZABETH).

79.     Also in March 2017, DAREN used a fraudulent document to cause GoDaddy to change the Registrant of the AllPaving.com Domain Name from PATRICK to DAREN, by transmitting to GoDaddy the Domain Name Purchase Agreement, which DAREN fraudulently altered by changing the Purchaser Company Name from "All Paving and Sealcoating" (which can only refer to ALL PAVING LLC since the word "Sealcoating" is only in ALL PAVING LLC's name, to "All Paving Inc.").  DAREN admitted in the State Court Case that in March 2017, after being advised by GoDaddy that any company listed in a domain name registration takes precedence, DAREN altered the purchaser company name in the Domain Name Purchase Agreement by changing the company name from All Paving & Sealcoating (which refers to ALL PAVING LLC) to All All Paving, Inc., and he sent the altered Domain Name Purchase Agreement to GoDaddy, in an effort to convince them to turn over control of the All Paving.com Domain Name to DAREN.  PE #23, ECF 77-23, pages 16-19, 22-37. The Court finds that this act was in furtherance of DAREN's fraudulent scheme, and willful and malicious injury to Plaintiffs.

80.     The proof of the alteration is shown by the metadata in the Domain Name Purchase Agreement PDF file Daren transmitted to GoDaddy on March 17, 2017, which reflects it was

created on March 17, 2017, even though the Domain Name was purchased pursuant to a Domain Name Purchase Agreement in 2014. The Microsoft Word document located on the company computer actually used in 2014 to purchase the AllPaving.com Domain Name with metadata dated February 20, 2014, reflects that the company which purchased the AllPaving.com Domain Name was "All Paving and Sealcoating" i.e., ALL PAVING LLC, not ALL PAVING INC. Furthermore, ALL PAVING INC. was not yet operating in 2014 when the AllPaving.com Domain Name was purchased (ALL PAVING INC. first began operations in late 2015). The AllPaving.com Domain Name was used by ALL PAVING LLC for its email and website until DAREN wrongfully seized control of the Domain Name in 2017, which has caused a major disruption in Plaintiffs' business. Because of DAREN's willful and malicious actions described above, in March 2017 ALL PAVING LLC acquired the 3-DPaving.com domain name in order to re-establish business email addresses and a website, due to the fact DAREN locked Plaintiffs out of the AllPaving.com Domain Name and blocked their email. This transition has harmed Plaintiffs' business and has caused customer confusion. T-108:5-110:4; 184:18-190:14 (testimony of PATRICK); PE #23.

81.     With regard to the AllPaving.com Domain Name, website, and email accounts, PATRICK testified that "this whole thing was all paid by LLC, all paid, all the updates, I told you earlier in the testimony, we paid thousands and thousands of dollars for the domain name, for the website, for everything that was going on, for all the updates, because you have to keep it all current and, you know, refreshed and all this other stuff and, you know, then everything that we had invested and everything, because we got possession of it, we were locked out of it and we had to start all over again." T-187:17-25 (testimony of PATRICK).

82.     As further acts of willful and malicious injury to Plaintiffs' businesses and their business interests, DAREN removed the server from Plaintiffs' office for several days and shut down the telephone and emails of Robert Holland (i.e., a 15% owner and employee of ALL

28

PAVING LLC at that time) and changed the locks to the office.  While the server was missing, Plaintiffs did not have the computer files and data needed to contact customers or transact business using QuickBooks.  When DAREN returned the server several days later, computer files were rearranged and missing.  T-180:12-181:4 (testimony of PATRICK).

83.    The Court also finds that Plaintiffs did not agree to change the ownership percentages originally established for ALL PAVING INC. when it began operating in 2015, notwithstanding DAREN's reliance upon an email from Jamie Schindler dated March 23, 2017 which she sent to PATRICK along with a proposed "contract" for signature by PATRICK and DAREN (DE #143).  That document was never signed, and it never became a contract between PATRICK and DAREN, and the document did not address ownership of ALL PAVING INC. in any event.  PATRICK noted in response to cross-examination regarding DE #143 that it was not an agreement, there are no signatures, and it was "a proposal as far as I'm concerned."  T-280:19-283:25; 995:1-997:16 (testimony of PATRICK).  Additionally, in her testimony at trial, Jamie Schindler admitted that she never witnessed PATRICK and DAREN coming to an agreement to resolve their controversies (and testified they were not even speaking with each other), and that she was acting as a "broker."  T-1743:16-1744:10; 1746:12-1748:2 (testimony of Jamie Schindler).  Furthermore, there was no testimony that ELIZABETH was ever a part of these discussions, or that she ever agreed to relinquish her 75% ownership interest in ALL PAVING INC.  The unsigned document, DE #143, made no mention of ELIZABETH giving up her ownership interest in ALL PAVING INC.

84.    The document signed by the parties dated April 14, 2017 to release the frozen funds from BankUnited (DE #100) also did not resolve the ownership dispute --- there is no language therein reflecting any change of ownership or resolution of an ownership dispute, and the evidence shows the division of funds in DE #100 was a "reconciliation" which had been the routine practice

of the parties, because ALL PAVING LLC regularly advanced funds for ALL PAVING INC.'s expenses and would receive reimbursements.   T-443:4-444:2; T-997:17-998:2 (testimony of PATRICK).

85.     The evidence has shown that DAREN was a very difficult person to work with and created hostility in Plaintiffs' office.   DAREN had frequent conflict with Robert Holland, salesman and 15% owner of ALL PAVING LLC, a man 30 years older than DAREN.   There was testimony that in one incident, DAREN grabbed Mr. Holland by his throat during an argument and PATRICK needed to step in between them.   DAREN was verbally abusive to other employees, bringing them to tears.   PATRICK testified that "If Daren had a dispute with him or whatever, he would turn off his phone, he'd turn off his computer, he would do anything to disrupt him that he could."   In May 2017, Robert Holland advised he could no longer work in the same office with DAREN, and at the end of May 2017, Plaintiffs opened a separate office to escape from DAREN and his hostilities. T-192:18-198:9 (testimony of PATRICK).   PATRICK testified that the physical moving out of the office did not resolve the ownership dispute, stating: "No, it didn't resolve anything.   All we were trying was trying to – I was trying to mitigate the situation that was at hand.   Like I said to you earlier in the testimony, I was afraid that one of the employees was going to come back and sue us, or do something along those lines, for his behavior.   His behavior was out of control."   T-200:10-18 (testimony of PATRICK).

86.     Keith Daly also described the hostility caused by DAREN in the office, and specifically directed at Mr. Holland, as follows: "Bob Holland had obviously been doing this a very long time. You know, I think he was in his 60s at the time. So it got nasty, to the point where, you know, Daren had made several threats to, you know -- I apologize, but, you know, beat his ass, on more than one occasion, so it became a very hostile kind of environment at the office between the two of them, specifically.   T-906:11-17 (testimony of Keith Daly).

87.     ELIZABETH testified that Plaintiffs' moving to a new office on May 22, 2017 was in furtherance of Plaintiffs' effort to separate from DAREN because he was impossible to work with, had caused the freezing of bank accounts and the shutting down of email and telephones, and had created a hostile work environment.  T-1096:7-1098:10 (testimony of ELIZABETH).  The separation from DAREN was not in furtherance of an agreement to give away the company to DAREN; in fact, PATRICK and ELIZABETH have maintained to the present day they own a combined 87.5% interest in ALL PAVING INC.  T-198:21-202:9 (testimony of PATRICK).

88.     On June 6, 2017, Jamie Schindler and PATRICK had a phone call which Jamie Schindler memorialized in a text message which Jamie Schindler sent to PATRICK (PE #24 in evidence).  T-1755:23-1756:9 (testimony of Jamie Schindler).  In her text message (PE #24), Jamie Schindler stated "I don't think we accomplished much on the phone call but I hope that you understand that I really don't care who gets what percentage of all paving …"  Jamie Schindler's June 6, 2017 text message also states "No one will ever agree on who was right and who was wrong.… all I can do is to ask everyone to stop making decisions that continue the fight and start making decisions toward a solution."  PE #24.  These statements show that Jamie Schindler did not consider ownership of ALL PAVING INC. to be a resolved issue as of June 6, 2017, pursuant to any agreement which Jamie Schindler allegedly "brokered" in March or April 2017.

89.     Jamie Schindler's June 6, 2017 text message to PATRICK (PE #24) shows that the dispute over ownership was ongoing as of that date, and the Court rejects DAREN's arguments asserting that PATRICK (or ELIZABETH) agreed to relinquish their ownership interests in ALL PAVING INC. pursuant to the unsigned document dated in March 2017 marked DE #143, or the joint letter submitted to BankUnited in April 2017 to unfreeze the frozen funds marked DE #100, or pursuant to any alleged prior verbal agreement which Jamie Schindler "brokered."

90.     Jamie Schindler was also asked about documentation purporting to establish her alleged ownership of 80% of the stock in ALL PAVING INC. at its inception (prior to the time Jamie Schindler and DAREN's creation of paper stock certificates in 2019 which was two years after the State Court Case was filed), and she testified as follows regarding the unsigned Excel Spreadsheet (DE #57): "Q. And prior to this point in time [2019], there was never any paper stock certificates for All Paving, Inc.; right?  A. Not a stock certificate. We only memorialized it on the corporate document that you have back in 2013 when we -- when Daren incorporated it. Q. The one that you didn't see until 2016, 2017, right, that Excel spreadsheet? A. Correct, I did not see it until 2016, 2017. Q. And it has no signatures on it, does it? A. Not that I'm aware of."  T-1763:14-24 (testimony of Jamie Schindler).  The Court finds that the unsigned Excel Spreadsheet (DE #57), first seen by the alleged 80% owner three years after the formation of ALL PAVING INC., is not a "corporate record," and does not have any evidentiary value to establish ownership of ALL PAVING, INC.  The facts have shown that Jamie Schindler was never an owner of ALL PAVING INC., and her assertion of prior ownership is without basis.

91.     Three days after Jamie Schindler's June 6, 2017 text, PE #24, DAREN withdrew $175,000.00 from ALL PAVING INC. through a wire transfer to his personal bank account.  PE #25.  This transaction was not authorized by Plaintiffs.  T-221:12-20 (testimony of PATRICK).

