**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                                            Case No. 22-15694-SMG

DAREN C. DALY,                                    Chapter 11 (Sub V)

     Debtor

_____/
PATRICK DALY, ELIZABETH DALY
and ALL PAVING AND SEALCOATING, LLC
                                                                     Adv. Case No. 22-01391-SMG

     Plaintiffs,

v.

DAREN C. DALY,

     Defendant.

_____/

**DEFENDANT'S NOTICE OF FILING PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

     **COMES NOW** the Debtor/Defendant, Daren C. Daly, by and through counsel, and

pursuant to the *Order Setting Deadlines for Parties to Submit and File Proposed Findings of Fact*

*and Conclusions of Law* [ECF No. 153] hereby submits his Proposed Findings of Fact and

Conclusions of Law attached hereto as **Exhibit A.**

Dated this 8th day of September, 2023.

                      Respectfully submitted,

                      **DGIM Law, PLLC**
                      *Counsel for the Debtor, Daren C. Daly*
                      2875 NE 191st Street, Suite 705
                      Aventura, FL 33180
                      Phone: (305) 763-8708

*/s/ Monique D. Hayes*
Isaac Marcushamer, Esq.
Florida Bar No. 0060373
isaac@dgimlaw.com
Monique D. Hayes, Esq.
Florida Bar No. 0841573
monique@dgimlaw.com

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** a copy of the foregoing Notice was filed via CM/ECF Notification to all parties registered to receive electronic notice on this 8th day of September, 2023.

*/s/ Monique D. Hayes*
Monique D. Hayes, Esq.
Florida Bar No. 0841573
monique@dgimlaw.com

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                                    Case No. 22-15694-SMG

DAREN C. DALY,                                Chapter 11 (Sub V)

      Debtor

_____/
PATRICK DALY, ELIZABETH DALY
and ALL PAVING AND SEALCOATING, LLC
                                                              Adv. Case No. 22-01391-SMG
      Plaintiffs,

v.

DAREN C. DALY,

      Defendant.
_____/

**MEMORANDUM OPINION AND ORDER SUSTAINING DEBTOR'S OBJECTION TO**
**CLAIM FILED BY PATRICK AND ELIZABETH DALY RULING ON ADVERSAY**
**COMPLAINT FOR EXCEPTION TO DISCHARGE**

THIS MATTER is before the Court on the Debtor's Objection to Claim No. 13-1 (the

"Claim Objection") [Main Case ECF No. 69] and the Response thereto [Main Case ECF No. 89]

and the Amended Adversary Complaint for Exception to Discharge [ECF No. 24[1]], (the

"Adversary Complaint") and the Answer filed by the Debtor [ECF No. 44 and 142]. The Court

held a nine (9) day consolidated trial on the Claim Objection and Adversary Complaint on April

10, 11, May 15, 16, 17, 18, June 6, 7, and 23, 2023 (the "Trial"). For the reasons set forth herein,

---

[1] Unless otherwise noted, all ECF references are to the record in the Adversary Proceeding.

the Court sustains the Claim Objection and determines no basis for exception to discharge has been established.

## PROCEDURAL HISTORY

### I.    Bankruptcy Proceedings

1.    On July 26, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of title 11 of the Bankruptcy Code.

2.    The Debtor is operating his business and managing his affairs as a debtor-in-possession pursuant to section 1184 of the Bankruptcy Code.

3.    On July 27, 2022, the United States Trustee filed notice of the appointment of Tarek Kiem to serve as Subchapter V Trustee in this case [ECF No. 11].

4.    On September 30, 2022, Patrick Daly and Elizabeth Daly filed proof of claim number 13-1 (the "POC") against the Debtor's estate asserting a claim amount of $4,051,277.41.

5.    On October 24, 2022, the Debtor timely filed his Claim Objection to Claim No. 13-1 (the "Objection") [Main Case ECF No. 69].

6.    On October 24, 2022, Patrick Daly and Elizabeth Daly, in their individual capacity and in their alleged capacity as majority shareholders of All Paving, Inc., filed the Adversary Complaint for Exception to Discharge (the "Adversary Complaint") [ECF. No 2].

7.    On January 11, 2023, the Debtor filed his Motion to Dismiss [ECF No. 51].

8.    On March 6, 2023, the Court entered its Order Granting in Part and Denying in Part Motion to Dismiss [ECF No. 106] (the "Motion to Dismiss Order"). In the Motion to Dismiss Order the Court dismissed Count I as being brought on behalf of All Paving, Inc., and All Paving and Sealcoating LLC. Count II, as to All Paving and Sealcoating, LLC was also dismissed and the

2

Court accepted that Count II was limited only to alleged embezzlement. Count III was dismissed as to all Paving Inc.

## II.    The Parties

9.      The Debtor is an individual.

10.     Patrick Daly ("Patrick") is an individual and the Debtor's Father.

11.     Elizabeth Daly ("Elizabeth") is an individual and the Debtor's Mother.

12.     Patrick and Elizabeth (together, the "Plaintiffs") initiated a state court action against the Debtor which has been pending in the Seventeenth Judicial Circuit Court of Broward County Florida since 2017.

13.     The Plaintiffs filed the POC against the Debtor's estate. The Plaintiffs, in their individual capacity and purportedly on behalf of All Paving, Inc. (as purported majority shareholders) filed the adversary proceeding seeking an exception to the Debtor's discharge rights.

14.     All Paving, Inc. ("API" or the "Company") is a Florida corporation.[2]

15.     All Paving & Sealcoating, LLC ("APS") is a Florida limited liability company. APS did not file a proof of claim against the Debtor's estate but has joined in the adversary proceeding seeking an exception to the Debtor's discharge rights.

## III.    The Trial and Relevant Testimony

16.     During the Trial, the Court heard testimony from the Plaintiff's witness, Joseph Fahrendorf ("Mr. Fahrendorf"). Mr. Fahrendorf testified that he is a practicing attorney and former friend of the Debtor.[3]  Mr. Fahrendorf testified that during the time period from August 2013 to

---

[2] The parties stipulated that the Company is a Florida Corporation. *See* Trans. of Trial, Vol. I; pg. 22:9.

[3] *See* PL Ex. 57, Pgs. 58:1 and 72-79*;* Trans. of Trial, Vol. I; pg. 16:9.

September 27, 2013 he was an employee of APS.[4] Mr. Fahrendorf further testified that his duties with APS included legal work, marketing, and website.[5] With respect to the formation of API, Mr. Fahrendorf testified that he was present for the incorporation and assisted in the submission of corporate formation documents, including articles of incorporation.[6] Specifically with respect to the formation of API,  Mr. Fahrendorf testified that he took all direction with respect to identifying the incorporator, officers, and directors of API from the Debtor.[7] The Debtor is listed as the incorporator of API.[8] Regarding the corporate ledger of API, Mr. Fahrendorf previously testified that he created the form "Excel Spreadsheet", but the Debtor made the entries reflecting the shareholder as Jamie Schindler 80%, Daren Daley 10%, and Patrick Daly 10%.[9]

17.     During the Trial, the Court also heard testimony from Joey Friedman ("Mr. Friedman"). Mr. Friedman testified that he is a Certified Public Accountant.[10] He also testified that he holds the accredited business valuator designation from AICPA.[11] Mr. Friedman further testified that he holds an undergraduate degree from the University of Florida[12] and a master of account degree from Florida Atlantic University.[13]

---

[4] *See* PL Ex. 57, pg. 62:12 and 77:8; Trans. of Trial, Vol. I; pg. 18:1-12.
[5] *See* PL Ex. 57, Page 63:5*;* Trans. of Trial, Vol. I; pg. 18:13.
[6] Trans. of Trial Vol. I, pg. 34:17-20; PL Ex. 57, Page 68:9, 69:19; Trans. of Trial, Vol. I; pg. 42: 11.
[7] Trans. of Trial Vol. I, pg. 51:22, *See also* PL Ex. 57, Page 85:7. Trans. of Trial, Vol. I; pg. 34:17 and Trans. of Trial, Vol. I; pg. 42:19.
[8] PL Ex. 57, Page 85:19
[9] PL Ex. 57 Page 85:19
[10] *See* Trans. of Trial Vol. IV, pg. 600:7-12
[11] *See* Trans. of Trial Vol IV, pg. 600:13-14
[12] *See* Trans. of Trial Vol. IV, pg. 603:24-25
[13] *See* Trans. of Trial Vol. IV, pg. 604:7-12