92.     On June 29, 2017, PATRICK and ELIZABETH executed an Action by Written Consent of a Majority of Owners/Shareholders (PE #26).  Said Action sets forth several Whereas clauses which include many of the facts proven by Plaintiffs in this proceeding, stated above.  Said Action was signed by ELIZABETH and PATRICK as the 75% shareholder and 12.5% shareholder of ALL PAVING INC., respectively.  Said action states that PATRICK and ELIZABETH were elected the sole Directors of ALL PAVING INC., and that any other Directors who may have

32

purported to assume such role including, without limitation, DAREN and Jamie Schindler, are removed.

93.    On June 29, 2017, PATRICK and ELIZABETH executed an Action By Written Consent of the Board of Directors of ALL PAVING INC., PE #27, which appointed PATRICK as President, ELIZABETH as Vice President, Secretary and Treasurer, and removed all other persons who have purported to assume the role of Officers of ALL PAVING INC. including, without limitation, DAREN and Jamie Schindler.  Said action also stated that "Daren Daly is hereby immediately TERMINATED as an employee, agent, independent contractor, or representative of the Corporation in any capacity, and he shall immediately remove himself from all premises of the Corporation, and turn over to its President, Patrick Daly, all property of the Corporation including all keys, personal property, equipment, documents, checkbooks, bank statements, emails, customer lists and contact information, vendor lists and contact information, contracts, project files, bonding documents, equipment financing documents, bills of sale and equipment ownership documents, ledgers, computers, computer data, software, media, etc., and all login information (including user names and passwords for all online access associated with the Corporation including with banks, QuickBooks, domain registrars, webhosts, email and all other services).  Daren Daly shall also execute any paperwork needed or requested by vendors, banks, QuickBooks, lenders, registrars, webhosts, and other parties, to confirm that he is no longer an employee, officer, agent, or other representative of the Corporation, and to transfer all access and authority to Patrick Daly and Elizabeth Daly.  Such paperwork shall include documents and online authorizations to transfer the domain names allpaving.com and allpavingandsealcoating.com to a GoDaddy account controlled by Patrick Daly or Elizabeth Daly (or turning over to them the GoDaddy account in which said domains are currently registered by providing Patrick Daly and Elizabeth Daly with the login information)."

94.     On June 29, 2017, ELIZABETH as Shareholder and Director, and PATRICK as Shareholder and Director, served DAREN with Notice of Action by Written Consent of Owners/Shareholders of All Paving, Inc. and Notice of Action by Written Consent of the Board of Directors, of All Paving, Inc., PE #28.  The evidence has shown that DAREN has not complied with said Corporate Action and has continued to maintain wrongful control of ALL PAVING INC., its assets, and its funds.

95.     After an unsuccessful meeting with DAREN and Jamie Schindler on July 11, 2017, ALL PAVING INC., ALL PAVING LLC, PATRICK and ELIZABETH filed the State Court Case on August 4, 2017 and put this dispute into the hands of the Courts, rather than contacting banks and causing the freezing of funds and "airing out our dirty laundry" by contacting customers.  T-1007:6-1009:5 (testimony of PATRICK).

96.     Two years after the State Court Case was filed, on November 27, 2019 DAREN filed in the State Court Case an alleged "Corporate Book of ALL PAVING INC." (PE #32, ECF No. 77-32).  Included in PE #32 (at ECF No. 77-32, pages 76-85) are documents purporting to be paper stock certificates and a stock transfer ledger bearing dates going back to 2016 and 2013. Nothing in PE #32 discloses that the stock certificates and stock transfer ledgers were backdated.

97.     DAREN's manufacturing and backdating false ALL PAVING INC. stock certificates and a false stock transfer ledger in 2019 (PE #32), after testifying in his State Court Case deposition in 2018 that ALL PAVING INC. never issued stock certificates (PE #54, ECF No. 78-11, pages 13-14), constitutes evidence of DAREN's fraudulent scheme, and his willful and malicious injury to Plaintiffs' property rights.

98.     The Court finds that the backdated stock certificates and stock transfer ledger included in PE #32 do not support DAREN's claim of ownership of ALL PAVING INC., and were created in a fraudulent effort to establish a false claim of ownership.

99.     Since DAREN is not the majority owner of ALL PAVING INC., and the majority owners, ELIZABETH and PATRICK, signed a Corporate Action to remove him but he has not complied, the Court finds that DAREN has been embezzling funds from the bank accounts of ALL PAVING INC. well into the seven figures, as supported by the expert testimony of Plaintiffs' expert witness, Joey Friedman, CPA, discussed below.

100.    From March 2017 to present, DAREN has maintained wrongful control of the business of ALL PAVING INC., including PATRICK and ELIZABETH's majority ownership interests therein.

101.    This intentional misconduct by DAREN is inconsistent with Plaintiffs' valuable property rights, and DAREN has engaged in a fraudulent scheme, embezzlement, and has willfully and maliciously injured and converted to his own use PATRICK and ELIZABETH's majority ownership interests in ALL PAVING INC., and ALL PAVING LLC's ownership interest in the AllPaving.com domain name, for which DAREN should be held liable and for which exceptions to discharge apply.

102.    The Court also notes that DAREN's Periodic Report Regarding Values, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest filed on August 11, 2023 as ECF No. 175 in the Main Case, reports that a significant amount of business is being run by DAREN through Resurface Industries, LLC.  On Exhibit B at page 15 of said filing DAREN asserts: "The Debtor is the 100% owner of All Paving, Inc. and Resurface Industries, LLC.   Through these entities the debtor provides roadway solutions, including paving, overlay, sealcoating and related services to municipalities and commercial customers."  Thus, DAREN admits that Resurface Industries, LLC is engaged in the exact same business as ALL PAVING INC.  Sunbiz.org shows that Resurface Industries, LLC was formed on April 14, 2022 (three months before DAREN's Subchapter V, Chapter 11 filing herein.)

DAREN's name is not listed in the Articles of Organization of Resurface Industries, LLC (there are no members or managers listed), and Resurface Industries, LLC has not filed its annual report for 2023 which was due on May 1, 2023.

103.    Since DAREN asserts he is (allegedly) "the 100% owner of All Paving, Inc. and Resurface Industries, LLC" and they are both engaged in the identical business, it is apparent that DAREN formed Resurface Industries, LLC in an effort to defeat PATRICK and ELIZABETH's claims should this Court determine they are the majority owners of ALL PAVING INC.  This is an additional reason for this Court's finding that DAREN is committing actual fraud by engaging in a fraudulent scheme, and that entry of a money judgment for the value of ALL PAVING INC. on the date he converted Plaintiffs' business interests plus disgorgement of embezzled amounts is appropriate, and that a mere declaration of ownership of ALL PAVING INC. will not fully compensate Plaintiffs.

104.    Joey N. Friedman, CPA testified as Plaintiffs' expert witness.  Mr. Friedman is a Certified Public Accountant, an Accredited Business Valuator through the AICPA, and has a Master's in International Business.  He was questioned during voir dire about his qualifications and the methods and methodologies used by Mr. Friedman.  The Court overruled DAREN's objections to Mr. Friedman's testifying as an expert witness and allowed his testimony under Federal Rules of Evidence 702.  Also, the Court admitted into evidence Mr. Friedman's Report, PE #41 (the "Friedman Report").  T-598:22-636:41 (testimony of Joey N. Friedman, CPA). DAREN did not call any expert witnesses at trial.

105.    Mr. Friedman's testimony included his opinions regarding the calculations that were included in Appendix D and Appendix E of the Friedman Report.  Appendix D is the business valuation for ALL PAVING INC. as of 2017 (the year DAREN seized sole control over ALL PAVING INC. and  converted ELIZABETH and PATRICK's business interests in ALL PAVING

INC).  Appendix E is Mr. Friedman's "disgorgement calculation".  T-637:13-638:3 (testimony of Joey N. Friedman, CPA).

106.    The Friedman Report describes the approaches, methods and methodologies used to arrive at the business valuations for ALL PAVING INC.  Appendix D sets forth the business valuation of ALL PAVING INC. as of December 31, 2017: $2,293,773.00, which was based on total revenue of $5,730,221.00 reported on ALL PAVING INC.'s 2017 income tax return. (Said tax return is DE #10 in evidence). Applying the combined ownership percentage interests of PATRICK and ELIZABETH (87.5%), to the $2,293,773.00 business valuation, means their claim amounts to $2,007,051.38 for that component of their damages.  T-643:11-644:23 (testimony of Joey N. Friedman, CPA).

107.    Additionally, Appendix E of the Friedman Report sets forth a disgorgement analysis and calculations, which totals $2,336,258.32 as of December 31, 2021.  Mr. Friedman testified that the items listed in Appendix E reflect embezzlement by DAREN, stating: "I was noting was that there are characteristics you look for when you believe there may be embezzlement, and then you try to track down, you know, how it's being -- the money is being embezzled, and this has all the characteristics of what would look – you know, financially, look like embezzlement, because there's such a significant amount of money missing, that someone managing a company and losing that much money, they would not accidently just not notice that 2 million, $2.8 million is missing over a five-year period. If they're competent, and they're running the business properly, they would obviously notice it missing, missing $2.8 million, so, yes. And some of the explanation of where this money went, it's just bogus, it's not typical accounting language. Some of them just don't have any explanation at all under the general ledger. So, yes, the best conclusion would be Daren has control of the company currently, and this money went

missing. So, I guess, you know, one plus one equals two, I guess that's the best I can say."  T-690:18-691:13 (testimony of Joey N. Friedman, CPA).