18.     Mr. Friedman submitted an expert report which was admitted as Plaintiff's Exhibit 41 (the "Friedman Report").[14] Mr. Friedman was tendered to the Court as an expert in all areas and issues set forth in the Friedman Report, including business valuation calculations and Appendices D and E.[15]

19.     On cross examination, Mr. Friedman acknowledges that: (i) he did not calculate the value of API as of the Petition Date;[16] (ii) he assumed for purposes for his testimony and report that Mr. and Mrs. Daly owned 87.5% of API, but did not express any opinion on that fact;[17](iii) that he followed counsel's direction to reach the number of $4,051,277.41 reflected in the proof of claim;[18] (iv) that for the value of API (used in the proof of claim number) he used the 2017 value notwithstanding the fact that API's value declined from 2017 through 2021;[19] (v) the "re-forecasted" valuation did not actually value API, rather it averaged API's gross revenue and then used the average of other companies from a database to calculate the various margins;[20] (vi)  that he relied extensively[21] on "What its worth, Valuing Paving Contractor Companies" (DF Ex. 210), but did not perform the cost approach even though the booklet (DF Ex. 210) has an entire chapter suggesting it is the best method to value a company like API;[22] (vii) he did not know how many contracts API had at the time of the valuations;[23] (viii) his analysis does not have the backlog of

---

[14] Both Mr. and Mrs. Daly testified that the sole measure of any damages was Mr. Friedman's report. *See* DF Ex. 217 (answer to questions 5 and 6); *see also* Trans. of Trial Vol. III, pg. 589:4-25.
[15] *See* Trans. of Trial Vol. IV, pg. 622:13-18.
[16] *See* Trans. of Trial Vol. IV, pg. 720:8-16.
[17] *See* Trans. of Trial Vol. IV, pg. 721:17-22.
[18] *See* Trans. of Trial Vol. IV, pg. 723:2-724:12.
[19] *See* Trans. of Trial Vol. IV, pg. 724:18-21.
[20] *See* Trans. of Trial Vol. IV, pg. 741:14-742:3; 745:6-18.
[21] *See* Trans. of Trial Vol. IV, pg. 745:25-746:15.
[22] *See* Trans. of Trial Vol. IV, pg. 747:9-756:3; 752:19-753:7.
[23] *See* Trans. of Trial Vol. IV, pg. 747:1-3.

work on existing contracts;[24] (ix) he did not look at the equipment leases that API had;[25] (x) he gave inconsistent testimony regarding his understanding of what Daren Daly does at API;[26] (xi) he did not consider Daren Daly a "key man" for purposes of valuing API;[27] (xii) that 85% of the sales used by Friedman in his report as comparable sales were asset sales not going concern sales;[28] (xiii) he did not give any weight to the valuation of API based on seller's discretionary earnings;[29] (xiv) he did not give any weight to the capitalization of benefits valuation of API;[30] (xv) he used the two highest numbers for the valuation of API and ignored the lower seller discretionary earning ($781,465) and the capitalization of benefits ($1,065,627) when calculating the value of API;[31] (xvi) he assumed reasonable compensation for Daren Daly to be $100,000.00 per year from a Glassdoor report (DF Ex. 212) for paving operator, not a manager or owner of a paving company;[32] (xvii) he did not know how much of Daren Daly's time he devotes to running All Paving Inc.;[33] (xviii) he incorrectly classified the $233,354.01 wire to Ameris Bank on the "Disgorgement" (Exhibit 41; Appendix E) as non-business expense, when in fact it was payment to settle a lawsuit brought by Ameris Bank against API;[34] (xiv) he incorrectly classified the $38,541.78 payment in connection with a garnishment case against API as a non-business expense.[35]

     20.    The Court also heard testimony from the Plaintiffs on direct and cross examination.

---

[24] *See* Trans. of Trial Vol. IV, pg. 747:21-23.
[25] *See* Trans. of Trial Vol. IV, pg. 752:16-18.
[26] *See* Trans. of Trial Vol. IV, pg. 759:15-760:7.
[27] *See* Trans. of Trial Vol. IV, pg. 758:19-759:14.
[28] *See* Trans. of Trial Vol. IV, pg. 767:20-21.
[29] *See* Trans. of Trial Vol. V, pg. 813:25-814:6
[30] *See* Trans. of Trial Vol. V, pg. 818:4-14.
[31] *See* Trans. of Trial Vol. V, pg. 818:4-14; 821:3-7.
[32] *See* Trans. of Trial Vol. IV, pg. 785:1-787:19
[33] *See* Trans. of Trial Vol. V, pg. 847:12-23.
[34] *See* Trans. of Trial Vol. V, pg. 848:4-864:8; *see also* DF Exs. 214 and 215.
[35] *See* Trans. of Trial Vol. V, pg. 866:2-868:3; *see also* DF Exs. 216.

21.     Plaintiff Patrick Daly ("Mr. Daly") testified that the date of original issue of shares in API was September 18, 2015, which coincides with the date he testified to having went to open the first API bank account with the Debtor and Mrs. Daly.[36]  Mr. Daly testified that the record of the original API share issuance is, as reflected in Plaintiff's Exhibit 33, 75% Elizabeth Daly, 12.5% Patrick Daly, and 12.5% Daren Daly.[37] On cross examination when pressed for the document or record of his authority to make and original issue of shares, Mr. Daly testified that the ledger he was relying on was created in 2020 in response to a state court filing by the Debtor.[38]

22.     On further cross examination, Mr. Daly referred to the original stock split between the Plaintiffs and the Debtor being 85% to the Plaintiffs and 15% to the Debtor.[39] Mr. Daly further testified on cross examination that he and the Debtor reached a verbal agreement in January of 2017 under which Mr. Daly would retain 65% of the ownership interests in API and the Debtor would retain 35%.[40] Mr. Daly testified that he later rescinded the agreement after the Debtor asserted the 65/35 split would apply to profits only.[41] Regarding his position within API, Mr. Daly testified that he obtained corporate authority from the Debtor who directed submissions on Sunbiz designating him as an officer.[42] Mr. Daly testified that he was not appointed a director of API prior to the dispute with the Debtor and there is no document reflecting his authority as a director to issue shares in API.[43] Mr. Daly testified that his ownership claim in API derives from an

---

[36] *See* Trans. of Trial Vol. I, pg. 232:8.
[37] *See* Trans. of Trial Vol. II, pg. 231:15-25 and 232:1-5.
[38] *See* Trans. of Trial Vol II, Pg. 252: 1-11.
[39] *See* Trans of Trial Vol. II, pg. 235:19-25 and 236:1.
[40] *See* Trans. of Trial Vol. II, pg. 244:4-25, and 245:1-25, 246:1-
[41] *See* Trans. of Trial Vol. II, pg. 246:9-25, 247:1-25, 248: -1-6, 305:14-25 and 306:1-25.
[42] *See* Trans. of Trial Vol. II, pg. 251:21-25, 252:1-25, 253:1-25, 254:1-25.
[43] *See* Trans. of Trial Vol. II, pg. 255:1-25, 256:1-2.

undocumented board of directors meeting at BankUnited on September 18, 2015 and related documents.[44]

23.    Plaintiff Elizabeth Daly ("Mrs. Daly") testified that with respect to the ownership percentages in API she and Mr. Daly gave 15% to the Debtor in 2015, but acknowledged there are no documents reflecting this purported transfer.[45] Mrs. Daly further testified that there were no documents reflecting the purported retention of an 85% interest in API by the Plaintiffs.[46] Regarding the funds used to start API, Mrs. Daly initially testified that the funds came from a percentage that would otherwise have been due to APS, but acknowledged her prior testimony confirming the initial funds to start API came from jobs secured by the Debtor.[47]

24.    The Court also heard testimony from the Debtor on direct and cross examination. Regarding the intellectual property associated with the Company, the Debtor testified that both API and APS used the brand name "All Paving."[48] The Debtor testified that both companies also shared a phone number and website for business development.[49] Regarding the domain name "allpaving.com" associated with the website, the Debtor testified that he purchased the domain name using his personal funds and a loan from his brother Keith Daly.[50] The Debtor also presented evidence of the payments to the previous owner of the domain name being made from personal accounts associated with the Debtor, his fiancé Jamie Schindler, and Keith Daly.[51]

---

[44] *See* Trans. of Trial Vol. III, pg. 484:11-25; 491:5-25; 494:6-25; 495:1-22. *See also* DF Ex. 199 pg. 78:7, 80:7-17.