108.    Mr. Friedman noted several items that are included in Appendix E of his report, including "$135,000 that was withdrawn from an ATM as cash" … "Daren's compensation as officer's pay, and the total was -- you can see here by year, but the total for five years was $1,158,618, which that should have been -- in our approximation, for someone in that position, should have been about $500,000, total, for five years." … "non-business expenses, like I mentioned, there were a lot of travel, Colorado, Royal Caribbean …" "There was non-business expenses – there were IRS payments of Daren's personal extension payment, personal IRS extension payment, but it was classified as business contractor expenses. So, again, personal expenses being put on business of $120,000." … "in 2017, $175,000 …" "and we've asked for explanations for this unaccounted -- these unaccounted for funds, and we haven't received them. So, Daren is the only place that I can imagine that the missing money would go. That's -- I would allocate -- it's all allocated to Daren. I mean, with cash withdrawals from ATMs, I don't imagine a lot of the employees are allowed to just withdraw cash from the ATM whenever they want, but I'll continue going down the list." … "An over the counter withdrawal, which is basically just like an ATM, you're going to the bank, and you're just going to the counter and asking for cash, we have a total over the five year period of over the counter withdraws of cash of $503,557."  ... "There was a journal entry for stolen funds for $176,810. Again, no explanation, that was all that was there, missing money, and it was notated as stolen funds. Then there was a teller connect withdraw, and that was only about 1,000."  … "Well, that's -- basically that's -- all of these missing funds or transactions, like, cash withdraws and everything and on this entire list, including Daren's compensation, non-business expenses, you know, for travel and whatnot, when you add it all up and total it, the total is $2,836,258. Now, this only goes through the end of 2021 because I only

had records at the point that I created this that go through that date. So the total that is missing, that Daren is it's likely his compensation, is that Daren has probably withdrawn $2,836,258 from the business, unless we are provided with a different explanation as to where that money went, but he does deserve a fair salary of $100,000 per year. So, out of that missing money, that I believe, you know, Daren, as the, you know, sole person that probably has control over the money, so out of that 2.8 million that we've calculated, we add back $500,000 for his fair compensation, and it brings us down to only missing, or compensation that's not designated as compensation for Daren, but that Daren used the money for, of $2,336,258." T-680:19-688:10 (testimony of Joey N. Friedman, CPA).

109.    During cross-examination, Mr. Friedman was shown documents not previously produced by DAREN.  The amounts reflected in these documents, marked as DE #214, DE #215, DE #216, account for $271,895.79 of the $2,336,258.32 reported in Appendix E of the Friedman Report.   Subtracting $271,895.79 from $2,336,258.32 leaves a net disgorgement amount of $2,064,362.53, and DAREN did not offer into evidence any other documents accounting for the remaining $2,064,362.53 calculated by Mr. Friedman in Appendix E of his Report.

110.    The Court notes that the Appendix E calculation is only through calendar year 2021, and that Appendix E contains a footnote stating that DAREN continues to pay himself $6,700 per week ($348,400 per year) which is in excess of a reasonable salary of $100,000 per year, and that "the additional $248,400 that DAREN has received needs to be added to the disgorgement amount."

111.    Therefore, the Court recalculates the disgorgement (embezzlement) amount of the claim to be as follows: $2,336,258.32 - $271,895.79 + $248,400.00 = $2,312,762.53. Since PATRICK and ELIZABETH own 87.5% of ALL PAVING INC., Plaintiffs' claim with respect to the disgorgement amount is 87.5% of $2,312.762.53, which equals $2,023,667.21.

39

112.    As a result, the total amount of Plaintiffs' allowed claim against DAREN hereby adjudicated by this Court is $2,007,051.38 (i.e., 87.5% of the 2017 value of ALL PAVING INC. converted by DAREN to his own use), plus $2,023,667.21 (i.e., 87.5% of the disgorgement (embezzlement) amount) = **$4,030,718.59.**

113.    Pages 49-58 within Appendix E of Mr. Friedman's Report (PE #41) also includes an analysis of unexplained significant discrepancies in DAREN's financial reporting for ALL PAVING INC. during the one-week span from June 23, 2022 (as reported by DAREN in the State Court Case) compared with the June 30, 2022 financial statements filed by DAREN with this Bankruptcy Court -- ECF No. 31 in the Main Case).  Mr. Friedman testified to these discrepancies at trial and they are discussed at pages 54-58 of the Friedman Report, which include several tables reflecting these significant discrepancies.  T-691:14-702:16 (testimony of Joey N. Friedman, CPA). Mr. Friedman testified that "I was able to extract information from the QuickBooks system. They gave me limited access. I extracted that information on June 23 -- on June 23rd, 2022. One week later, June 30th of 2022, those same statements that I was able to extract from the QuickBooks system are provided to the Bankruptcy Court, and when I made the comparison of what was provided to the Bankruptcy Court versus what I was able to pull from the system, it almost looks like you're looking at a different company. They are so drastically different that I don't even think there is any way that there could be an explanation for the things that are occurring, because it's -- I'll go through the things item by item, but they're anomalistic because it's like -- like, here is one example, so total accounts receivable decreases by $273,000 over one week, but the total bank account also decreases by $104,000 over one week. Now, both of these are not typical. If you look back at all the five years of their statements, never do huge swings like this happen, but if accounts receivable went down by $273,000, that means that these clients who owed money to the company paid the 273,000. So the bank account should go up. Instead it goes down

by $104,000. Total assets decreased by 378,000." T-691:20-692:19 (testimony of Joey N. Friedman, CPA).

114. Mr. Friedman was further questioned regarding these discrepancies, as follows: "Q. So let me make sure I understand, okay? So as of June 23rd, 2022, are you saying that the QuickBooks provided by Daren Daly online that were able to access -- A. Right. Q. -- compared to what he reported to the Bankruptcy Court as of one week later, June 30, 2022 -- A. Yes. Q. -- $331,556.84 net income vanished? A. Yes, and this is the exact same report. I can show you both reports next to each other, there's no difference between the type of report that's pulled – we pulled the same report from the same data, and they are drastically different. T-694:19-695:7 (testimony of Joey N. Friedman, CPA). Mr. Friedman also testified as follows: "Q. Okay. Did you -- were you able to discern any reasonable explanation for the $104,757.35 drop in SunTrust Account 06343? A. No. In fact, when you look at everything as a whole, I can't come up with any explanation at all for what would cause these types of transactions to all occur within a weeks time period, especially to the magnitude that they are. I mean, a couple thousand here, a couple thousand there, some -- you know, the bank account fluctuates or, you know, the accounts receivable fluctuates, but to this degree, I mean, this is what you would see in -- fluctuations, this is what you see in year's worth of time, not in a month. Q. Or a week? A. I'm sorry, not in a week, right. So, right, so in seven days it appears that the company suddenly went from showing a profit of $203,024, on the statement that I have, to showing a loss of $128,532, on the statement provided to the Court. Q. Now, did you notice that Daren Daly asserted that he's the 100 percent owner of All Paving, Inc. and Resurface Industries, LLC -- A. Yes. Q. -- a company he first formed a few months ago? A. I'm aware of that, yes, and that -- Q. Were you provided with any information on that company, including whether any cash went over to that company, or receivables went over to that company? A. I have not been provided any information for Resurface, Inc. but, yes -- yes,

41

that's one plausible way, you know -- Q. When you say "plausible" -- A. That's one -- I mean, yes, sure, that's one potential way, where the money could have gone." T-699:6-700:15 (testimony of Joey N. Friedman, CPA). Mr. Friedman was also asked: "Q. Did you see any "due to" or "due from" entries in the accounting of All Paving, Inc. for any potential intercompany transactions? T-701:2-10. Mr. Friedman provided the following answer to that question: "The money -- so, in my opinion, based on what I've seen, doing this for years, one, these types of transactions make no sense. It's definitely planned to be extracting money and assets from the company, that's the only explanation I can come up with. Again, I'm not giving you a legal conclusion or anything, that someone is stealing money, but that's the only thing I can -- the way I can imagine that, within one week's time, this occurs. So that being the case, either it's going to Daren Daly, or it is going to his other company, because he would be the person that would authorize, you know, this to have happened and occurred. I don't know – you know, I don't know which one of those two options it is, but that's the only two options I can think of of how this would happen, and where the money would go." T-701:21-702:11 (testimony of Joey N. Friedman, CPA).

115.    Mr. Friedman testified that the disgorgement amount calculations (on page 48 of the Friedman Report) do not include the June 23 – June 30, 2022 discrepancies. T-702:13-16 (testimony of Joey N. Friedman, CPA). However, the Court has included a discussion regarding the significant discrepancies between DAREN's June 23, 2022 and June 30, 2022 financial reporting for ALL PAVING INC. in these findings of fact because they further provide support for the Court's finding that DAREN has engaged in embezzlement and a fraudulent scheme, and that DAREN is not entitled to a discharge of his debt to Plaintiffs, as discussed in the Conclusions of Law section, below.[2]

_____

[2]    The Court also notes that on August 28, 2023, DAREN filed Amended Periodic Reports as of 7/31/22, 1/31/23, and 7/31/23 (DE #178, 179, and 180 in the Main Case) which revealed for the first time in the Balance Sheets included therein that ALL PAVING INC. has had on deposit with Seacoast Bank **an additional $1.5 million**

## CONCLUSIONS OF LAW

## JURISDICTION AND VENUE

Pursuant to 28 U.S.C. § 1334, this Court has jurisdiction of this consolidated evidentiary hearing and trial of the issues presented in Debtor's Objection to Plaintiffs' Claim Number 13-1, and Plaintiffs' adversary proceeding against Debtor.  Plaintiffs' adversary proceeding requests that this Court find Debtor's debt to Plaintiffs is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), 11 U.S.C. § 523(a)(4), and 11 U.S.C. § 523(a)(6).  This matter constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (I) because it involves Debtor's objection to Plaintiffs' claim in his bankruptcy proceeding, and seeks the determination of dischargeability of certain debts.  28 U.S.C. § 157(b)(1) empowers the Bankruptcy Courts to enter appropriate orders and judgments.  Venue is proper pursuant to 28 U.S.C. § 1409, because Debtor filed his Subchapter V Petition under Chapter 11 of the Bankruptcy Code, in this District.

## STANDARD OF PROOF

In *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court stated that: "…we hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."  498 U.S. at 291.  "In an adversary proceeding, the party seeking to establish an exception to the dischargeability of a debt bears the burden of proof … by a preponderance of the evidence.  *In re: Rassbach,* 650 B.R. 568, 572 (Bankr. Wis. 2023). "While exceptions to discharge should be construed in favor of debtors in accordance with the principle that provisions dealing with this subject are remedial in nature and are designed to give a fresh start to honest debtors unhampered by pre-existing financial burdens … [h]owever, bankruptcy courts are not to be used as 'a haven

---

since the date of DAREN's bankruptcy filing on July 26, 2022.  DAREN failed to explain why he previously did not report said $1.5 million in cash to this Court.  This is another example of an unexplained discrepancy in DAREN's financial reporting, and provides further support for the Court's findings of fact and conclusions of law herein.

for wrongdoers'." *In re: Davis,* 194 F.3d 570, 573 (5th Cir. 1999) (citing to *In re: DeFelice,* 77 B.R. 376, 378 (Bankr. D. Conn. 1987).