[45] *See* Trans. of Trial Vol. VI, pg. 1119:3-12.
[46] *See* Trans. of Trial Vol. VI, pg. 1119:19-22.
[47] *See* Trans. of Trial Vol VI, pg. 1173:3-18 and 1175:16-25, 1176:1-12; *See also* DF Ex. 103 pg. 74.
[48]  *See* Trans. of Trial Vol. IX, pg. 1367:9.
[49] See Trans. of Trial Vol. IX, pg. 1347-1348 and 1384:19.
[50] See Trans. of Trial Vol VIII; pg. 1444: 3-9.
[51]  See Trans. of Trial Vol VIII; pg. 1444: 13-25 and pg. 1445: 1-25

25.     Keith Daly, the Plaintiffs' son and brother of the Debtor, testified that he did in fact loan the funds to the Debtor to help him purchase the domain name, but nevertheless believed the domain name purchase to be for the benefit of the Plaintiffs.[52]

26.     Mr. Daly testified that he did not authorize the Debtor to purchase the domain name. [53] He testified that the Debtor presented the offer to purchase the domain name to him, but he declined due to limited resources.[54] Mr. Daly testified that the funds the Debtor paid for domain name were eventually reimbursed. In support of this testimony, Mr. Daly presented a summary exhibit reflecting purported reimbursements to the Debtor.[55] The purportedly supporting documents did not reference the domain name purchase and when ask to clarify the association of the line items of purported reimbursements to the domain name purchase or reimbursement, Mr. Daly could not.[56]

27.     At the Trial, the Court also heard testimony from witness Jamie Schindler. Ms. Schindler, the Debtor's fiancé, testified that she brokered an agreement between Mr. Daly and the Debtor regarding the complete split of API (going to the Debtor) and All Paving and Sealcoating LLC going to Mr. Daly.[57] Ms. Schindler testified that at the time of the Separation Agreement in March of 2017, there was no need to include transfer of ownership because Mr. Daly had stated he "want[s] nothing to do with it, no part of All Paving, Inc.  I want nothing to do with Daren Daly, and that was that."[58] She further testified that "[w]e came to an agreement.  Everyone went their separate ways in April, everybody had the understanding that we're done, the agreement has been

---

[52] See Trans. of Trial Vol V; pg. 962: 19-25 and pg. 963: 1-10
[53] *See* Trans. of Trial Vol III; pg. 560: 13-18.
[54]  *See* Trans. of Trial Vol III; pg. 565: 8-25 and pg. 566:1-9.
[55] *See* Trans. of Trial Vol III; pg. 567: 10-25; pg. 568: 1-25; and pg. 569:1-10.
[56] *See* Trans. Of Trial Vol. III; pg. 574: 11-23 and pg. 575:2-9.
[57] *See* Trans. of Trial Vol IX; pg. 1742;16-25.
[58] *See* Trans. of Trial Vol IX; pg. 1751;1-5.

made…"[59] She further testified that at the meeting on July 11, 2017, the Debtor had performed everything under the Separation Agreement and only Mr. and Mrs. Daly had not preformed some of their obligations.[60] She further testified that the Debtor, after the Separation Agreement in March of 2017, "moved forward as the hundred percent owner of All Paving Inc."[61] Ms. Schindler gave extensive testimony about certain text messages she had with the Plaintiffs in 2017 that corroborate the Debtor's facts about ownership of API, the split with his parents, and ownership of the domain name allpaving.com.[62]

28.    Both the Debtor and the Plaintiffs submitted exhibits and registers for the Court's consideration at the Trial. No objections were raised to the admissibility of the Debtor's exhibits. At the Trial, the Court ruled on various objections to exhibits proposed for admission by the Plaintiffs as reflected in the record. The final exhibits registers reflecting admitted and rejected exhibits were filed on the docket in the Adversary Proceeding.

29.    The Court, having heard the testimony of the Debtor's and Plaintiffs' witnesses on direct examination, cross examination, and re-direct examination (where applicable); having reviewed the exhibits introduced by the parties and admitted into evidence; and having reviewed the Claim Objection, the Adversary Complaint, the Answer, and the Record in this case, makes the following findings of fact and conclusions of law.[63]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    JURISDICTION

---

[59] *See* Trans. of Trial Vol IX; pg. 1757;9-11.
[60] *See* Trans. of Trial Vol IX; pg. 1766;10-22.
[61] See Trans. of Trial Vol IX; pg. 1768:8-12.
[62] See Trans. of Trial Vol IX; pg. 1770:14-1795:8; *See also* DF Ex 141.
[63] Findings of fact designated as conclusions of law shall be construed as findings of fact, and conclusions of law designated as findings of fact shall be construed as conclusions of law.

The Court has jurisdiction over proceedings related to the Objection and Adversary Complaint pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. No party challenged jurisdiction or venue.

## II.    STATUTORY AUTHORITIES

The statutory authorities which govern the relief requested by the Debtor in the Objection are 11 U.S.C. §§ 501 and 502, Fed. R. Bankr. P. 3001, 3007, and 3008. Section 502 of the Bankruptcy Code provides in pertinent part that:

> (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.
> (b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

11 U.S.C. §§ 502 (a) – (b)(1).

The statutory authority which governs ownership of a Florida corporation is Chapter 607 of the Florida Statutes (the "Florida Business Corporations Act").

The statutory authorities which govern the relief requested by the Plaintiffs in the Adversary Complaint are 11 U.S.C. § 523 and Fed. R. Bankr. P. 4007. Section 523 of the Bankruptcy Code provides in pertinent part:

> (a)　　A discharge under section 727, 1141, 11921 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> 　　…
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> 　　…
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11. U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).

## III.　　BURDEN OF PROOF

As to the proof of claim asserted by the Plaintiffs, the Debtor has the burden of producing evidence to negate the prima facia validity of the filed claim. In support of his Claim Objection, to the validity of the claim, the Debtor must produce "sufficient evidence that would discredit at least one of the allegations essential to the claim's legal sufficiency." *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011). Once the Debtor offers evidence refuting the allegations in the proof of claim and the presumption is overcome, the burden to demonstrate an entitlement to payment on the claim shifts back to the Plaintiffs. *In re Adam,* Case No. 22-10140-MAM, 2022 WL 4451814 (Bankr. S.D. Fla. Sept. 23, 2022) (citing *In re Dorway*, No. 07-21140-AJC, 2008 WL 5111882, at *2 (Bankr. S.D. Fla. July 14, 2008)). The Plaintiffs have the ultimate burden of proving the validity of their claim by a preponderance of the evidence. *In re South Motor Co, of Dade County*, 161 B.R. 532, 547 (Bankr. S.D. Fla. 1993).