## STATE OF FLORIDA SUBSTANTIVE LAW

**I.      ALL PAVING INC. is Owned 75% by ELIZABETH DALY, 12.5% by PATRICK DALY, and 12.5% by DAREN DALY**

1.      DAREN was named in the Electronic Articles of Incorporation of ALL PAVING INC. as the Incorporator.  PE #20.  The Incorporator has no authority to issue shares of stock in a Florida corporation; that authority is reserved to the directors pursuant to Florida Statutes Section 607.0621(2) which provides: "The board of directors may authorize shares to be issued ...." DAREN was not named as a director in the Electronic Articles of Incorporation — no one was. DAREN's argument that he allegedly issued 80% of the shares of ALL PAVING INC. to his fiancé Jamie Schindler "at inception" legally fails and is not supported by a preponderance of the evidence.  In the absence of a board of directors, shares of ALL PAVING INC. stock could not be issued simultaneously with incorporation.  Fla. Stat. §§ 607.0201, 607.0205.

2.      Florida Statutes Section 607.0626(1) provides: "Unless the articles of incorporation or bylaws provide otherwise, the board of directors of a corporation may authorize the issuance of some or all of the shares of any or all of its classes or series without certificates. ..."  The Electronic Articles of Incorporation of ALL PAVING INC. does not prohibit the issuance of shares without certificates, and therefore, Section 607.0626(1) permits issuance of ALL PAVING INC. shares "without certificates."

3.      Florida Statutes Section 678.1131 provides further support that under Florida law, written stock certificates are not required to establish ownership interests in a corporation, because it specifically states that the statute of frauds is inapplicable:

678.1131 Statute of frauds inapplicable.—A contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or

record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.

4.     The Uniform Commercial Code Comment notes that Florida Statutes Section 678.1131, enacted in 1998, is a reversal of prior law, in that it states: "This section [Fla. Stat. § 678.1131 (1998)] provides that the statute of frauds does not apply to contracts for the sale of securities, reversing prior law which had a special statute of frauds in Section 8-319 (1978)." Therefore, cases which relied upon the earlier version of Article 8 of the Uniform Commercial Code, including *Ennis v. Phillips,* 890 So.2d 313 (Fla. 4th DCA 2004) and *Sackett v. Shahid,* 722 So.2d 273 (Fla. 3d DCA 1998), are no longer good law to the extent they relied upon the repealed statutes.

5.     In fact, both *Sackett* and *Ennis* noted in their decisions that Chapter 678, Florida Statutes (1995) was substantially revised in 1998, and that their decisions were based on the prior version of Chapter 678 of the UCC.  The *Sackett* Court stated: "The version of Chapter 678, Florida Statutes (1995), applicable to the instant action was substantially revised in 1998. See ch. 98–11, Laws of Florida (1998)."  *Sackett,* 722 So. 2d at 276, n. 3.  Similarly, in *Ennis,* the Court stated: "As the court pointed out in *Sackett,* this section was substantially revised in 1998."  *Sackett,* 722 So.2d at 276 n. 3.

6.     Former Section 678.313, Florida Statutes, upon which both *Sackett* and *Ennis* relied was repealed (along with the entire Chapter 678, Florida Statutes), by Florida Laws 1998, c. 98-11, § 25, effective Oct. 1, 1998.  The language (now repealed) within former Florida Statutes Section 678.313 (1995) required, through the use of the word "only" in subsection (1) thereof, a certificated security or other documentary evidence, and the repealed version of Chapter 678 contained a statute of frauds, now repealed and replaced with a statute which states that the statute

of frauds is inapplicable.  Fla. Stat. § 678.1131. Therefore, DAREN's reliance upon *Sackett* and *Ennis* is misplaced.

7.      Plaintiffs are not relying upon a "transfer" of ownership interests in ALL PAVING INC. to them.  Instead, the facts of this case show that original ownership of ALL PAVING INC. was agreed upon and established on September 18, 2015, when ALL PAVING INC. opened its first bank account and began operations.

8.      Therefore, DAREN's argument based on sections of Chapter 678, Florida Statutes that pertain to corporate registration of transfers of securities fails.  It is DAREN, not Plaintiffs, who asserts that his ownership depends on an alleged transfer of securities from his fiancé Jamie Schindler, based on the allegation that she originally owned 80% of the shares in ALL PAVING INC., which was legally impossible since the incorporator has no authority to issue shares under Florida Statutes, as discussed above.  As a result, DAREN's argument that ALL PAVING INC. did not strictly follow the transfer of shares statutes regarding delivery and registration under Chapter 678 actually works against him.

9.      On August 4, 2017, Plaintiffs filed their original Complaint in the State Court Case. A copy of the Second Amended Complaint filed by Plaintiffs in the State Court Case on February 17, 2021 is attached to the Amended Adversary Complaint as Exhibit 10, filed herein as ECF No. 24-10, and it is also attached to Plaintiffs' Claim No. 13-1 filed in the Main Case (hereinafter, the "Second Amended Complaint.").

10.     As of the date the State Court Case was filed on August 4, 2017, there were no ALL PAVING INC. stock certificates or a corporate book.  This is undisputed.

11.     Ownership of ALL PAVING INC. was established without certificates on September 18, 2015, pursuant to the documents executed by PATRICK, ELIZABETH and DAREN at BankUnited, i.e.: the Corporate Resolution (PE #1 in evidence), and the Beneficial

46

Ownership Certification (PE #2 in evidence) which states that ELIZABETH owns 75%, PATRICK owns 12.5%, and DAREN owns 12.5% of ALL PAVING INC. The evidence has shown that the Beneficial Ownership Certification was signed by ELIZABETH as President of ALL PAVING INC., in the presence of and with the approval of DAREN and PATRICK, and reflects the ownership percentages which DAREN provided to BankUnited through the advance arrangements DAREN made with BankUnited, prior to ELIZABETH, DAREN and PATRICK's arrival at BankUnited on September 18, 2015.

12.     The Corporate Resolution dated September 18, 2015 which bears the signatures of PATRICK, ELIZABETH, and DAREN (PE #1), establishes that ALL PAVING INC. was organized and had a Board of Directors and Officers as of September 18, 2015.

13.     The Corporate Resolution and Beneficial Ownership Certification jointly submitted to BankUnited on September 18, 2015 by PATRICK, ELIZABETH and DAREN were valid corporate actions of ALL PAVING INC., and constitute corporate records of ALL PAVING INC. which establish the officers, directors, and shareholders of ALL PAVING INC. as of that date.

14.     The 2016 Annual Report for ALL PAVING INC., electronically signed by DAREN and filed with the Florida Secretary of State on January 15, 2016 (PE #20 -- ECF No. 77-20, page 12), reflects the same officer positions stated in the September 18, 2015 Corporate Resolution (PE #1), jointly submitted to BankUnited, and the 2016 Annual Report filed by DAREN reflects DAREN's ratification of the corporate action of ALL PAVING INC. taken 4 months earlier at BankUnited.

15.     In *Etheredge v. Barrow,* 102 So. 2d 660 (Fla. 2d DCA 1958), the Court noted that closely held corporations often do not have formal meetings of directors with minutes, but that does not impact the validity of corporate actions taken by the officers, directors and shareholders. The *Etheredge* Court cited and quoted *Fletcher Cyclopedia of Corporations,* stating as follows:

The meeting in question was not a formal meeting of the directors and the minutes contain no mention of it, but those present and participating in the discussion constituted all of the directors and holders of all stock of the corporation. The directors were not purporting to act as a board, which is a general requirement for the exercise of authority by and as directors, but the law recognizes an exception to the rule in the case of closed corporations, such as the evidence shows this corporation to have been.

'The doctrine of permitting closed corporations to act informally is recognized as an exception to the general rule that directors must act as a board at duly convened meeting. In fact it is well known that corporations which include only a few stockholders do not often act with as much formality as larger companies. This is especially so where the members of the board, actually and directly, personally conduct the business.'

'If the directors own all of the stock, a conveyance, mortgage or contract authorized by them when not assembled at a meeting is valid, and * * *. This rule has been applied to the execution of a lease without formal authorization at meeting of board of directors.' 2 Fletcher Cyclopedia of Corporations, #394.1 and #395.

*Etheredge v. Barrow,* 102 So. 2d 660, 663 (Fla. 2d DCA 1958).

16.     Similarly, in *Zinger v. Gattis,* 382 So. 2d 379 (Fla. 2d DCA 1980), the Court stated

as follows:

The appellant, Bernard Zinger sought a declaratory judgment of his rights as stockholder and principal officer of Citrus Aviation, Inc., and other relief, against the appellees, Gattis and McGuire. After a nonjury trial the lower court denied any relief because no stock in Citrus Aviation, Inc. was formally issued. We reverse this case for a new trial.

There was conflicting evidence presented concerning the ownership and control of Citrus Aviation, Inc. Both Zinger and Gattis consulted a Lakeland attorney about forming the corporation. It was formed with Gattis as the sole incorporator, on September 17, 1974. Both signed signature cards on the corporate account; Zinger paid the attorney $600.00 to form the corporation; the attorney's notes indicate both were to have a one-half interest in the corporation; and both signed a corporate resolution. ... The trial judge noted the factual disputes presented, but he declined to resolve them. He ruled that Zinger could have no interest in the corporation as a stockholder because a first meeting of the Board of Directors of Citrus Aviation, Inc. had never been held to authorize the issuance of any stock.
...

It is well established that directors' meetings, irregularly convened or conducted, may be cured by acquiescence or subsequent ratification. *Redstone v. Redstone Lumber & Supply Company,* 101 Fla. 226, 133 So. 882 (1931). Mere irregularities or informalities of a stock issuance do not render the stock void. *See, Randall v. Mickel,* 103 Fla. 1229, 141 So. 317 (1932); *Therrell v. Riley,* 111 Fla. 805, 151 So. 305 (1933). In this case, there was evidence presented from which the trier of fact could have concluded that *Zinger* was intended to have some kind of stockholder interest in Citrus Aviation, Inc.

*Zinger v. Gattis,* 382 So. 2d 379, 379–80 (Fla. 5th DCA 1980).