Exceptions to discharge are to be strictly and narrowly construed in favor of the Debtor. *Gleason v. Thaw*, 236 U.S. 558, 35 S. Ct. 287, 59 L.Ed. 717 (1915), *In re Lowinger*, 19 B.R. 853 (Bankr. S.D. Fla. 1982). In challenging the dischargeability of a debt, the creditor bears the burden of proof. *In re Robertos, Inc*., 18 B.R. 551 (Bankr. S.D. Fla. 1982), *In re Ashley*, 5 B.R. 262 (Bankr. E.D. Tenn. 1980), *Second National Bank of Tampa v. Fox*, 17 B.R. 300 (Bankr. M.D. Fla. 1982). Further, the creditor must establish each element of its claim of nondischargeability by clear and convincing evidence. *Matter of Albritton*, 17 B.R. 555 (Bankr. M.D. Fla. 1982).

## IV.    LEGAL DISCUSSION

### A.    <u>The Formation and Initial Ownership Interests in API</u>

The threshold issue in this matter is whether, Patrick and Elizabeth Daly have an ownership interest in All Paving, Inc. (the "Company" or "API"). *See Order on Motion to Dismiss* at pg. 2. The parties stipulated that API is a corporation formed under the laws of the state of Florida in 2013.[64]

The Florida Business Corporation Act, Chapter 607, Florida Statutes, provides that only an incorporator of a Florida Business Corporation whose articles have not named directors can appoint directors, who then have the exclusive power and discretion to issue stock. It is undisputed that the Debtor was the sole incorporator of All Paving, Inc. *See* Fla. Stat.§ 607.0205.[65] The Debtor

---

[64] *See* Trans. of Trial, Vol. I; pg. 22:9.

[65] *607.0205    Organizational meeting of directors.—*
    (1)    After incorporation:
    (a)    If initial directors are named in the articles of incorporation, the initial directors shall hold an organizational meeting, at the call of a majority of the directors, to complete the organization of the corporation by appointing officers, adopting bylaws, and carrying on any other business brought before the meeting;
    (b)    If initial directors are not named in the articles, *the incorporators shall hold an organizational meeting at the call of a majority of the incorporators:*
    1.    To elect directors and complete the organization of the corporation; or
    2.    To elect a board of directors who shall complete the organization of the corporation.

testified and presented corporate records indicating he was the sole incorporator of the Company.[66] The Plaintiffs' witness, Mr. Fahrendorf, also testified that the Debtor was the incorporator for the Company and gave sole direction as to who would be identified as the officers and shareholders of the Company.[67] The Articles of Incorporation for API did not identify any directors.[68] The Debtor testified that at the time API was formed he oversaw the creation of a corporate ledger reflecting the ownership interests on inception as 80% Jamie Schindler, 10% Daren Daly, 10% Patrick Daly.[69] The Debtor also introduced prior testimony from the Plaintiffs indicating they were not aware of the formation of API until years after its formation.[70]

Mrs. Daly's testimony regarding the formation and initial ownership interests in API is particularly noteworthy:

> Q: So you're saying in 2013 that there were no owners in All Paving, Inc.?
>
> A: I never seen anything showing who the owners of All Paving, Inc. was in 2013.
>
> Q: You had no knowledge of the owners of All Paving, Inc.?
>
> A: That is correct.
>
> Q: Okay, and in 2014, did you have any knowledge of the owners of All Paving, Inc.?
>
> A: No, I did not.
>
> Q: Okay. In 2015, did you have any knowledge of the owners of All Paving, Inc.?

(emphasis supplied).

---

[66] *See* Trans. Of Trial Vol. IX; pg. 1577: 12-18
[67] *See* Trans. of Trial Vol I, pgs. 22-23 and pg. 40:5-12.
[68] DF Ex. 56; *see also* Trans. of Trial Vol. II, pg. 253:12-25 and pgs. 254-256.
[69] Trans. of Trial Vol. VII, pgs. 1282:18-25, 1283-1287. *See also*, DF Ex. 57 and 58.
[70] *See* DF Ex. 209 at pgs. 352:17-25, 362:10-25, and 363:10-12.

> A: That's when it was established, when it came off the shelf, who the owners of All Paving, Inc. was when it came into play.

Trans. of Trial Vol IV, pg. 1111:5-19.[71] Mr. Daly has also acknowledged he had no knowledge of

the formation and initial ownership in API by testifying in deposition:

> Q: Okay. So were you aware that this corporation was being set up –
>
> A: No, I was not.
>
> Q: -- at the time?
>
> A: No.
>
> Q: So you had nothing absolutely to do with it, setting it up?
>
> A: Setting it up, correct.
>
> Q: Okay. So you don't know or you certainly didn't know at the time who the owners were when this was created?
>
> A: Correct.

See DF Ex. 209, pg. 352:17-25 and 353:1-3.

The Plaintiffs later became aware of the formation of API and that the APS credit card was

used to pay state registration fees for the formation of API.[72]

**Based on the record in these proceedings, including the foregoing, and considering the testimony and evidence presented at trial, I make the following findings of fact with respect to the formation and initial ownership interests in API:**

1. API was formed in 2013 as a Florida Corporation.

2. The Debtor was the incorporator of API.

---

[71] *See also* DF Ex. 206; pg. 29:14-23.
[72] *See* Trans. Of Trial Vol. II; pg. 224:11-23

3.  In his capacity as incorporator, the Debtor identified the initial officers and shareholders of API.

4.  The initial shareholders of API were Jamie Schindler, Daren Daly, and Patrick Daly.

**B.  The Funding of API and Purported Change in Ownership**

The Plaintiffs' theory of ownership in API, as presented at trial, hinges on their claim that after the entity was formed in 2013 it was a "shelf company" purportedly without ownership interests, until the parties opened the API bank account at BankUnited on September 18, 2015.[73] The Plaintiffs testified that the parties were each present at the BankUnited office and agreed to an ownership share split.[74] Regarding the specific ownership percentages as reflected in BankUnited Beneficial Ownership Statement, none of the parties recognized the numbers reflected as having been provided by them to the bank representative or previously discussed.[75] The Plaintiffs assert that the Debtor made all arrangements for the BankUnited account opening and presume he gave the purported percentage numbers to the bank representative.[76] The Debtor denied the Plaintiffs account of the September 18, 2015 BankUnited meeting. The Debtor testified that Mr. Daly was not present with him and Mrs. Daly at BankUnited on September 18, 2015.[77] The Debtor presented evidence of conflicting accounts from the Plaintiffs as to who was present at the BankUnited September 18, 2015 meeting.[78] The Debtor also presented evidence of the

---

[73] *See* Trans. of Trial Vol VI, pg. 1109: 3-9. *See also,* DF Ex. 104 at pg. 296:8-16; DF Ex. 206 at pgs. 30:20-22, 38:6-19, 40:16-25, 43:1-11; 110:17-25. *See also,* Plaintiff's Supplemental Trial Brief [ECF No. 99 at pg. 4, ¶ 9].

[74] *See* Trans. of Trial Vol VI, pg. 1112:1-13.

[75] *See* Trans. of Trial Vol. VI, pg. 1115:1-25; Trans. of Trial Vol. VII, pg. 1330:3-25.

[76] *See* Trans. of Trial Vol. VII, pg. 1329-1333.

[77] *See* Trans. of Trial Vol. VII, pgs. 1323-1324.

[78] DF Ex. 199 at pg. pg. 78:7, 80:7-17.