17.     Furthermore, by operation of Florida Statutes Sections 607.01401(65), 607.08401(2) (which requires board of directors action to appoint officers) and 607.0801, the four signatures on the September 18, 2015 Corporate Resolution by DAREN as Vice President, ELIZABETH as President, and PATRICK as Vice President and Secretary (PE #1), establish as a matter of law that ALL PAVING INC. had a Board of Directors as of September 18, 2015; otherwise, ALL PAVING INC. could not have had any Officers including a Secretary, President, and two Vice Presidents, since those officers are only appointed by the Board of Directors pursuant to Florida Statutes Sections 607.01401(65) and 607.08401(2), and ALL PAVING INC. could not have legally opened a bank account or conducted business in the State of Florida since the year 2015 pursuant to Florida Statutes Section 607.0801 if it did not have a Board of Directors.  DAREN is bound by his signature on the September 18, 2015 Corporate Resolution which specifically states that ALL PAVING INC. was previously "organized" and had a Board of Directors and Officers.

18.     DAREN argues that since he was the incorporator of ALL PAVING INC. he could unilaterally designate himself the initial sole director and unilaterally determine the shareholders, which he purported to do in 2019 (four years after ownership was established at BankUnited and ALL PAVING INC. commenced operations, and two years after the State Court Case was filed). DAREN's argument fails for a number of reasons.

19.     First, the incorporator merely forms a corporation.  In 1A *Fletcher, Cyclopedia on the Law of Private Corporations* § 81 (Perm.Ed.1983), as quoted in Footnote 13 in *Hodges Realty Co., Inc. v. John Smiley's Motel, Inc.,* 395 S.E.2d 751 (W.Va 1990), "incorporator" is defined as follows:

> The persons who become incorporated upon the formation of the corporation are called 'corporators' or 'incorporators.' These terms are used interchangeably, and should not be

used as synonyms for stockholders, shareholders, or members, who may be such by succession without having been incorporators, or as synonyms for subscribers, who may subscribe after incorporation and never become stockholders. The persons incorporated, the corporators, may not be stockholders at all or ever. In other words, an incorporator is one of the persons to whom the charter is granted in case of a corporation created by special act of the legislature, or one of the persons who executes the articles of association or certificate of incorporation in case of a corporation formed under a general statute providing for the formation of corporations. Corporators are mere instruments of the law for purposes of preliminary organization. ... They exist before stockholders, and do not exist with them, for it is said that "when stockholders come in, corporators cease to be."

*Hodges Realty,* 395 S.E.2d at 762, n. 13.

Therefore, when the ownership structure of ALL PAVING INC. was established by the Beneficial Ownership Certification (PE #2), and the directors and officers of ALL PAVING INC. were established by the Corporate Resolution (PE #1), ALL PAVING INC. was organized and the incorporator "cease[d] to be."  *See also, Tweedie, v. Tweedie,* 2006 WL 1670270 (Me. 2006) (Superior Court of Maine cites to 1A *Fletcher* at § 81 and Hodges Realty, supra, and holds: "A person who is an incorporator or director of a corporation does not become a shareholder merely because of that relationship with the entity. ... 1A *Fletcher at* § 81; *Hodges Realty, Inc. v. John Smiley's Motel, Inc.,* 395 S.E.2d 751, 757 n. 11 (W.Va.1990).").

20.    In any event, Florida Statutes Section 607.0205(1)(b) provides that an incorporator only has the authority to name the initial director(s) and no other authority.  ALL PAVING INC. had a Board of Directors by September 18, 2015 as confirmed by the Corporate Resolution signed by PATRICK, ELIZABETH and DAREN, and DAREN had no authority to call an "organizational meeting" with himself four years later to replace the existing board with himself as sole director. Also, Florida Statutes Section 607.0205 does not provide that the incorporator has any authority to issue shares.

21.    Furthermore, Florida Statutes Section 607.0205(2) provides that "Action required or permitted by this act to be taken by incorporators or directors at an organization meeting may

be taken without a meeting if the action is evidenced by one or more written consents describing the action and signed by each incorporator or director."  The September 18, 2015 Corporate Resolution, signed by ELIZABETH, PATRICK, *and DAREN,* as the 3 officers and directors of ALL PAVING INC., along with the Beneficial Ownership Certification executed simultaneously with the opening of ALL PAVING INC.'s first bank account and commencement of business operations, constitute action under Florida Statutes Section 607.0205(2) and show that ALL PAVING INC. was organized as of that date.

22.    The fact that stock certificates were not issued by ALL PAVING INC. (to anyone) does not impact PATRICK and ELIZABETH's rights as owners of a majority of the shareholder interests in ALL PAVING INC. pursuant to Florida Statutes Section 607.0626(1) which provides that a corporation is not required to issue stock certificates, and pursuant to Florida Statutes Section 678.1131 which provides that the statute of frauds is inapplicable.

23.    In *Acoustic Innovations, Inc. v. Schafer,* 976 So. 2d 1139 (Fla. 4th DCA 2008), the Court affirmed the trial court's judgment finding the plaintiff to be a 50% owner and shareholder with standing to sue, notwithstanding the fact the incorporator of the corporation signed a corporate action purporting to state he was the sole shareholder, stating as follows:

> Miller contends further that the trial court erred in entering judgment in favor of Schafer because Schafer lacked standing to seek relief under sections 607.1430 and 607.1434, Florida Statutes, where he did not prove that he was "a holder of record of shares in a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation." § 607.01401(24), Fla. Stat. (2006) (defining "shareholder" or "stockholder"). This argument fails.
>
> In *Smallwood v. Moretti,* 128 So.2d 628 (Fla. 3d DCA 1961), the Third District recognized: "[I]t is possible under some circumstances for one to own stock in a corporation though no certificate has been issued to him." *Id.* at 629 (citation omitted). Moreover, strict record ownership is not a prerequisite for the holders of equitable or beneficial interests in shares of stock to have standing to sue. ... The trial court determined that Schafer was, at all material times, the equitable and beneficial owner of fifty percent of Acoustic's stock. This finding was supported by competent, substantial evidence. Accordingly, Schafer did not lack standing to sue for relief ....

*Acoustic Innovations, Inc. v. Schafer,* 976 So. 2d 1139, 1144-45 (Fla. 4th DCA 2008); *see also, Reed v. Honoshofsky,* 76 So. 3d 948 (Fla. 4th DCA 2011) (trial court properly entered declaratory judgment determining proportionate ownership of a family-owned corporation following non-jury trial).

24.      In *Hyman v. Daoud,* 194 So. 3d 392 (Fla. 3d DCA 2016), rev. den., SC16–1388, 2017 WL 6061998 (Fla. 2017), the plaintiff, an attorney, sued her father asserting she was the 100% owner of the corporation.   Unlike the facts of this case where DAREN was merely designated the incorporator of ALL PAVING INC. in the Electronic Articles of Incorporation and not also a director, the plaintiff in *Hyman* designated herself in the articles as the director of the corporation (in addition to incorporator).   *Id.* at 393.   Nevertheless, the Court affirmed the trial court's declaratory judgment determining of 50/50 ownership of the corporation, stating:

> In this case, because the parties had not memorialized the Corporation's ownership with a written shareholder agreement, articles of incorporation, or a corporate resolution, the trial court was called upon to adjudicate the Corporation's ownership structure in light of the parties' vastly different views of the Corporation's ownership.

*Hyman,* 194 So. 3d at 395.

25.      The *Hyman* case further establishes that under Florida law, the trial court has authority to determine the ownership structure of a corporation, in cases where ownership is in dispute and no stock certificates were issued.

26.      Based on the foregoing findings of fact and conclusions of law, this Court hereby determines and declares that ALL PAVING INC. is owned 75% by ELIZABETH DALY, 12.5% by PATRICK DALY, and 12.5% by DAREN DALY.

## II.    DAREN ratified the September 18, 2015 corporate action of ALL PAVING INC. taken through the Corporate Resolution and Beneficial Ownership Certification submitted to BankUnited, and is estopped by his own handwriting and signatures from asserting that PATRICK and ELIZABETH are not the majority owners of ALL PAVING INC.

27.    "Stockholders who participate in and assent to acts of corporations will not afterwards be heard to complain of such acts, but will be held estopped to question the validity of the proceedings." *Sommers v. Apalachicola Northern R. Co.,* 85 Fla. 9, 96 So. 151 (Fla. 1923). In *Redstone v. Redstone Lumber & Supply Co.,* 101 Fla. 226, 133 So. 882 (Fla. 1931), the Florida Supreme Court determined that appellant was barred by estoppel, acquiescence and ratification from asserting that appellee was not the owner of 44 shares of the corporation, stating as follows:

> Appellant contends here that the sale of the said 44 shares of capital stock to J. H. Atkin was never authorized.
> ...
> The courts generally hold that acquiescence, laches, or estoppel is a bar to relief against stock irregularly issued without consideration or for an insufficient consideration, except when such stock is made absolutely void by statute. 1 *Cook on Corporations (6th Ed.)* § 39; 5 *Fletcher, Cyclopedia of Corporations* § 3586; 14 C. J. 477.
> ...
> Directors' meetings irregularly convened or conducted may be cured by acquiescence or subsequent ratification. *Helliwel, Stock & Stockholders,* 452; 3 *Fletcher, Cyclopedia of Corporations* § 1893.
>
> Failure of the board of directors of a corporation to record their action will not affect the validity of the acts done by them. ...
> ...
> If no minutes are kept, or if the record is incomplete, action at a meeting of the directors may be proved by parol evidence. ...
> ...
> If the meetings of the directors were informal and proper minutes were not kept, the appellant was in part responsible for it.
>
> *Redstone,* 133 So. at 229, 230, 231.

28.    Two days after the ALL PAVING INC. bank account at BankUnited was opened on September 18, 2015, DAREN in his own handwriting filled out a credit application dated September 20, 2015 that was submitted to CAT Financial, and included the representation that

ELIZABETH is the 75% owner of ALL PAVING INC. and PATRICK is the 12.5% owner of ALL PAVING INC., which is consistent with the percentages reflected on the Beneficial Ownership Certification jointly submitted by the parties to BankUnited two days earlier.  PE #4. ELIZABETH and PATRICK signed said credit application filled out by DAREN in his handwriting below their representation that the information is true, correct and complete.  The fact that DAREN handwrote the ALL PAVING INC. ownership information on this document, indicates his ratification of the corporate action taken at BankUnited two days earlier, including the Beneficial Ownership Certification submitted to BankUnited.  PE #2.