Plaintiffs acknowledging in prior testimony that they did not contribute personal funds to start API.[79]

The Debtor maintains he has had full operational and ownership control of the Company since inception.[80] The Debtor testified that the initial funds deposited into the API BankUnited account were proceeds from paving projects originated by him.[81] The Plaintiffs made no representation and presented no evidence of how their purported majority interest was obtained, either (i) at formation by agreement; or (ii) after formation by transfer. Instead, they ask the Court to recognize the BankUnited account opening documents[82] as establishing ownership interests in the Company.[83]

The BankUnited documents relied on by the Plaintiffs to establish their ownership interests are three forms: (i) Corporate Resolution (DF Ex. 93); (ii) Signature Card (DF Ex. 91); and (iii) Beneficial Ownership Certification (DF Ex. 92). None of the parties testified to witnessing the creation of the BankUnited forms or contributing to the substantive content of the forms.[84] Indeed, none of the parties testified to even reading the forms prior to arriving at the BankUnited branch office, on or around September 18, 2015- nearly two years after formation.[85] None of the documents purport to cause a transfer of ownership interests in API. A close review of the documents reveals no signature attestation or acceptance by the Debtor.[86] Indeed, to the extent the Debtor's signature appears on any of the BankUnited documents, it is only as an exemplar or

---

[79] *See* DF Ex. 103, pg. 128. *See also,* Trans. of Trial Vol. VI, pg. 1177:3-16.
[80] *See* Trans. of Trial Vol. VII, pg. 1268:6-25.
[81] *See* Trans. of Trial Vol. VII, pg. 1334:8-25.
[82] *See* DF Ex. 91-92.
[83] *See* Trans. of Trial Vol.  II, pgs. 239-241 and Trans. of Trail Vol VI, Pg. 1109:3-25 and pgs. 1110-1111.
[84] *See* Trans. of Trial Vol. VII, pgs. 1323-1324.
[85] *See* Trans. of Trial Vol. VI, pg. 1115:1-25; Trans. of Trial Vol. VII, pg. 1330:3-25.
[86] *See* DF Ex. 91, 92, and 93. *See also* Trans. of Trial Vol. II, pgs. 239-240.

17

signature sample-with no representation from the Debtor as to the truth or accuracy of information provided in the forms. The only BankUnited document used by the Plaintiffs to support their purported ownership interests in API is the Beneficial Ownership Certification. The Debtor's signature does not appear on the Beneficial Ownership Certification, as a sample or otherwise.[87] The Debtor testified that he did not see the document before litigation between the parties began and was not otherwise aware of the certification and representation of beneficial ownership interests.[88] Mrs. Daly is the signatory to the Beneficial Ownership Certificate, but testified that she had no knowledge of how the purported ownership interests percentages got on the document.[89] Mrs. Daly's testimony about the Bank United Beneficial Ownership Certification is particularly noteworthy:

> Q. Okay, but -- thank you.
>
> Is there anything on this document that you can point me to
>
> that transfers, or gives you an interest in All Paving, Inc.?
>
> A. I don't see it says anything about transfers.
>
> Q. Okay. Is there anything about giving?
>
> A. I don't see anything about giving either.
>
> Q. Is there anything here about changing the ownership of
>
> All Paving, Inc.?
>
> A. No.

Trans. of Trial Vol. VI, pg. 1116:4-14. *See also*, Trans. of Trial Vol. VI, pg. 1117-1119.

---

[87] *See* DF 92.
[88] *See* Trans of Trial Vol. VIII, pg. 1500:16-20.
[89] *See* Trans. of Trial Vol. VI, pg. 1115:2-25, Trans. of Trial Vol. VII, pg. 1250:7-18.

The Plaintiffs also point to other extrinsic evidence to support their claim of ownership.[90] However, during cross examination, Mr. Daly testified that the parties engaged in a business scheme whereby the company name, ownership, and credit references of both entities, API and APS, would be routinely intertwined and misrepresented to third parties in order to obtain financing.[91] The doctrines of unclean hands and *in pari delicto* preclude the Plaintiffs from establishing ownership of API as a result of this scheme.[92] "It is a fundamental principle of equity that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands." *Leila Corp. of St. Pete v. Ossi*, 138 So. 3d 470, 473 (Fla. 2d DCA 2014).

Regardless of how the third-party credit applications and supporting documents were used,[93] they remain insufficient to legally establish a transfer of ownership in the Company. "[T]o perfect the transfer of shares of corporate stock it is necessary to comply with the requirements of Florida's Uniform Commercial Code." *In re Shabanah*, No. 8:18-AP-00595-RCT, 2020 WL 5745939, at *3 (Bankr. M.D. Fla. Jan. 3, 2020). The transfer of an ownership interest in unregistered stock is governed by the Uniform Commercial Code, as enacted in Florida in Chapter 678 of the Florida Statutes, which requires clear "instructions" and "delivery." Fla. Stat. §§ 678.1021(1)(l), 1071(1)(b); *see also Guthartz v. Park Centre West Corp.,* 409 Fed. Appx. 248, 250 (11th Cir. 2010). In *Guthartz*, the United States Court of Appeals for the Eleventh Circuit,

---

[90] *See* PL Exs. 4, 5, 12, 14, 18.
[91] *See* Trans of Trial Vol. II, pgs. 337-345.
[92] *Perry v. Turner*, No. 2D22-119, 2023 WL 4277448, at *2 (Fla. Dist. Ct. App. June 30, 2023)
[93] Interestingly, while relying on the third party credit applications to establish ownership in API, the Plaintiffs at the same time maintain the applications are forgeries and unauthorized. *See* Trans. of Trial Vol. VI, pg. 1163:20-25 and pgs. 1164-1166.

considering the Florida UCC transfer provisions and similar assertion of an ownership interest in uncertificated stock based on extrinsic evidence reasoned—

> regardless of the nature of the ownership of the shares at issue, *the transfer in question does not conform to the requirements of the Uniform Commercial Code for transferring unregistered stock*. See FLA. STAT. §§ 678.1021(1)(l), 1071(1)(b) (requiring that "instructions" directing the transfer of uncertified shares be made to the issuer); FLA. STAT. § 678.3011(2)(a)–(b) (defining "delivery" for uncertified securities by registration with the corporation). *Such requirements exist to prevent situations exactly like the one at bar: he said/she said lawsuits where one party asserts that a transfer was made based on some document not reflected in the corporate records*.

409 Fed. Appx. at 250. (emphasis added). *See also Frierdich v. Mottaz (In re Frierdich)*, 294 F.3d 864, 868-69 (7th Cir. 2002) (applying substantially similar Illinois law, holding that a transfer of an interest in a security requires delivery under the UCC and that failure to record notations in the applicable registers resulted in finding that debtor retained securities); *Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) (holding "an effective transfer of stock requires physical possession in the transferee" and rejecting argument that "no stock certificates had been created, so there was nothing physical to obtain" noting that transferor could have had stock certificates issued in transferee's name to afford possession).

The Plaintiffs reliance on the BankUnited documents to establish transfer a majority interest in API is misplaced. *Compare Zinger v. Gattis,* 382 So. 2d 379 (Fla. 2d DCA 1980). Unlike the situation presented in Zinger, the Debtor did not sign the BankUnited documents, and none reflect an intent to transfer ownership of API.[94] Zinger is also distinguishable where the Plaintiffs'

---

[94] DF Ex. 91, 92, and 93. The Debtor's signature on the BankUnited Corporate Resolution and Signature Card is presented as exemplars and samples rather than attestations or acceptances. The Debtor's signature does not appear at all on the BankUnited Beneficial Ownership Certification. *See also* Trans. of Trial Vol. III, pgs. 508-509.

claim of a purported transfer was not acquiesced to or ratified, but rather disclaimed by the Plaintiffs themselves in tax returns, PPP loan applications, and WBENC Applications and affidavits.[95]

Even if an intention to transfer the majority interest in API was apparent from the BankUnited account opening documents, such intention does not satisfy the requirement of the Uniform Commercial Code or the common law to effectuate such transfer. *Ennis v. Phillips*, 890 So. 2d 313, 314-15 (Fla. 4th DCA 2004); *Sackett v. Shahid*, 722 So. 2d at 276 (discussing the import of formalities in corporate law and concluding that no transfer was effectuated irrespective of any extrinsic evidence of intent in the absence of evidence sufficient under Article 8). While the requirement to satisfy the statute of frauds requirement has been repealed with respect to transfer of corporate interests, *see* Fla. Stat. § 678.1131, the requirement that any purported transfer include clear instructions and delivery remains the standard in Florida and an impediment to the Plaintiffs' claim. Fla. Stat. §§ 678.1021(1)(l), 1071(1)(b).