29.     On October 29, 2015, DAREN transmitted finance documents including a Komatsu Financial Security Agreement with an effective date of November 3, 2015 signed by ALL PAVING INC. by "ELIZABETH DALY Owner" and "PATRICK DALY President" (PE #5). However, ELIZABETH and PATRICK did not sign the Komatsu Financial Security Agreement nor did they handwrite the words "owner" and "president" — DAREN did, and DAREN's signing of his mother's signature with the designation she is the owner of ALL PAVING INC. is yet another ratification by DAREN of ELIZABETH's majority ownership of ALL PAVING INC., and proves the falsity of DAREN's assertion that ELIZABETH was never an owner of ALL PAVING INC., and estops DAREN from asserting ELIZABETH is not the majority owner of ALL PAVING INC.

30.     On January 15, 2016, DAREN electronically signed (as Vice President) and filed the 2016 Annual Report for ALL PAVING INC. with the Florida Secretary of State (PE #20 -- ECF No. 77-20, page 12), which reflects the same officer positions set forth on the September 18, 2015 Corporate Resolution jointly submitted by PATRICK, ELIZABETH and DAREN to BankUnited (ELIZABETH as President, PATRICK as Vice President, and DAREN as Vice President).  DAREN's filing of said 2016 Annual Report further demonstrates that DAREN ratified the corporate action taken four months earlier at BankUnited, including the establishment

54

of the directors, officers, and shareholders of ALL PAVING INC. (i.e., including the Beneficial Ownership Certification jointly submitted to BankUnited on September 18, 2015 which states that ELIZABETH owns 75%, PATRICK owns 12.5% and DAREN owns 12.5% of ALL PAVING INC.).

31.    On June 22, 2016, DAREN transmitted an Application for Business Credit and Agreement to Titan America signed by ALL PAVING INC. by "ELIZABETH DALY Owner" (PE #46 in evidence, ECF No. 78-3, page 43).  As discussed above, DAREN admitted that he signed ELIZABETH's name and printed the title "Owner" next to her name on said credit application.  DAREN's admitted signing of ELIZABETH's signature on this document, and his admission that he handwrote the title "Owner" next to his signature of ELIZABETH's name, constitutes yet another admission and ratification by DAREN that ELIZABETH is the majority owner of ALL PAVING INC.

32.    On January 6, 2017, DAREN caused a CNA Surety Fast Track Bond Application to be completed and signed by ALL PAVING INC., PATRICK, ELIZABETH, and DAREN (PE #17).  The Bond Application form required disclosure of all owners of ALL PAVING INC., including marital status and "% of Business Ownership," and required the use of an additional sheet if necessary.  DAREN signed this Bond Application which states he has a 35% ownership interest in ALL PAVING INC, and that ELIZABETH and PATRICK have a combined 65% ownership interest in ALL PAVING INC.  However, DAREN later asserted he did not agree to a 35% ownership interest, and therefore the original ownership percentages continue to apply which were established at BankUnited on September 18, 2015, with DAREN having a 12.5% ownership interest in ALL PAVING INC., PATRICK having a 12.5% ownership interest in ALL PAVING INC., and ELIZABETH having a 75% ownership interest in ALL PAVING INC.  In any event,

DAREN's signature on PE #17 is yet another ratification that he is not the majority owner of ALL PAVING INC.

33.     On February 14, 2017, DAREN submitted a Wells Fargo Credit Application for Construction Equipment on behalf of ALL PAVING INC., purporting to state that DAREN owns 50% of ALL PAVING INC., and that PATRICK owns 50% of ALL PAVING INC.  DAREN signed this Application; however, DAREN admittedly forged the signature of his father PATRICK on said Application.  PE #46.  This document is illegitimate because PATRICK's signature was forged by DAREN and not authorized by PATRICK, and also because it states that DAREN owns 50% of ALL PAVING INC. when in fact at no time has DAREN held more than a minority interest in ALL PAVING INC.

34.     The Court finds that DAREN ratified the ALL PAVING INC. Corporate Resolution and Beneficial Ownership Certification submitted to BankUnited on September 18, 2015 setting forth the ownership structure of ALL PAVING INC. by virtue of the above-described acts, documents, and his own signatures (including his signing of his parents' signatures on credit applications admitting to ELIZABETH's majority ownership). Furthermore, having participated in the aforementioned credit applications including those which bear DAREN's handwriting and his admitted signing of his parents' signatures which state that ELIZABETH is the "owner" of ALL PAVING INC., DAREN is estopped from asserting that ELIZABETH and PATRICK are not the majority owners of ALL PAVING INC.  *Sommers v. Apalachicola Northern R. Co.,* 85 Fla. 9, 96 So. 151 (Fla. 1923);  *Redstone v. Redstone Lumber & Supply Co.,* 101 Fla. 226, 133 So. 882 (Fla. 1931).

### III. DAREN converted PATRICK and ELIZABETH's majority ownership interests in ALL PAVING INC., and he also converted the AllPaving.com Domain Name owned by ALL PAVING LLC

35.    "Actions for conversion may properly be brought for a wrongful taking over of intangible interests in a business venture." *In re Corbin's Estate,* 391 So.2d 731, 732 (Fla. 3d DCA 1980).  In *Corbin,* the party held liable for conversion "had attempted to establish her ownership of the business by reference to a purported bill of sale from the deceased" and the Court determined "that the supposed sale was wholly ineffective" and was subject to a conversion claim and award of damages.  *Id.* at 732.  "The proper measure of damages for conversion in Florida is the interest's reasonable market value, measured at the time and place of conversion."  Id. at 733.

36.    In *Taubenfeld v. Lasko,* 324 So. 3d 529, 541–42 (Fla. 4th DCA 2021), the Court stated: "'Conversion is an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein' *Warshall v. Price,* 629 So. 2d 903, 904 (Fla. 4th DCA 1993)  … The essence of an action for conversion is 'not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled.' *Star Fruit Co. v. Eagle Lake Growers, Inc.,* 160 Fla. 130, 33 So. 2d 858, 860 (1948)."  The *Taubenfeld* Court cited to *Corbin, supra,* stating: "Florida law recognizes that an action for conversion may be based upon a wrongful takeover of the intangible interests in a business venture. *In re Estate of Corbin,* 391 So. 2d at 732."  *Taubenfeld v. Lasko,* 324 So. 3d 529, 542 (Fla. 4th DCA 2021).

37.    *Corbin* was also cited by the United States Bankruptcy Court, Southern District of Florida in *In re Aqua Clear Techs., Inc.,* 361 B.R. 567 (Bankr. S.D. Fla. 2007), wherein the Court stated: "'Conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.' " *Warshall v. Price,* 629 So.2d 903, 904 (Fla. 4th Dist.Ct.App.1993). A claim for conversion is appropriate where the defendant has wrongfully taken personal property or an intangible interest in a business venture. *Id.*; *see also In re Corbin's*

*Estate,* 391 So.2d 731, 732 (Fla. 3rd Dist.Ct.App.1980). Misappropriation of a business opportunity likewise constitutes conversion. *See In re Burress,* 245 B.R. 871 (Bankr.D.Colo.2000)." *Aqua Clear Techs, Inc.,* 361 B.R. at 574.

38.     The evidence has shown that DAREN converted the business interests of PATRICK and ELIZABETH in ALL PAVING INC. in view of the fact that commencing in 2017, DAREN wrongfully took control over the ALL PAVING INC. business even though he is only a 12.5% owner, and notwithstanding the fact the 87.5% owners, PATRICK and ELIZABETH, executed Corporate Actions dated June 29, 2017 (PE #26 and PE #27) which removed and terminated DAREN.

39.     DAREN failed to abide by said Corporate Actions which led to Plaintiffs' filing of the State Court Case and the filing of their Claim and Adversary Proceeding in this Bankruptcy case.  DAREN has therefore converted the business interests and property of Plaintiffs.

40.     Florida case law provides for an award of damages based on the value of the business interests as of the time it was converted (in this case, 2017). *Corbin,* 391 So. 2d at 733. Plus, Plaintiffs are entitled to recover disgorgement damages under Florida law.  *Bailey v. St. Louis,* 268 So. 3d 197 (Fla. 2d DCA 2018).   In *Bailey,* the Court stated: "The equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains." *Id.* at 202.  "A conscious wrongdoer is liable for the 'net profit attributable to the underlying wrong.'" *Id.* at fn. 2.  The Eleventh Circuit Court of Appeals has cited to *Bailey,* and recognized that "disgorgement is 'a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior'". *Kallberg Indus., LLC v. Auto. Experts, Inc.,* 861 Fed. Appx. 321, 323 (11th Cir. 2021).

41.     Beginning in 2017 through the present, DAREN has had exclusive (wrongful) control over ALL PAVING INC., and DAREN has embezzled cash from ALL PAVING INC.,

which expert witness Joey N. Friedman, CPA calculated in Appendix E of his Report, and to which he testified.

42.     Therefore, the Court adjudicates that, Plaintiffs are entitled to recover from DAREN, 87.5% of the 2017 value of ALL PAVING INC. ($2,007,051.38), plus 87.5% of the disgorgement/embezzlement damages shown by Plaintiffs' expert witness ($2,023,667.21), for a total sum of $**4,030,718.59**.  Said total sum is a debt owed by DAREN to Plaintiffs.

## **BANKRUPTCY CODE AND PROCEDURAL LAW**

**IV.** **Plaintiffs' claims against DAREN are not dischargeable because he engaged in actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).**

43.     Bankruptcy Code section 523(a)(2)(A) excepts from an individual debtor's discharge "any debt . . . for money, property, [or] services . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud…." 11 U.S.C. § 523(a)(2)(A).

44.     In *Husky Intern. Electronics, Inc. v. Ritz,* 578 U.S. 356, 136 S.Ct. 1581 (2016), the United States Supreme Court held: "Because we must give the phrase 'actual fraud' in § 523(a)(2)(A) the meaning it has long held, we interpret 'actual fraud' to encompass fraudulent conveyance schemes, even when those schemes do not involve a false representation." *Husky,* 578 U.S. 366, 136 S.Ct. at 1590.

45.     In the case of *In re: Khan,* 652 B.R. 552 (Bankr. S.D. Fla. 2023), this Court noted that "actual fraud consists of any deceit, artifice, trick or design involving the direct and active operation of the mind used to circumvent and cheat another."  652 B.R. at 563.  In finding that the debt in *Khan* was not dischargeable, this Court stated: "[the state court] jury's findings that the Defendants conspired to defraud the Plaintiff and convert all or part of his investment in Alliance, and engaged in overt acts that included manufacturing fraudulent invoices, processing fraudulent invoices, and transferring funds to themselves or third-party entities owned by them or their

families, do establish both actual fraud and false pretenses." 652 B.R. at 564. The debtor's liability in *Khan* was based on a damage award for conversion and other state law claims, which was the debt excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). Similarly, DAREN's liability to Plaintiffs for conversion damages, is a debt that may be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).