The Debtor testified that a verbal agreement was made with Jamie Schindler whereby she relinquished her ownership interest in API to him.[96] Jamie Schindler also testified that her ownership interest in API was transferred to the Debtor.[97] The Plaintiffs presented evidence contesting the disclosure and timing of the purported transfer of Jamie Schindler's interests to the Debtor, but did not contest the fact of the transfer. The transfer from Jamie Schindler to the Debtor was documented in 2020 and made effective as of the time of the intention to transfer.[98]

---

[95] *See* ECF No. 152 Notice of Stipulation of Fact and ECF No. 94 at pg. 33.
[96] *See* Trans. of Trial Vol. VII, pg. 1302:14-25 and 1303:1-13.
[97] *See* PL Ex. 54; *See also,* Trans. of Trial Vol. IX at 1700:21-1701:14; 1768:13-1769:2.
[98] *See* Trans. of Trial Vol. II, pgs. 229-231.

**Based on the record in these proceedings, including the foregoing, and considering the testimony and evidence presented at trial, I make the following findings of fact and conclusions of law with respect to the financing of API and purported transfer of ownership:**

1. API was initially funded with proceeds from paving projects originated by the Debtor.

2. The parties engaged in a practice to establish credit for API, whereby the business identity, history, and ownership of APS was supplanted with that of API in third party credit applications.

3. The parties opened a bank account for API at BankUnited in 2015 which allowed each access to API funds.

4. The API BankUnited account opening documents, including the Beneficial Ownership Certification and Corporate Resolution, were not signed by the Debtor, except to provide a sample of his signature.

5. The API BankUnited account opening documents are insufficient to establish a transfer of ownership in API under Florida law.

6. Jamie Schindler transferred her interest in API to the Debtor pre-petition.

7. The Debtor's interest in API is property of the Debtor's bankruptcy estate.

**C.  The API and APS Business Operations and Separation Agreement**

It was undisputed by the parties that a business relationship existed between API and APS.[99] During the relationship, the companies shared the brand identity and name "All Paving."[100] The Debtor purchased the Allpaving.com domain name and used it for a common website which serviced API and APS.[101] The companies also shared use of office space, staff, telephone number,

---

[99] *See* Trans. of Trial Vol. 263-268; Trans. of Trial Vol. 1352-1354.
[100] *See* PL Ex. 7.
[101] *See* Trans. of Trial Vol. VI, pg. 1346-1347.

domain name, and back-office support software.

During the course of the business relationship intercompany debts arose between API and APS which were routinely reconciled and satisfied.[102] A dispute between the parties arose in late 2016 and continued into early 2017.[103] The dispute purportedly included disruptions to the businesses and threats of violence.[104] In resolution of the dispute, the parties negotiated terms to discontinue the business relationship between API and APS, reconcile debts between the entities, and split and disburse funds from the API BankUnited account.[105] The parties also negotiated the terms of separating and resolving their personal business relationship.[106]

On March 23, 2017, Jamie Schinder sent Mr. Daly a written document reflecting terms negotiated for the business separation between the Debtor and Mr. Daly.[107]

On April 14, 2017, consistent with the terms presented by Jaime Schindler to Mr. Daly, the parties issued a joint letter to BankUnited, directing the release of funds in the API account as follows:

- Subtotal to LLC BB&T: $313,659.35

- Subtotal to Patrick Daly: $59,800.00

- Balance Forward After Distributions to Suntrust

See DF Ex. 100; Trans. of Trial Vol. III, pg. 457-458; Trans. of Trial Vol. VI, pg. 1201:14-25 and

---

[102] *See* Trans. of Trial Vol. II, pg. 361-362. Interestingly, despite asserting majority ownership of both entities, Mr. Daly described the reconciliation process as being necessary because as so intercompany debts, the Debtor (on behalf of API) would "dispute, and not want to pay." Trans of Trial Vol. II, pg. 361:18-25.
[103] *See* Trans. of Trial Vol. II, pg. 273:6-25.
[104] Trans. of Trial Vol. II, pg. 310:17-25.
[105] DF Ex. 100; *see also,* Trans. of Trial Vol. II, pg. 381:12-25.
[106] Trans. of Trial Vol. I, pg. 162-166.
[107] DF Ex. 143; *see also* Trans. of Trial Vol. II, pg. 275:18-25, 281-285; Trans. of Trial Vol. IX, pg. 1742:16-25.

1205-1206.

Regarding the April 14, 2017, letter to BankUnited, Mr. Daly testified about his objective noting—

> Q. Objective?
>
> THE COURT: Objective?
>
> THE WITNESS: Thank you, sir.
>
> THE COURT: You're welcome.
>
> THE WITNESS: -- was not to -- LLC was hemorrhaging at the time.
>
> BY MS. HAYES:
>
> Q. What does that mean, I'm sorry?
>
> A. It means that we were paying a bunch of expenses out of LLC. There is $313,000, which was owed for a long period of time, that needed to go back into the business to keep it viable. So at that point in time I had -- ***I was wore out and exhausted, arguing and fighting with Daren. I probably would have signed anything just to put this thing behind us because it was an influx of cash, and I wanted to make sure that we didn't sink both entities because of his stupidity versus -- and I was trying to keep this entity afloat.***

Trans. of Trial Vol. II, pg. 397:1-18 (emphasis added).

Thereafter the Debtor took action to replace the Plaintiffs as personal guarantors on API related debts[108] and regained exclusive control of the Allpaving.com domain name. During the same period, the Plaintiffs relocated from the API leased facilities, leaving API related files and equipment. The Plaintiffs also ceased to monitor API projects, permits, or operations.[109] Mr. Daly also testified that he did not provide notice to the lenders, employees, vendors, or project related

---

[108] Trans. of Trial Vol. VII, pgs. 1314-1316.
[109] Trans. of Trial Vol. I, pgs. 165-166; Trans. of Trial Vol. II, pgs. 332-335,

property owners that the Debtor was purportedly terminated from API.[110]

The Debtor and Jamie Schindler testified that all of the Debtor's obligations under the agreement were satisfied.[111] The Debtor testified that he complied with the terms of the agreement in order for the parties to "go their separate ways" and for him to acquire Mr. Daly's 10 percent interests in API.[112] Mr. Daly acknowledged receipt of the document and satisfaction of the terms by the Debtor, but maintains no agreement was reached.[113]

Consistent with the terms of the March 23, 2017 document, the Debtor resumed dominion and control over APIs intellectual property, including the Allpaving.com domain name. Nevertheless, without statutory or decisional authority, the Plaintiffs seek a declaratory judgment that they are the owners of the AllPaving.com domain name, trademark and logo. This concept of "dominion and control" as the hallmark of ownership routinely has been applied by the courts to determine ownership of property. *United States v. Hovind*, No. 3:06cr83/MCR, 2009 WL 2369340 (N.D. Fla. 2009). As stated in *Hovind*,

> Courts in this circuit will look to who has dominion and control over Florida property in deciding true ownership. *See A Single Family Residence Located at 900 Rio Vista Blvd.*, 803 F.2d at 630. Florida case law is consistent. *See, e.g., Wilson Cypress Co. v. Logan*, 120 Fla. 124, 162 So. 489, 491 (Fla.1935) (exercising dominion over property is inconsistent with true owner's rights); *Wilson v. Burke*, 53 So.2d 319, 320–21 (Fla.1951) (holding that ownership of a car depends on dominion and control over it); *Broward County v. Eller Drive Ltd. Partnership*, 939 So.2d 130, 133 (Fla. 4th DCA 2006) (finding that dominion over a building constitutes ownership for tax purposes).

2009 WL 2369340 *4.

---

[110] *See* Trans. of Trial Vol. VII, pgs. 420-422 and 424-426.
[111] Trans. of Trial Vol. IX, pg. 1720:20-25 and 1721:1-6.
[112] See Trans. of Trial Vol. VII, pg. 1303:17-25 and 1304:1-23; Trans. of Trial Vol. IX, pg. 1720 and 1721:1-3.
[113] See Trans. of Trial Vol. II, pg. 283:22-25.