46.     In the case of *In re: Moschell,* 607 B.R. 487, 496 (Bankr. W.D. Pa. 2019), the Court in discussing "actual fraud", stated that it encompasses "any deceit, artifice, trick or design involving direct and active operation of the mind used to circumvent and cheat another." (citing to *McClellan v. Cantrell,* 217 F.3d at 793). The *Moschell* Court went on to state regarding "actual fraud", that: "[f]raud is a generic term , which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth.. No invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick cunning, dissembling and any unfair way by which another is cheated." *Moschell,* 607 B.R. at 496. The *Moschell* court also cited to the 2016 Supreme Court case of *Husky, supra,* and stated that according to the Supreme Court, "fraud connotes 'deception or trickery' generally. Thus, if the tort involves deception or trickery, and is done with wrongful intent or moral turpitude, the claim falls within the coverage of 'actual fraud' for purposes of 11 U.S.C. § 523(a)(2)(A)." *Moschell,* 607 B.R. at 496.

47.     "Actual fraud" was further discussed in *In Re: Call,* 560 B.R. 814, 821 (Bankr. D Utah 2016), wherein the court stated: "[p]ut simply, actual fraud is 'anything that counts as 'fraud' and is done with wrongful intent.' No misrepresentations, however, are necessary to determine actual fraud or wrongful intent. Wrongful intent can be manifested 'when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right.'"

48.    In *In Re: Richert,* 632 B.R. 877 (Bankr. M.D. Fla. 2021), the Court stated that "[a]ctual fraud precluding discharge 'consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another --- something done, said or omitted with the design or perpetrating what is known to be a cheat or deception.'" 632 B.R. at 894. The *Richert* court also opined that "[a] bankruptcy court may look to the recklessness of a debtor's behavior under the totality of the circumstances. 'Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the [inference] of intent to deceive.'" *Richert,* 632 B.R. at 894 (citing to and quoting from *In Re: Miller,* 39 F.3d 301, 305 (11th Cir. 1994)).

49.    In this case, DAREN converted PATRICK and ELIZABETH's ownership interests in ALL PAVING INC., and has engaged in overt acts constituting actual fraud, by manufacturing fraudulent documents and engaging in a scheme to deprive and cheat Plaintiffs of their legal rights in ALL PAVING INC., including by (1) falsely claiming ownership of ALL PAVING INC. through an unsigned Excel Spreadsheet (DE #57) which DAREN first showed to anyone 3 years after incorporation including Jamie Schindler who DAREN claims was the original owner of an 80% interest; (2) by creating and signing stock certificates and a stock transfer ledger in July 2019 (four years after ALL PAVING INC. began operations and two years after the State Court Case was filed --- after testifying that no stock certificates of ALL PAVING INC. existed) with dates going back to 2013 which were written in 2019; (3) by opening new ALL PAVING INC. bank accounts at BankUnited, and moving funds from the original ALL PAVING INC. BankUnited accounts, for which PATRICK, ELIZABETH and DAREN were all signatories, to new accounts at BankUnited which DAREN unilaterally opened with himself as sole signatory, and by absconding with ALL PAVING INC. funds; and (4) by using a fraudulently altered Domain Name Purchase Agreement to convince GoDaddy to transfer control of the AllPaving.com Domain Name

to DAREN; and (5) by removing ALL PAVING INC. funds from ALL PAVING INC. bank accounts and transferring them into his personal accounts.  This conduct manifests an intentional scheme to deprive another of property and their legal rights.

50.    DAREN had no right to appoint himself the sole director and issue stock at his fictional "organizational" meeting he allegedly held with himself in July 2019, since the Board of Directors of ALL PAVING INC. was established no later than September 18, 2015, as confirmed by the signatures of PATRICK, ELIZABETH, and DAREN on the September 18, 2015 Corporate Resolution (PE #1).

51.    In fact, DAREN's manufacturing of ALL PAVING INC. stock certificates and a stock transfer ledger in 2019 (PE #32), at a time the State Court Case was pending for two years and the undisputed testimony was that no stock certificates existed prior to that date, constitutes evidence of DAREN's fraudulent conveyance scheme and his overt acts of deceit, artifice, and trickery, recklessly designed to create a false color of title, and thus actual fraud within the meaning of 11 U.S.C. § 523(a)(2)(A).

52.    Furthermore, DAREN's filing of a Periodic Report Regarding Values, Operations, and Profitability of Entities in Which the Debtor's Estate Holds a Substantial or Controlling Interest on August 11, 2023 as ECF No. 175 in the Main Case, reports that a significant amount of business is being run by DAREN through Resurface Industries, LLC.  On Exhibit B at page 15 of said filing DAREN asserts: "The Debtor is the 100% owner of All Paving, Inc. and Resurface Industries, LLC.  Through these entities the debtor provides roadway solutions, including paving, overlay, sealcoating and related services to municipalities and commercial customers."  Thus, DAREN admits that Resurface Industries, LLC is engaged in the exact same business as ALL PAVING INC.  Resurface Industries, LLC was formed on April 14, 2022 (three months before DAREN's Subchapter V, Chapter 11 filing herein).  The formation of Resurface Industries, LLC

by DAREN to conduct the same business as ALL PAVING INC. constitutes additional evidence of DAREN's fraudulent conveyance scheme and another overt act of actual fraud, and provides further support for finding that DAREN's debt to Plaintiffs is not dischargeable.

53.    The foregoing intentional misconduct by DAREN is inconsistent with Plaintiffs' valuable property rights.  The "obtained by" requirement of 11 U.S.C. § 523(a)(2)(A) is satisfied, because Plaintiffs' claims against DAREN arose from the money, property and business interests obtained by DAREN through his actual fraud and false pretenses.

54.    Therefore, the Court finds that Plaintiffs' claims against DAREN are not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

**V.    Plaintiffs' claims against DAREN are not dischargeable because he has engaged in embezzlement and/or larceny within the meaning of 11 U.S.C. § 523(a)(4).**

55.    Bankruptcy Code section 523(a)(4) excepts from an individual debtor's discharge "any debt . . . for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4).

56.    "The phrase 'while acting in a fiduciary capacity' does not qualify 'embezzlement' or 'larceny'" *In Re: Chun S. Woo,* 2010 WL 11719184 (Bankr. M.D. Fla. 2010).  "Claims based in embezzlement and larceny do not require a finding of fiduciary capacity." *In re Keitel,* 15-21654-EPK, 2018 WL 9597494, at *3 (Bankr. S.D. Fla. May 11, 2018).

57.    "A discharge in bankruptcy will not discharge an individual debtor from certain debts, including debts for embezzlement. *See* 11 U.S.C. § 523(a)(4). The term 'embezzlement' in section 523(a)(4) is defined by federal common law. *See In Re Langworthy,* 121 B.R. 903, 907 (Bankr.M.D.Fla.1990). Under federal common law, 'embezzlement' is 'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.'" *Fernandez v. Havana Gardens, LLC,* 562 Fed.Appx. 854, 856 (11th

Cir. 2014).  The three elements a plaintiff must establish to sustain a claim under Section 523(a)(4) for embezzlement are "(1) the debtor rightfully possessed another's property; (2) the debtor appropriated the property for use other than the use for which the property was intended; and (3) the circumstances implied fraudulent intent." *In Re: Daffner,* 612 B.R. 630, 651 (Bankr. E.D. N.Y. 2020).   The *Daffner* court also stated that "[e]mbezzlement does not require a fiduciary relationship". *Id.*

58.    In *Fernandez,* the Eleventh Circuit noted the difference between the fraudulent intent required by 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4), stating: "Under section 523(a)(2)(A), the issue is whether a debtor had fraudulent intent when he obtained money or property from a creditor. *See* 11 U.S.C. § 523(a)(2)(A). Because Ricardo, as the LLC's co-manager, was in lawful possession of Havana Gardens's money, he had no fraudulent intent to obtain the money for purposes of section 523(a)(2)(A). Instead, the issue was whether Ricardo had a fraudulent intent to appropriate Havana Gardens's money for his own personal benefit. *See Sayklay*, 542 F.2d at 944. Because analyses of these two subsections involve separate inquiries, nothing was inherently inconsistent about the Bankruptcy Court's determining that Ricardo acted with fraudulent intent for purposes of section 523(a)(4) but not for purposes of section 523(a)(2)(A). *Cf. United States v. Trevino,* 491 F.2d 74, 75 (5th Cir.1974) (The 'difference between the crimes of embezzlement and stealing [is that e]mbezzlement presupposes lawful possession and theft does not.')." *Fernandez,* 562 Fed.Appx. at 856.

59.    The evidence has shown that in December 2016, DAREN, with fraudulent intent to appropriate ALL PAVING INC.'s funds, removed $500,000 from the BankUnited bank account and wired that sum into his personal account.  The evidence also shows that in June 2017, DAREN withdrew $175,000.00 from ALL PAVING INC.'s bank account through a wire transfer to his

personal bank account.  PE #25.  These transactions clearly amount to appropriations of property for use other than the use for which the property was intended.

60.    Additionally, on March 16, 2017, DAREN, with fraudulent intent, opened new ALL PAVING INC. bank accounts at BankUnited, and moved all funds from the original ALL PAVING INC. BankUnited accounts, for which PATRICK, ELIZABETH and DAREN were all signatories, to new accounts at BankUnited which DAREN unilaterally opened with himself as sole signatory, and absconded with ALL PAVING INC. funds.

61.    Similar to the facts in this case, in *In re Keitel, supra,* the bankruptcy debtor opened a new bank account for the entity and used the account to pay substantial sums to himself and to others for his benefit. The Court allowed the tort claims against the debtor and found that exceptions to discharge apply pursuant to both 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 523(a)(6). *In re Keitel,* 15-21654-EPK, 2018 WL 9597494, at *1 (Bankr. S.D. Fla. May 11, 2018).  The Court stated as follows: "In the end, whether Mr. Keitel ever had corporate authority to open a new bank account for Ltd. and direct use of funds owned by Ltd. is a red herring. To be sure, if Mr. Keitel lacked authority to even open the new bank account in the name of Ltd., this would be further support for the Court's ruling here. But the fact that Mr. Keitel, while president of Inc., had corporate authority to open the Wells Fargo account, cause funds payable to Ltd. to be deposited in that account, and use those funds to pay the legal obligations of Ltd. does not eliminate his liability in this case. The overwhelming evidence in this case indicates that Mr. Keitel used funds owned by Ltd. not for the benefit of Ltd. but for his own personal benefit." *In re Keitel,* 15-21654-EPK, 2018 WL 9597494, at *10 (Bankr. S.D. Fla. May 11, 2018).