Because the Debtor purchased the Allpaving.com domain name and commissioned the creation of the intellectual property (trademark and logo), there is no basis to grant the Plaintiffs ownership of such intellectual property.[114]

Moreover, "[u]nder Florida law, '[i]t is well established that a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract ...'" *Barnes v. Diamond Aircraft Indus., Inc.*, 499 F.Supp.2d 1311, 1316 (S.D. Fla. 2007) (quoting *Greater N.Y. Corp. v. Cenvill Miami Beach Corp*., 620 So.2d 1068, 1070 (Fla. 3d DCA 1993)).

"An unsigned contract may be binding and enforceable where the parties perform under the contract, because assent may be shown by the parties' conduct." *Siegel v. Newagecities.com, Inc.*, 920 So. 2d 1274, 1276 (Fla. 4th DCA 2006); *see also Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500 (Fla. 4th DCA 2003); *Integrated Health Servs. of Green Briar, Inc. v. Lopez–Silvero*, 827 So.2d 338 (Fla. 3d DCA 2002); *Sosa v. Shearform Mfg*., 784 So.2d 609 (Fla. 5th DCA 2001) (parties may be bound to the provisions of an unsigned contract if they acted as though the provisions of the contract were in force). Where in this case, one party fully performs there is no applicable statute of frauds requiring the agreement be reduced to writing. *Fresh Capital Financial Services, Inc., v. Bridgeport Capital Services, Inc.,* 891 So.2d 1142, 1144 (Fla. 4th DCA 2005) (full performance by one party to an oral contract removes the contract from the statute of frauds)

The evidence presented at trial indicates the Debtor and Mr. Daly (through Jamie Schindler's negotiations) had a meeting of the minds with respect to the essential elements of the business divorce agreement and separation of the parties and their interests.[115] Performance under

---

[114] *See* Trans. of Trial Vol. VII, pgs. 1343-1347.
[115] DF Ex. 143; *see also*, Trans. of Trial Vol. IX, pg. 1742:16-25.

the business divorce agreement was begun and substantial payment was made to Mr. Daly and APS before his breach.[116] Following the business divorce agreement, the Plaintiffs and APS abandoned the office space shared with the Debtor and API, and abandoned the "All Paving" fictitious name registration. The Plaintiffs also abandoned work on API projects after the business divorce agreement and left behind records, files and, equipment associated with API.[117]

**Based on the record in these proceedings, including the foregoing, and considering the testimony and evidence presented at trial, I make the following findings of fact and conclusions of law with respect to the purported business separation agreement, reconciliation of intercompany debts, and ownership of All Paving related intellectual property.**

1.      The Debtor and Mr. Daly entered into an agreement to sever their business relationship in April 2017 (the "Business Divorce Agreement").

2.      Pursuant to the terms of the Business Divorce Agreement, the parties authorized the distribution of funds held in the API BankUnited Accounts and the subsequent closing of the API BankUnited Accounts.

3.      The funds held in the API BankUnited Accounts were disbursed to (1) APS as reconciliation and satisfaction of intercompany debts; (2) Mr. Daly as payment for services rendered; and (3) the API account opened by the Debtor at Suntrust Bank.

4.      Patrick Daly surrendered his interest in API and related intellectual property pursuant to the Business Divorce Agreement.

5.      Elizabeth Daly never held an ownership interest in API.

---

[116] DF Ex. 100; *see also* Trans. of Trial Vol. IX, pg. 1720:21-25 and 1721:1-3.
[117] *See* Trans. of Trial Vol. III, pg. 538:17-25 and 539-541.

6.      The Plaintiffs abandoned API facilities, projects, and property after the Business Divorce Agreement.

## D. __The Plaintiffs' Ancillary Claims__

### (1)  Conversion and Related Aiding and Abetting and Conspiracy Claims

"Under Florida law, a plaintiff in an action for conversion or civil theft must establish," among other elements, "possession or an immediate right to possession of the converted property at the time of the conversion." *U.S. v. Bailey*, 419 F.3d 1208, 1212 (11th Cir. 2005).

**Based on the record in these proceedings, including the foregoing, and considering the testimony and evidence presented at trial, I make the following findings of fact and conclusions of law with respect to the conversion, aiding and abetting, and conspiracy claim:**

1.      The Plaintiffs do not have possession or a right to possession of the Company or the majority interest therein.

2.      The Plaintiffs do not have possession or a right to possession of the API intellectual property, including the domain name.

3.      The Plaintiffs put forth no evidence to support their claim that the Debtor aided and abetted an effort to convert the majority interest in API.

4.      The Plaintiffs put forth no evidence of a conspiracy to convert the majority interests in API or its intellectual property.

5.      Accordingly, the Plaintiffs' conversion and related aiding and abetting and conspiracy claims fail.

### (2) Breach of Fiduciary Duty and Related Aiding and Abetting Claim

A claim for breach of fiduciary duty requires a showing of the existence of a fiduciary duty, and the breach of that duty that is the proximate cause of the plaintiff's damages. *Gracey v. Eaker*,

28

837 So. 2d 348, 353 (Fla. 2002).  "Officers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of authority or neglect of duty." *Flight Equip. & Eng'g Corp. v. Shelton*, 103 So. 2d 615, 627 (Fla. 1958).  There are two fundamental forms of fiduciary duties: the duty of care and the duty of loyalty. *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 32 (Del. Ch. 2014).

**Based on the record in these proceedings, including the foregoing, and considering the testimony and evidence presented at trial, I make the following findings of fact and conclusions of law with respect to the breach of fiduciary duty and related aiding and abetting claim:**

1.      The Debtor was an officer and/or director of API at all times relevant to the claims and defenses asserted in these proceedings.

2.      Actions taken by the Debtor in his capacity as an officer of API, including as it relates to business ventures, operations, expenses, and expenditures are shielded by the business judgment rule.

3.      The business relationship between the Debtor and the Plaintiffs and API and APS was severed as of April 2017.

4.      The Debtor had no fiduciary duty to either of the Plaintiffs after the business relationships were severed.

5.      No damage or loss has resulted to the Plaintiffs because of the breach of a duty owed by the Debtor, and no evidence of any such damage was presented by the Plaintiffs.

6.       Accordingly, the Plaintiffs' breach of fiduciary duty and aiding and abetting claims.

### E. The Debtor's Objection to Proof of Claim

For the reasons discussed above, the Court determines that the Plaintiffs did not establish themselves to be the majority owners of API, did not prove their claims for conversion and breach of fiduciary duty, and also did not prove their claims for aiding and abetting or conspiracy. Consequently, the Plaintiff's Proof of Claim Number 13-1 is disallowed.

Even if the Plaintiff's Proof of Claim Number 13-1 was not disallowed for the reasons above, the evidence presented at Trial would be insufficient to support the claim. The Plaintiffs filed Proof of Claim #13-1 (the "POC") with the purported claim amount of $4,051,277.41.[118] However, the POC was not introduced into evidence during the Trial.