62.    The liability for the tort claims asserted against the debtor/defendant in *Keitel* was determined to be non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) based on his opening of a new bank account and misdirection of company funds. Similarly, DAREN's actions in this case,

including (1) his opening of new ALL PAVING INC. bank accounts for which only DAREN is a signatory and for which PATRICK and ELIZABETH are not signatories, and (2) DAREN's wire transfers of ALL PAVING INC. funds to his personal account, and (3) DAREN's receipt of funds from ALL PAVING INC. which Plaintiffs' CPA expert witness identified in Appendix E of his Report (PE #41) as being subject to disgorgement because they cannot be justified (except as discussed in the Findings of Fact section above), constitute embezzlement and larceny within the meaning of 11 U.S.C. § 523(a)(4), and therefore DAREN's debt to Plaintiffs is not dischargeable in bankruptcy.

63.    DAREN also committed embezzlement and larceny with respect to the AllPaving.com Domain Name because he used a fraudulent document to cause GoDaddy to change the Registrant of the AllPaving.com Domain Name from PATRICK to DAREN, by transmitting to GoDaddy the Domain Name Purchase Agreement, which DAREN fraudulently altered by changing the Purchaser Company Name from "All Paving and Sealcoating" (which can only refer to ALL PAVING LLC since the word "Sealcoating" is only in ALL PAVING LLC's name, to "All Paving Inc.").  DAREN's fraudulent appropriation of the AllPaving.com Domain Name forced ALL PAVING LLC to select and operate under a new domain name and tradename.

64.    DAREN also demonstrated his fraudulent intent by creating and signing stock certificates and a stock transfer ledger in July 2019 (four years after ALL PAVING INC. began operations and two years after the State Court Case was filed --- after testifying that no stock certificates of ALL PAVING INC. existed), which falsely reflected that DAREN is the sole shareholder and director of ALL PAVING INC. (PE #32), as a further act of embezzlement.

65.    Additionally, Plaintiffs have shown by a preponderance of the evidence that DAREN, by virtue of his intentional fraudulent conduct, fraudulently appropriated the 87.5% ownership interests of PATRICK and ELIZABETH in ALL PAVING INC.

66.     Therefore, DAREN is not entitled to a discharge of Plaintiffs' claims against him pursuant to 11 U.S.C. § 523(a)(4).

**VI.     Plaintiffs' claims against DAREN are not dischargeable because he has willfully and maliciously injured the property interests of PATRICK, ELIZABETH, and ALL PAVING LLC within the meaning of 11 U.S.C. § 523(a)(6).**

67.     Bankruptcy Code section 523(a)(6) excepts from an individual debtor's discharge "any debt . . . for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

68.     In *In Re Monson,* 661 Fed.Appx. 775 (11th Cir. 2016), the Court held: "This Court has explained that a debtor commits a 'willful' injury when 'he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury.' *Kane*, 755 F.3d at 1293 (quoting *Jennings,* 670 F.3d at 1334); *see also Kawaauhau v. Geiger,* 523 U.S. 57, 61–62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). We have determined that 'malicious' means 'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.' *Jennings,* 670 F.3d at 1334 (quotation marks and citation omitted). For the purposes of § 523(a)(6), 'malice can be implied.' *Kane,* 755 F.3d at 1294 (internal brackets, quotation marks, and citation omitted). 'Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice.' *In re Ikner,* 883 F.2d 986, 991 (11th Cir. 1989). Here, the Bankruptcy Court's factual determinations are well supported by the record evidence. The Bankruptcy Court did not err in finding that Claimant Galaz, as successor-in-interest to Creditor Segundo, showed, by a preponderance of the evidence, that Monson committed a willful and malicious injury within the meaning of § 523(a)(6)." *In re Monson,* 661 Fed. Appx. 675, 682–83 (11th Cir. 2016).

67

69.    "Monson committed a willful injury because his action of absconding with the Center's equipment and using it to open a new internet center was an 'intentional act the purpose of which [was] to cause injury or which [was] substantially certain to cause injury.' *Kane,* 755 F.3d at 1293." *In re Monson,* 661 Fed. Appx. 675, 683 (11th Cir. 2016).

70.    "In order to prove willfulness under section 523(a)(6), a plaintiff must prove that the debtor acted intentionally; proof that the injury resulted from reckless or negligent conduct is not sufficient. *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). A debtor acts willfully when the debtor either intended the injury that resulted or the debtor acted intentionally and the act in question was certain or substantially certain to result in the injury. *Thomas v. Loveless (In re Thomas),* 288 Fed. Appx. 547, 549 (11th Cir. 2008) (citing *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1165 (11th Cir. 1995)); *In re Kane,* 470 B.R. at 939-41. While proof that the defendant intended to cause the harm experienced by the plaintiff satisfies the willfulness standard, it is not necessary for a plaintiff to go that far. A debtor's intentional act may result in a non-dischargeable obligation under section 523(a)(6) where injury to the plaintiff was a substantial certainty." *In re Keitel,* 15-21654-EPK, 2018 WL 9597494, at *4 (Bankr. S.D. Fla. May 11, 2018); *see also, In Re Scott,* 227 B.R. 918, 922 (Bankr. S.D. Fla. 1998) (citing to *In re Latch,* 820 F.2d 1163, 1164 n. 4 (11th Cir.1987).

71.    "'A willful and malicious injury' includes conversion, which is defined as the unauthorized exercise of ownership of goods belonging to another to the exclusion of the owner's rights." *In Re Jacobs,* 243 B.R. 836, 846 (Bankr. M.D. Fla. 2000).

72.    In this case, there has been substantial evidence of DAREN's willful and malicious conduct resulting in the damages claimed by Plaintiffs, including DAREN's false claims of ownership of ALL PAVING INC.  DAREN's assertion of 100% ownership of ALL PAVING INC. was contradicted by the documents signed at BankUnited when ALL PAVING INC. began

operations on September 18, 2015 (PE #1 and PE #2), and the several documents described above and admitted into evidence wherein DAREN in his own handwriting and signatures ratified ELIZABETH's majority ownership of ALL PAVING INC.  The evidence has shown that DAREN converted the business interests of PATRICK and ELIZABETH in ALL PAVING INC. in view of the fact that commencing in 2017, DAREN wrongfully took control over the ALL PAVING INC. business even though he is only a 12.5% owner, and notwithstanding the fact the 87.5% owners, PATRICK and ELIZABETH, executed Corporate Actions dated June 29, 2017 (PE #26 and PE #27) which removed and terminated DAREN.

73.    DAREN failed to abide by said Corporate Actions which led to Plaintiffs' filing of the State Court Case and the filing of their Claim and Adversary Proceeding in this Bankruptcy case.  DAREN has therefore converted the business interests and property of Plaintiffs and caused willful and malicious injury of PATRICK and ELIZABETH's majority ownership interests in ALL PAVING INC.

74.    The evidence has also shown that in December 2016, DAREN willfully and maliciously removed $500,000 from the ALL PAVING INC. BankUnited bank account and wired that sum into his personal account after having an argument with mother, ELIZABETH.

75.    Additional willful and malicious injury to Plaintiffs caused by DAREN has been shown by virtue of the fact that on March 16, 2017, DAREN opened new ALL PAVING INC. bank accounts at BankUnited, and moved funds from the original ALL PAVING INC. BankUnited accounts, for which PATRICK, ELIZABETH and DAREN were all signatories, to new accounts at BankUnited which DAREN unilaterally opened with himself as sole signatory, and by absconding with ALL PAVING INC. funds. DAREN's willful and malicious intent was also demonstrated by DAREN in the parking lot of BankUnited on that day, when DAREN threatened his mother ELIZABETH with severe physical violence.

76.    Also in March 2017, DAREN committed willful and malicious injury by using a fraudulent document to cause GoDaddy to change the Registrant of the AllPaving.com Domain Name from PATRICK to DAREN, by transmitting to GoDaddy the Domain Name Purchase Agreement which DAREN fraudulently altered by changing the Purchaser Company Name from "All Paving and Sealcoating" (which can only refer to ALL PAVING LLC since the word "Sealcoating" is only in ALL PAVING LLC's name) to "All Paving Inc."  The change of the Registrant's name of the AllPaving.com Domain Name, and the consequent disruption of the email accounts of ALL PAVING LLC was certain or substantially certain to damage ALL PAVING LLC's operation and ability to conduct business, and was done with maliciousness.

77.    As further acts of willful and malicious injury to Plaintiffs' businesses and their business interests, DAREN removed the server from Plaintiffs' office for several days and shut down the telephone and emails of Robert Holland (i.e., a 15% owner and employee of ALL PAVING LLC at that time) and changed the locks to the office.  While the server was missing, Plaintiffs did not have the computer files and data needed to contact customers or transact business using QuickBooks.  When DAREN returned the server several days later, computer files were rearranged and missing.  T-180:12-181:4 (testimony of PATRICK).

78.    Based on the foregoing, DAREN is not entitled to a discharge pursuant to 11 U.S.C. § 523(a)(6), because of his willful and malicious injury inflicted on Plaintiffs.

**VII.    Conclusion.**

Plaintiffs have proven by a preponderance of the evidence and this Court declares that ELIZABETH owns 75%, PATRICK owns 12.5%, and DAREN owns 12.5% of ALL PAVING INC.  Plaintiffs have also proven by a preponderance of the evidence that they have incurred damages caused by DAREN and are entitled to a money judgment and an allowed claim against DAREN in the total amount of **$4,030,718.59** (comprised of $2,007,051.38 for 87.5% of the 2017

value of ALL PAVING INC. plus $2,023,667.21 for 87.5% of the disgorgement/embezzlement amount calculated by Plaintiffs' expert witness).  Plaintiffs have also proved by a preponderance of the evidence that DAREN's debt to Plaintiffs is not dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), § 523(a)(4), and § 523(a)(6).

A separate judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.