Both Mr. and Mrs. Daly testified that the sole measure of the damages to support the sum of $4,051,277.41, listed in their Proof of Claim is the expert report of Mr. Friedman.[119] This sum is comprised of their claim for 87.5% of the ownership of API and 87.5% of the amounts that Friedman- incorrectly claimed were not appropriate business expenses.[120]

Mr. Friedman was asked to value All Paving Inc., as of certain points in time.[121] However, he did not value API as of the petition date. Moreover, as noted above, there are material inaccuracies with his report. Indeed, Mr. Friedman's report and the claim assert in the Proof of Claim is based entirely on the notion that Patrick and Elizabeth Daly are the owners of 87.5% of API. As noted above they are not. Moreover, the alleged disgorgement claims as reflected in PL Ex. 41-Appendix D, are simply unsubstantiated. The vast majority of the amount relates to the Debtor's pay as the person who generated all of the business, took the risk of the company since the Separation Agreement by guaranteeing equipment, and is otherwise acting as the owner and

---

[118] The Proof of Claim [Claim 13-1] itself was never submitted by the Plaintiffs as evidence in connection with their case.
[119] *See* DF Ex. 217 (answer to questions 5 and 6); *see also* Trans. of Trial Vol. III, pg. 589:4-25.
[120] FL Ex. 41.
[121] Trans. of Trial. Vol. IV 719:19-720

chief executive officer of API. To suggest that he should be compensated the same as a person who drives a paver is wrong. There was no evidence that the Debtor's compensation was excessive. Additionally, the $176,810 alleged stolen funds relates to an accounting entry for the checks that Mr. Daly diverted to the PNC account.[122] The analysis also includes $233,354.01 that was paid to AmerisBank to settle a lawsuit brought against API. Mr. Friedman also included $38,541.78 for a garnishment action that was against API. The Debtor explained that the use of cash to pay vendors (not employees) is and was common for API.[123]

The Friedman Report (the only evidence presented by the Plaintiffs as to damages in support of their claim) is not credible. Mr. Friedman: (i) failed to value API as of the Petition Date; (ii) he ignored the valuations of API that were lower than the ones he chose to use; (iii) he did not perform an asset based valuation which his own sources suggested would be the best method to value API; (iv) he did not understand the role of the Debtor with API and failed to properly account for it; (v) he included business expenses in the alleged disgorgement analysis; (vi) his claim of excess compensation is inappropriate because it is based upon a Glassdoor printout for a paving operator not the owner and chief executive of a paving company.

Accordingly, because Mr. and Mrs. Daly have no interest in API (as noted above) and even if they did, they have failed to carry their burden to establish their damages. The Debtor's objection to the Proof of Claim is sustained and the Proof of Claim is stricken.

## F. The Dischargeability Challenge

The action to determine the dischargeability of a debt is based on §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code. As noted above the Plaintiffs bear the burden to

---

[122] Trans. of Trial. Vol. VIII at 1457:13-1459:2.
[123] Trans. of Trial. Vol. VIII at 1456:2-6.

establish all of the elements for dischargeability. Specifically, the Plaintiffs assert that their claim against the Debtor for conversion, breach of fiduciary duty, aiding and abetting, and conspiracy should be excepted from the Debtor's discharge because of the Debtor's alleged fraud, false pretenses, false representations, or actual fraud, embezzlement, and willful and malicious injury.

Since the Plaintiffs' claim is disallowed, as explained above, the cause of action based on §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6) of the Bankruptcy Code should be dismissed. The Plaintiffs are not the holders of a claim that is subject to a dischargeability action.

Additionally, the Plaintiffs did not prove a cause of action under §§ 523(a)(2)(A),[124]

---

[124]    The Eleventh Circuit Court of Appeals (the "Eleventh Circuit") has made clear that in order to state a claim for fraud under section 523(a)(2)(A) of the Bankruptcy Code, a plaintiff must demonstrate the following elements:

- the debtor made a false statement;
- with the purpose and intention of deceiving the creditor;
- the creditor relied on such false statement;
- the creditor's reliance on the false statement was justifiably founded; and
- the creditor sustained damage as a result of the false statement.

*Fuller v. Johannessen (In re Johannessen),* 76 F.3d 347, 350 (11th Cir. 1996). This exception to dischargeability addresses deceit or artifice rooted "in a specific intent to mislead, trick, or cheat another person or entity," and the intent to deceive may be shown using circumstantial evidence in relation to the totality of a situation. *In re Raccuglia*, 464 B.R. 477, 485 (Bankr. N.D. Ga. 2011). While the Plaintiffs allege the Debtor's representations of his 100% ownership interest are false statements, the evidence presented fails to establish of deception, intention to deceive, reliance, or resulting damages. Moreover, the Plaintiffs presented no evidence where that they s relied on the misrepresentations themselves.

523(a)(4)[125], and 523(a)(6)[126] of the Bankruptcy Code for the same evidentiary reasons that they did not establish their proof of claim. In other words, the Plaintiffs failed to prove that they owned a majority interest in API let alone that the Debtor engaged in an actually fraudulent scheme to take control of API from them. The Plaintiffs failed to prove that the Debtor engaged in any fraudulent or willful or malicious conduct that injured the Plaintiffs. The Plaintiffs further failed to prove that the Debtor embezzled money from API.

## V.    CONCLUSION

The Trial was conducted on the Debtor's Claim Objection to Mr. and Mrs. Daly's POC,

---

[125] The Plaintiffs failed to establish ownership of the property. *In re Case*, 636 B.R. 852, 861 (Bankr. S.D. Fla. 2022) (dismissing a §523(a)(4) claim with prejudice where the plaintiff was unable to demonstrate its ownership of the property that was allegedly embezzled by the Debtor.

Section 523(a)(4) requires that the Defendant commit "fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. 523(a)(4). In order to be actionable, the debtor's fiduciary capacity must exist "prior to the act which created the debt." *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006) (quoting *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993)); *Great Am. Ins. Co. v. Brandt (In re Brandt)*, 594 B.R. 829, 832–33 (Bankr. S.D. Fla. 2019); *Coosemans Miami, Inc. v. Arthur (In re Arthur)*, 589 B.R. 761, 766 (Bankr. S.D. Fla. 2018). The Plaintiffs failed to present evidence that the Debtor was acting in a fiduciary capacity. As such, their 523(a)(4) claim fails.

[126] Section 523(a)(6) of the Bankruptcy Code only applies when a debtor intends the injury caused by his actions. It does not cover a failure to meet a duty of care that leads to injury. *See Boggus, supra,* 479 B.R. 147, 157 (Bankr. N.D. Ga. 2012) (*citing Herndon v. Brock (In re Brock)*, 186 B.R. 293 (Bankr. N.D. Ga. 1995); *Myrick v. Ballard (In re Ballard)*, 186 B.R. 297, 299–301 (Bankr. N.D. Ga. 1994). Moreover, the debt itself must have originated from willful and malicious action and such conduct, when occurring after a debt is created, is not sufficient to render the debt nondischargeable pursuant to this exception. *See Modi v. Virani (In re Virani)*, Case No. 15–61378–WLH, 2016 WL 429787 (Bankr. N.D. Ga. Jan. 29, 2016). The Eleventh Circuit has interpreted "willful" as requiring "'a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another.'" *Hope v. Walker (In re Walker),* 48 F.3d 1161, 1163 (11th Cir.1995) (quoting *Lee v. Ikner (In re Ikner),* 883 F.2d 986, 991 (11th Cir.1989)). It has also interpreted "malicious" as "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Id.* at 1164 (quoting *Ikner,* 883 F.2d at 991). The Plaintiffs put forth no evidence of the Debtor's intent to cause injury. As such, the section 523(a)(6) claim fails.

and also on the Plaintiff's complaint to determine the dischargeability of a debt.

The Plaintiffs' POC should be disallowed in its entirety, because they failed to establish either that the Debtor fraudulently seized control or ownership of API, or that the Debtor breached a fiduciary duty owed to the Plaintiffs.

Further, a judgment should be entered in favor of the Debtor, and against the Plaintiffs, in the adversary proceeding. Since the Plaintiffs' claim was disallowed, the Plaintiffs have no claim in the case that is subject to a dischargeability action or in the alternative that the Plaintiffs have failed to carry their burden to establish the requirements under any of §§ 523(a)(2)(A), 523(a)(4), and 523(a)(6).

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that –

1.    The Objection to Claim Number 13-1 of Patrick and Elizabeth Daly, and by extension All Paving & Sealcoating, LLC, filed by the Debtor, Daren C. Daly, is **SUSTAINED**, and Claim Number 13-1 of Patrick and Elizabeth Daly is **DISALLOWED** and **STRICKEN** in its entirety.

2.    A Final Judgment will be entered in favor of the Debtor, Daren C. Daly, and against the Plaintiffs, Patrick and Elizabeth Daly individually and in their purported capacity a majority shareholders of All Paving, Inc., with respect to all remaining counts in the Amended Complaint to determine the dischargeability of a debt.

3.    A separate Final Judgment will be entered consistent with this Memorandum Opinion.